UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:14-21559-CIV-UNGARO

COLIN BOWE and BRIAN MORGAN,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.                                                                        **CLASS ACTION**

PUBLIC STORAGE, a Maryland
Real Estate Investment Trust,

      Defendant.
_____/

## AMENDED COMPLAINT

Plaintiffs Colin Bowe and Brian Morgan (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, file this Amended Complaint against Defendant Public Storage, a Maryland Real Estate Investment Trust ("Public Storage" or "Defendant"), and allege as follows.

## INTRODUCTION

1.      This is a class action lawsuit filed to redress injuries that Plaintiffs, along with a national class and a Florida Class of consumers, suffered and will continue to suffer as a result of Public Storage's practices relating to its marketing and sale of self-storage insurance policies.

2.      Public Storage requires its customers to maintain insurance for the items they store at its facilities.

3.      Public Storage knows that the purchase of self-storage insurance is generally unnecessary because homeowners, renters, or business insurance covers virtually the same items covered by self-storage insurance.

4.      Nevertheless, Public Storage advises its customers that insurance is required, and its standard form contract states that insurance is required.  It encourages its employees to engage in an upsell by marketing and promoting an insurance product called "Perfect Solutions Storage" ("Perfect Solution").  Public Storage deceptively markets Perfect Solution as an independent self-storage insurance product that was specifically created to cover property stored outside of the customer's home or business at "low, competitive monthly rates."

5.      Public Storage fails to disclose that this insurance program is, in reality, a hidden profit center for itself that kicks back to Public Storage unconscionable profits at the expense of consumers.

6.      This profit center is evidenced by the fact that the only insurance offered by Public Storage is part of a single Master Policy for Public Storage underwritten by New Hampshire Insurance Company.  (*See* **Exhibit 1**, Certificates of Storage Insurance).  There is no underwriting performed for an individual customer's policy.  Thus, there is no correlation between the risk written and the premiums charged.

7.      This, not surprisingly, results in excessive premiums.  For example, for the same price as Perfect Solution's cheapest policy in Florida ($11 per month for $3,000 of coverage), a policy with the company SafeStor offers $4,000 of coverage for only $6 per month.  Public Storage's customers pay an inflated insurance premium because an overwhelming majority of the insurance premium payment is a kickback to Public Storage.

8.      By retaining an overwhelming majority of the premium for itself in the form of an undisclosed kickback, Public Storage is able to generate massive amounts of revenue with huge profit margins.  For example, as disclosed in its 2013 Form 10-K filed with the U.S. Securities and Exchange Commission, Public Storage grossed $84,904,000 from its tenant insurance program in calendar year 2013 alone, with a net profit of $67,837,000.  Public Storage's 10-K acknowledges that the year over year rise in revenue for its insurance program was due in significant part to "an increase in average premium rates," demonstrating that it forces customers into costly and often unnecessary storage insurance policies in order to enrich itself.

9.      Public Storage does not disclose that it is financially motivated to sell storage insurance to as many of its customers as possible.  Instead, just the opposite is true.  Public Storage affirmatively attempts to mask its relationship with the insurance company.  In its standard rental agreements Public Storage states:  "**[CUSTOMER] UNDERSTANDS THAT [PUBLIC STORAGE] WILL NOT INSURE OCCUPANT'S PERSONAL PROPERTY AND THAT [CUSTOMER] IS OBLIGATED UNDER THE TERMS OF THIS LEASE/RENTAL AGREEMENT TO INSURE HIS OWN GOODS.**"

10.      The only relationship between Public Storage and the insurance company that is disclosed is found in an additional standard form addendum to its rental agreement which, in relevant part, states: "I authorize [Public Storage] to conduct the administrative function of receiving premiums to send to the insurance company on my behalf."  Public Storage fails to disclose that it keeps an overwhelming majority of the premium that it purportedly sends to the insurance company in the form of a kickback from the insurance broker and underwriter, which is paid to Public Storage indirectly through its captive reinsurer Public Storage of Hawaii.

11.     In short, Public Storage has engaged in a pattern of unconscionable profiteering, deceit, and self-dealing with regard to the self-storage insurance policies it promotes and sells its customers.

## PARTIES, JURISDICTION, AND VENUE

12.     Plaintiff Colin Bowe is, and at all material times was, a resident and citizen of Miami-Dade County, Florida.  Mr. Bowe purchased an insurance policy from Willis Storage Insurance on May 30, 2012.

13.     Plaintiff Brian Morgan is, and at all material times was, a resident and citizen of Miami-Dade County, Florida.  Plaintiff Morgan purchased an insurance policy from Willis Storage Insurance for the goods he stored in a Public Storage unit in approximately the fourth quarter of 2011 and another insurance policy from Willis Storage Insurance for the goods he stored in a different Public Storage unit on February 14, 2013.

14.     Defendant Public Storage is a Maryland Real Estate Investment Trust, with its principal place of business in California.  It does business regularly throughout the United States, including the state of Florida.

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is an action for a sum exceeding $5,000,000, exclusive of interest and costs, and the Plaintiffs and at least one Class member are citizens of a state different than the Defendant.

16.     This Court has personal jurisdiction over Public Storage because it continuously and systematically operates, conducts, engages in, and carries on business in Florida by renting over twenty million square feet of self-storage space at 250 Florida locations.  Moreover, Public Storage purposefully avails itself of Florida's consumer market through the advertisement,

promotion, and rental of its self-storage space and self-storage insurance policies in Florida. Pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, this Court has personal jurisdiction over Public Storage.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because Mr. Bowe's and Mr. Morgan's causes of action accrued within this judicial district and a substantial part of the events and omissions giving rise to the Plaintiffs' claims occurred here, the Plaintiffs are residents and citizens of this district, Public Storage routinely operates and solicits business in this district, and Public Storage's wrongful acts in the district have impacted the general public of this district, including the Plaintiffs.

## FACTUAL ALLEGATIONS

18.     Public Storage provides self-storage space available for rent to customers at approximately 250 Florida locations and throughout the nation.

19.     Customers are required to execute a standard form rental agreement before Public Storage will rent storage space to them.  In connection with all of its rentals nationwide, Public Storage uses the same form rental agreement.  A copy of Public Storage's standard form rental agreement is attached to this Complaint as **Exhibit 2**.  That agreement requires renters to maintain insurance on the contents of their storage unit.

20.     The Insurance Addendum to the rental agreement states that "the Lease/Rental Agreement requires [the customer] to maintain insurance that covers loss or damage for the personal property" at Public Storage.

21.     Public Storage has a policy of marketing and selling storage insurance to its customers in order to fulfill this requirement.

22.     The self-storage insurance purchased by Plaintiffs was marketed and sold by Public Storage on behalf of Willis Storage Insurance ("Willis") and was underwritten by New Hampshire Insurance Company ("NHIC").   Perfect Solutions Storage Insurance recently replaced Willis as Public Storage's exclusive insurance broker for self-storage insurance, but NHIC continues to underwrite the Master Policy.

23.     Advertisements and marketing materials for Perfect Solutions can be found in every Public Storage location.

24.     Public Storage's employees are trained to aggressively sell insurance to every Public Storage customer who rents self-storage space.  In fact, Public Storage employees have scripted dialogue and talking points to use when they sell self-storage insurance.  Their sales efforts are assisted by Public Storage's policy that it will not rent storage space without proof of insurance.

25.     At the time when Willis was Public Storage's insurance program administrator and broker, Public Storage employees utilized standard form documents to direct customers to a website,  www.willisstorageinsurance.com  (the "Willis Website"), which made numerous references to Public Storage and informed customers that "it's a good policy to get insurance [t]hrough the Willis Storage Insurance Program[.]"

26.     Public Storage employees now utilize standard form documents to direct customers to the website of their current insurance program administrator and broker, www.perfectsolutionstorageinsurance.com, which makes numerous references to Public Storage and informs customers that insurance for their belongings is required when storing goods at a Public Storage facility.

284631.1

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 424  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

27.     For example, Willis offered self-storage insurance at four coverage levels: (1) $2,000 of coverage for $9 a month; (2) $3,000 of coverage for $14 a month; (3) $4,000 of coverage for $19 a month; and (4) $5,000 of coverage for $24 a month.  Perfect Solutions Storage Insurance offers customers in Florida three coverage levels: (1) $3,000 in coverage for $11 per month; (2) $4,000 in coverage for $13 per month; and (3) $5,000 of coverage for $15 per month.

28.     These monthly premiums are significantly higher than self-storage insurance rates available to consumers on the open market (but not available at Public Storage locations).  For example, on the open market, the self-storage insurer SafeStor offers the following policies: (1) $4,000 of coverage for $6 a month; (2) $10,000 of coverage for $18 a month; and (3) $15,000 of coverage for $24 a month.  A copy of SafeStor's published rates is attached as **Exhibit 3**.

29.     Public Storage has a strong incentive to push its customers into high-priced insurance policies, because it derives substantial revenue from the sale of the policies.

30.     Annually, Public Storage derives significant revenue from this program.  The program is an inherently deceptive kickback scheme because Public Storage collects and retains an overwhelming majority of each customer's insurance premium for itself.  NHIC underwrites and then immediately transfers 100% of the risk of the self-storage insurance policies purchased by Public Storage's customers to Public Storage's captive reinsurer, Public Storage of Hawaii.  NHIC, in turn, pays Public Storage of Hawaii 98% of the premiums collected on the self-storage insurance.  Public Storage of Hawaii, after deducting a small administrative fee, pays the overwhelming majority of the premiums it receives to Public Storage.

31.     As Public Storage's most recently filed Form 10-K revealed, in the year ending December 31, 2013, Public Storage recorded $84,904,000 in revenue from its tenant insurance

program.   Likewise, the program in 2012 generated $77,977,000 in revenue and in 2011 it generated $71,348,000 in revenue.

32.     Public Storage's pursuit of profits through its sale of tenant insurance directly correlates to the high premiums that its insurer charges as a result of the kickbacks paid to Public Storage.   In fact, as Public Storage's 2013 Form 10-K states: "[Public Storage] reinsure[s] policies offered through a non-affiliated insurance company . . . . The level of tenant reinsurance revenue is largely dependent upon the level of premiums charged for such insurance and the number of tenants that participate in the insurance program."

33.     Public Storage is incentivized to sell its customers Willis or Perfect Solutions marketed insurance at the highest possible premiums to its customers' financial detriment.   For example, one of Public Storage's direct competitors, U-Haul Storage, offers its customers the option to purchase policies from SafeStor, who as noted above offers better coverage at significantly lower monthly premiums.   Public Storage, however, could not monetize low premiums as effectively, as their 10-K expressly noted that their reinsurance revenues were boosted by higher premiums paid by its customers.

34.     Public Storage's 10-K states that the increase in tenant reinsurance revenues in 2012 and 2013 were due in substantial part to "an increase in average premium rates."

35.     In an inherently deceptive practice, Public Storage does not disclose to its customers that it derives a substantial financial benefit from charging its customers high insurance premiums because of the kickbacks it receives on the premiums paid on those policies. Instead, it attempts to disguise its financial interest by receiving kickbacks from NHIC, Willis, Perfect Solutions Storage Insurance, and other unidentified co-conspirators involved in the self-storage insurance sold to its customers through its captive reinsurer.

36.     For example, the Insurance Addendum misleadingly states that the Public Storage "facility and its employees are not qualified or authorized to evaluate the adequacy of any insurance" the customer may have and that the specific insurance peddled by Public Storage "is not required in order to store" goods at Public Storage's facility.   Yet, immediately below that statement is a pre-printed application for self-storage insurance for NHIC only.  *See* **Exhibit 4**.

37.     Public Storage's standard form contract requires the customer to purchase and maintain insurance, while failing to disclose that Public Storage has a financial incentive, through a secret kickback scheme that returns an overwhelming majority of the customers' premium payment to Public Storage. Indeed, the standard form contract does the opposite of disclosing Public Storage's financial interest, and instead affirmatively states that the company is not "insuring" the customer's personal property.   The contract gives no indication that Public Storage is engaged in a reinsurance kickback scheme or that Public Storage is taking an overwhelming majority of the customers' premium payment in the form of a kickback for its own benefit.

38.     The customer is also required to execute an "Insurance Addendum to Lease/Rental Agreement," which, in relevant part, states "I authorize [Public Storage] to conduct the administrative function of receiving the premium to send to the insurance company on my behalf.   I have elected to satisfy my obligation to have insurance for the stored goods by purchasing the insurance protection available through Willis Insurance Services of California, Inc."  (*See* **Exhibit 4**).

39.     The Insurance Addendum to the Lease/Rental Agreement represents the insurance premium as a pass-through charge, and fails to disclose that Public Storage keeps an overwhelming majority of the premium, in the form of an illegal kickback, for itself.

40.     This deception is also evident in the fact that monthly premiums for these insurance policies are added to Public Storage's customers' monthly billing statements as a line-item separately designated as an insurance charge, with no indication that Public Storage obtains an overwhelming majority of this charge through its illegal kickback scheme.

41.     Charges for customers' insurance premiums appear on their monthly statements because Public Storage's rental agreement requires that "the additional amount for such insurance coverage must be included with the monthly payments[.]"  Copies of Plaintiffs' monthly statements are attached to this Complaint at **Exhibits 5-6**.  The bills do not reflect that an overwhelming majority of the insurance premium, or illegal kickback, is retained by Public Storage.

42.     Public Storage's monthly statements are designed to lead reasonable consumers to believe that monthly insurance premiums collected by Public Storage are pass-through charges. An invoice contains a distinct line item for the monthly rental rate, another distinct line item for the monthly taxes, and yet another distinct line item denoting the monthly charge for storage insurance.  Thus, the monthly statements lead Public Storage's customers to believe that it collects insurance premiums and remits the entirety of that premium amount to the insurer, not that it unjustly enriches itself through the retention of an overwhelming majority of the customer's premium through its illegal kickback scheme.

43.     Public Storage's standard form rental agreement leads reasonable customers to the same conclusion—that the monthly charges are pass-through costs, not a reinsurance kickback scheme.

44.     Public Storage's financial incentive in selling these insurance policies is likewise undisclosed.

45.     On May 30, 2012, Mr. Bowe rented self-storage space at Public Storage location number 25579, located at 2851 SW 31st Avenue, Miami, Florida 33133.

46.     Consistent with the requirement found in his Public Storage rental agreement that he maintain insurance for his stored belongings, Mr. Bowe purchased $2,000 of coverage for $9 a month.

47.     Each month since renting his self-storage space and purchasing self-storage insurance, Mr. Bowe has been charged $9 on his monthly statement from Public Storage, which he has paid. *See* **Exhibit 5**.

48.     In approximately 2011, Mr. Morgan rented self-storage space at the Public Storage located at 2336 Biscayne Boulevard, Miami, Florida 33137.

49.     Consistent with the requirement found in his Public Storage rental agreement that he maintain insurance for his stored belongings, Mr. Morgan purchased $2,000 of coverage for $9 a month.

50.     Each month since renting his self-storage space and purchasing self-storage insurance, Mr. Morgan has been charged $9 on his monthly statement from Public Storage, which he has paid.

51.     On February 14, 2013, Mr. Morgan also rented self-storage space at Public Storage location number 00501, located at 3700 NW 29th Avenue, Miami, Florida 33142.

52.     Consistent with the requirement found in his Public Storage rental agreement that he maintain insurance for his stored belongings, Mr. Morgan purchased $2,000 of coverage for $9 a month.

53.     Each month since renting this self-storage space and purchasing self-storage insurance, Mr. Morgan has been charged $9 on his monthly statement from Public Storage, which he has paid.  *See* **Exhibit 6**.

54.     Public Storage never disclosed to the Plaintiffs or any members of the Class or Florida Class the true nature of its relationship with Willis, Perfect Solutions Storage Insurance, NHIC, or Public Storage of Hawaii.  Specifically, Public Storage has not disclosed the fact that it receives an overwhelming majority of its customers' premium payments as an illegal kickback.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this Complaint as a class action pursuant to Federal Rule of Civil Procedure 23.

### Class Definitions

56.     Plaintiffs seek to represent the following Class:

Class

All persons who rented storage units from Public Storage within the United States and who purchased self-storage insurance policies through Public Storage within the applicable limitations period (the "Class Period").

Excluded from this class are Public Storage, its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.


57.     The Plaintiffs seek to represent the following Florida Class:

Florida Class

All persons who rented storage units from Public Storage within Florida and who purchased self-storage insurance policies through Public Storage within the applicable limitations period (the "Florida Class Period").

Excluded from this class are Public Storage, its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

58.     The members of the Class and Florida Class number in the thousands and joinder of all Class and Florida Class members in a single action is impracticable.

59.     This class action is brought pursuant to Rule 23(b)(2) because Public Storage has acted or refused to act on grounds generally applicable to all the members of the Class and the Florida Class, thereby making final injunctive relief or declaratory relief concerning the Class and the Florida Class appropriate.

60.     This class action is also brought pursuant to Rule 23(b)(3) because the questions of law or fact common to Plaintiffs' claims and the Class and the Florida Class members' claims predominate over any question of law or fact affecting only individual Class and Florida Class members.

61.     Public Storage has subjected Plaintiffs and the members of the Class and the Florida Class to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.  The conduct described above is Public Storage's standard business practice.

A.      **Numerosity**

62.     The individual Class and Florida Class members are so numerous that joinder of all members in a single action is impracticable.  Public Storage operates approximately 2,200 facilities nationwide, including 250 facilities in Florida.

63.     Nationwide, in 2013 alone, Public Storage issued 759,000 insurance certificates for policies sold to its customers.

64.     Assuming that self-storage insurance policies are sold pro-rata by location, there are approximately 86,250 purchasers of self-storage insurance sold by Public Storage's 250 Florida locations.  Each of these 86,250 purchasers is a member of the Florida Class.

65.    While 86,250 purchasers in Florida is an estimate, the exact number of Class members in Florida, as well as nationwide, including the Class and the Florida Class members' names and addresses, can be identified from Public Storage's business records.

**B.    Commonality/Predominance**

66.    Common questions of law and fact exist as to Plaintiffs' and the Class and the Florida Class members' claims. These common questions predominate over any questions solely affecting individual Class and Florida Class members, including but not limited to, the following:

a.    Whether Public Storage engaged in a deceptive and unfair business practice by misleading the Class and the Florida Class about its financial interest in selling its self-storage insurance product and its receipt of a kickback;

b.    Whether the representations made and insurance premiums collected by Public Storage would lead a reasonable consumer to believe it was a pass-through charge;

c.    Whether Public Storage receives undisclosed kickbacks, commissions, or fees for selling self-storage insurance;

d.    Whether Public Storage manipulated the Class and the Florida Class through the sale of insurance products in order to maximize its own profits at the expense of the Class and the Florida Class;

e.    Whether and to what extent the Defendant's conduct injured the Plaintiffs and the Class and the Florida Class members;

f.    Whether Public Storage breached its contract with the Class and the Florida Class members, and violated the implied covenant of good faith and fair dealing, by keeping kickbacks

provided by its insurers,  while representing in the rental agreement that it would not insure the Class and the Florida Class;

g.      Whether Public Storage has done anything to warrant the payment of a commission from insurers;

h.      Whether Public Storage unlawfully enriched itself at the expense of the Class and the Florida Class;

i.      Whether Public Storage violated 18 U.S.C. § 1962(a), (c), and (d);

j.      Whether Public Storage violated Florida's Deceptive and Unfair Trade Practices Act; and

k.      Whether Public Storage's conduct is unconscionable.

**C.      Typicality**

67.      Plaintiffs' claims are typical of the Class and the Florida Class members' claims because of the uniformity and common purpose of Public Storage's unlawful conduct.  Plaintiffs, like all Class and Florida Class members, were damaged through their payment of insurance premiums as a result of the undisclosed kickback received by Public Storage.

68.      Each Class and Florida Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Public Storage's wrongful conduct and willful nondisclosures.

**D.      Adequacy**

69.      The Plaintiffs will fairly and adequately protect and represent the interest of each member of the Class, because they have suffered the same wrongs as the Class members. Similarly, the Plaintiffs will fairly and adequately protect and represent the interest of each

member of the Florida Class, because they have suffered the same wrongs as the Florida Class members.

70.     Plaintiffs are fully cognizant of their responsibilities as Class representatives and have retained León Cosgrove, LLC and Grossman Roth, P.A. to prosecute this case.  Both firms are experienced in complex class action litigation, including litigation related to unfair and deceptive trade practices, and have the financial and legal resources to meet the costs of, and understand the legal issues associated with, this type of litigation.

71.     Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

**E.     The Prerequisites of Rule 23(b)(2) Are Satisfied.**

72.     The prerequisites to maintaining a class action for equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist as Public Storage has acted or refused to act on grounds generally applicable to the Class and the Florida Class, thereby making appropriate final equitable relief with respect to the Class and the Florida Class as a whole.

73.     Public Storage's actions are generally applicable to the Class and the Florida Class as a whole, and Plaintiffs seek, among other things, equitable remedies with respect to the Class and the Florida Class as a whole.

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 424  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

**F.**      **The Prerequisites of Rule 23(b)(3) Are Satisfied.**

74.      The questions of law and fact enumerated above predominate over questions affecting only individual members of the Class and the Florida Class, and a class action is the superior method for fair and efficient adjudication of the controversy.

75.      The likelihood that individual members of the Class and the Florida Class will prosecute separate actions, and their interest in so doing, is small due to the extensive time and considerable expense necessary to conduct such litigation, especially considering Public Storage's scorched earth litigation tactics employed in this litigation to date.

76.      This action will be prosecuted in a fashion to ensure the Court's able management of this case as a class action on behalf of the Class and the Florida Class. Plaintiffs know of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**COUNT I**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(On behalf of the Florida Class)**

77.      Plaintiffs Bowe and Morgan re-allege paragraphs 1 through 76 as if fully set forth herein.

78.      This Count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

79.      At all times material, Plaintiffs Bowe and Morgan, and all members of the Florida Class, were consumers within the meaning of Section 501.203, Fla. Stat., and are entitled to relief under FDUTPA, in accordance with Section 501.211, Fla. Stat.

80.      At all times material, Public Storage conducted trade and commerce within the meaning of Section 501.203, Fla. Stat.

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 424  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

81.     Public Storage has engaged in unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices alleged above.

82.     The concealment and omissions of material facts and deceptions alleged in the preceding paragraphs occurred in connection with Public Storage's trade and commerce in Florida.

83.     Public Storage's unfair and deceptive acts and practices violate FDUTPA, Sections 501.201 and 501.211, Fla. Stat.

84.     As a direct and proximate result of Public Storage's FDUTPA violations, Plaintiffs Bowe and Morgan, and the Florida Class, have been damaged in an amount to be proven at trial.

85.     Plaintiffs Bowe and Morgan, and the Florida Class, are entitled to actual damages, declaratory and injunctive relief, attorneys' fees and costs, and all other remedies available under FDUTPA.

**COUNT II**
**BREACH OF CONTRACT**
**(On behalf of the Class)**

86.     Plaintiffs re-allege paragraphs 1 through 76 as if fully set forth herein and further allege the following.

87.     Defendant Public Storage utilizes a standard form rental agreement with its customers.

88.     This contractual agreement requires customers to purchase insurance for their stored goods, stating "Occupant is obligated under the terms of this lease/rental agreement to insure his own goods."

89.     The contract further states that Public Storage will not insure the customer's goods: "Owner will not insure occupant's personal property."  With regard to the Willis and Perfect Solutions Storage Insurance, the contract states that Public Storage conducts "the administrative function of receiving the premium to send to the insurance company on [customer's] behalf."

90.     This contract is legally valid and enforceable, and Plaintiffs complied with all material terms and conditions precedent by purchasing self-storage insurance through Willis and Perfect Solutions Storage Insurance and paying their monthly premiums.

91.     Public Storage breached the contract by, among other things, 1) failing to pass through to the disclosed insurer the entirety of the insurance premium paid by Class members and instead retained an overwhelming majority of the insurance premium for its own use; and 2) taking for itself as a kickback the overwhelming majority of what it represented in the contract to be the monthly "premium" for insurance.

92.     Plaintiffs and the Class suffered damages as a result of Defendant's breaches.

## COUNT III
## UNJUST ENRICHMENT
### (On behalf of the Class)

93.     Plaintiffs re-allege paragraphs 1 through 76 as if fully set forth herein and further allege the following.

94.     This is a count for unjust enrichment.

95.     Plaintiffs and each member of the Class conferred a benefit on Defendant through their payment for storage insurance with Willis and Perfect Solutions Storage Insurance, allowing Public Storage to enrich itself to the detriment of the Class.

96.     Defendant appreciated, accepted, and retained this benefit, as it garnered enormous profits by virtue of its kickback scheme.

97.     Under the circumstances, it would be unjust and inequitable to allow the Defendant to retain this benefit, as it was obtained through false and misleading representations.

98.     Plaintiffs and the Class suffered damages as a result of Defendant's unjust enrichment.

**COUNT IV**
**BREACH OF CONTRACT AND BREACH OF COVENANT**
**OF GOOD FAITH AND FAIR DEALING[1]**
**(On behalf of the Class)**

99.     Plaintiffs re-allege paragraphs 1 through 76 as if fully set forth herein and further allege the following.

100.    This is a count for breach of contract and of the implied covenant of good faith and fair dealing.

101.    Plaintiffs and the Class entered into a valid and enforceable standard form contract with Public Storage.

102.    This contract contained the implied covenant of good faith and fair dealing.

103.    Defendant breached the covenant of good faith and fair dealing by, among other things, falsely representing in the contract that its role with the insurer was solely administrative, when in fact Public Storage retains an overwhelming majority of all insurance premiums for itself, thereby damaging the Plaintiffs and the Class members.

104.    Plaintiffs and the Class suffered damages as a result of Defendant's breach.

---

[1] Florida and certain other states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract. Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract. For the sake of convenience, the Amended Complaint pleads these two types of claims, which are substantively identical, in a single count.

**COUNT V**
**UNCONSCIONABILITY**
**(On behalf of the Class)**

105.     Plaintiffs re-allege paragraphs 1 through 76 as if fully set forth herein and further allege the following.

106.     Public Storage's policies and practices with regard to selling self-storage insurance are or were substantively and procedurally unconscionable in the following respects, among others:

    a.   Public Storage failed to disclose that it was not passing through the entirety of the insurance payment it received from the Plaintiffs and the members of the Class;

    b.   Public Storage did not disclose that it was keeping an overwhelming majority of the insurance "premium" for itself as a kickback; and

    c.   Public Storage falsely represented that its role with its insurer was solely administrative.

107.     Considering the great business acumen and experience of Public Storage in relation to Plaintiffs and the Class, its superior and indeed unique knowledge of the arrangement between itself and the insurer whose premiums it purports to be collecting, the material omissions regarding the insurance being sold including the fact that it retains a substantial part of the insurance "premiums," the commercial unreasonableness of its kickback arrangement and its concealment of it, and similar public policy concerns, the contract provisions that allowed Public Storage to collect the insurance premiums from Plaintiffs and the Class are unconscionable and therefore unenforceable as a matter of law.

108.     The collection of an insurance "premium" that is, in large part, an undisclosed kickback to Public Storage, is not reasonably related to the cost of insurance and is itself unconscionable.

109.     Plaintiffs and the Class suffered damages as a result of Defendant's unconscionable policies and practices.

**COUNT VI**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(A)**
**(On behalf of the Class)**

110.     Plaintiffs re-allege paragraphs 1 through 76 as if fully set forth herein and further allege the following.

111.     At all relevant times, Public Storage was employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(a).  These acts include the sale of more than 150,000 self-storage insurance policies to Public Storage's customers, hundreds of thousands of invoices sent through the mail and wire facilities, and the payments of premiums and kickbacks through both wire facilities and the U.S. Postal Service.

112.     The RICO enterprise, which Public Storage engaged in, and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities that included Public Storage, NHIC, Willis, Perfect Solutions Storage Insurance, Public Storage of Hawaii, and other unnamed co-conspirators.   A third-party consulting company worked with and assisted Public Storage, NHIC, and Willis in developing the self-storage insurance scheme to defraud Plaintiffs and the Class members by obtaining money through a series of fraudulent omissions via the U.S. mail and wires.  The association was structured by

22

contracts between and among the participants.  Public Storage had a contract with Willis under which Willis agreed to serve as Public Storage's exclusive insurance broker for the sale of Public Storage's self-storage insurance policies in return for a fee.  When Public Storage replaced Willis with Perfect Solutions Storage Insurance, Public Storage entered into a contract with Perfect Solutions Storage Insurance to serve as its exclusive insurance broker in return for a fee.  Public Storage has a contract with NHIC whereby NHIC underwrites the master policy for Public Storage's self-storage insurance policies and receives 100% of the insurance premiums paid by Public Storage's customers, from which NHIC keeps a fee.  NHIC has a contract with Public Storage of Hawaii whereby NHIC transfers 100% of the risk of the insurance policies underwritten under the master policy to Public Storage of Hawaii along with 98% of the premiums paid by Public Storage's customers.  Public Storage of Hawaii has a contract with Public Storage pursuant to which the former pays, after the deduction of a small administrative fee, the remainder of the 98% in premium payments it receives from NHIC back to Public Storage.

113.    The enterprise originally consisted of Public Storage, Willis, NHIC, Public Storage of Hawaii, and various unnamed co-conspirators.  Willis, as described above, acted as the insurance broker, and NHIC served as the insurance underwriter and underwrote the master policy for the self-storage insurance policies Public Storage sold its customers.   NHIC underwrote the master policy for the self-storage insurance policies and transferred 100% of the risk of the self-storage insurance policies to Public Storage of Hawaii.  NHIC paid Public Storage of Hawaii 98% of the premiums collected and Public Storage of Hawaii paid a majority of those premiums, after the deduction of a small administrative fee, to Public Storage. Willis and NHIC paid Public Storage, through Public Storage of Hawaii, a kickback that represented

the overwhelming majority of the insurance premium paid by the Plaintiffs and the Class members, in order to serve as Public Storage's exclusive broker and insurance underwriter, respectively. Public Storage, however, later replaced Willis with Perfect Solutions Storage Insurance as its exclusive insurance broker for the sale of self-storage insurance, and continued to use NHIC as the insurance underwriter.  In turn, NHIC continued to transfer 100% of the risk of the self-storage insurance policies under the master policy to Public Storage of Hawaii and pay Public Storage of Hawaii 98% of the insurance premiums collected.  Public Storage of Hawaii, after deducting a small administrative fee, continued to pay an overwhelming majority of those premiums right back to Public Storage.  Perfect Solutions Storage Insurance and NHIC paid and continue to pay Public Storage, through Public Storage of Hawaii, a kickback that represents an overwhelming majority of the insurance premium paid by the Plaintiffs and the Class members, in order to serve as Public Storage's exclusive broker and insurance underwriter, respectively.  This RICO enterprise has existed for more than six years and continues to exist and operates pursuant to certain agreements entered into between and among Perfect Solutions Storage Insurance, Public Storage, NHIC, Willis, Public Storage of Hawaii, and other unnamed co-conspirators.

114.    The members of the RICO enterprise all had a common purpose: to increase and maximize the revenues of Public Storage by requiring the Plaintiffs and the members of the Class to pay for self-storage insurance through a scheme that manipulated the premiums to cover kickbacks paid to Public Storage and allowed NHIC, Willis, and Perfect Solutions Storage Insurance to operate as Public Storage's exclusive insurance underwriter and insurance brokers. Public Storage, NHIC, Willis, Public Storage of Hawaii, and Perfect Solutions Storage Insurance

LEÓN COSGROVE, LLC
255 ALHAMBRA CIR.  |  SUITE 424  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

shared the bounty of their enterprise, *i.e.,* by sharing the premiums generated by the joint scheme to defraud the Plaintiffs and the Class members.

115.    The RICO enterprise has functioned for more than six years as a continuing unit and has and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

116.    Public Storage conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.    Plaintiffs have attached standard form contracts and monthly invoices representing the continuity of Defendant's conduct over multiple years and on a monthly basis, representing multiple separate and distinct examples of mail and wire fraud violations. (*See* Exs. 2, 4, 5-6).  Thus, Plaintiffs have demonstrated the continuity of Public Storage's conduct over a fixed period of time.  Furthermore, Public Storage continues to engage in these predicate acts and harm the Class members on a daily basis, which establishes a threat of long-term racketeering activity and evidences the continuity of Public Storage's open-ended pattern of racketeering activity.

117.    As part and in furtherance of the scheme to defraud, Public Storage made numerous material omissions to the Plaintiffs and the members of the Class with the intent to defraud and deceive the Plaintiffs and the Class members.

118.    Public Storage required Plaintiffs and the Class members to obtain self-storage insurance as a condition of renting a self-storage unit at Public Storage.  Public Storage informed the Plaintiffs and the Class members in its standard form contract that it would not "insure

occupant's personal property" stored in its storage units, but omitted to disclose that it would, in fact, collect nearly the entire premium for itself. Accordingly, Plaintiffs and the Class members were "obligated under the terms of this lease/rental agreement to insure [their] own goods."

119.   To satisfy the self-storage insurance requirement, Public Storage at the time of rental, provided the Plaintiffs and the Class members with a standard form contract enabling the Plaintiffs and the Class members to purchase self-storage insurance from a purportedly "independent" insurer. Typically, Willis and later Perfect Solutions Storage Insurance acted as the insurance broker, with the insurance being underwritten by NHIC. As required by the terms of the standard lease/rental contract that Plaintiffs and the Class members entered into with Public Storage, each month the Plaintiffs and the Class members paid the self-storage insurance premium to Public Storage through the U.S. Postal Service and wire facilities instead of directly to the insurance company or insurance broker. Public Storage uniformly represented through its standard form contracts to Plaintiffs and the Class members that it would pass the insurance premium directly to the "independent" insurer by "conduct[ing] the administrative function of receiving the premium to send to the insurance company on [the customer's] behalf." Public Storage communicated this information to Plaintiffs and the Class members through the U.S. Postal Service and other wire facilities.

120.   Public Storage billed Plaintiffs and the Class members each month by sending them an invoice through the United States Postal Service and other wire facilities charging them for self-storage insurance. (*See* Exs. 2, 4, 5-6). Public Storage deceived the Class members by intentionally failing to disclose in its standard form contacts or the tens of thousands of invoices its sent each month to Plaintiffs and the Class members that it actually retained the overwhelming majority of the Plaintiffs' and the Class members' premiums for self-storage

insurance for itself through its illegal kickback scheme.  Public Storage received kickbacks from Willis, NHIC, and Perfect Solutions Storage Insurance, which represented the overwhelming majority of the self-storage insurance premiums paid by Plaintiffs and the Class members.

121.    In making these statements in its standard form rental agreement, Public Storage deceived Plaintiffs and the Class members by intentionally fostering the mistaken impression that the insurance premiums paid by the Plaintiffs and the Class members for the insurance policy was the cost of the policy, when in fact the premium also included a large kickback to Public Storage.  Public Storage had a duty to correct this mistaken impression but instead fostered it in order to increase the amount of kickbacks it received through the sale of more self-storage insurance policies at the highest rate possible.  This omission was material, because it significantly increased the cost of the Plaintiffs' and the Class members' insurance premiums.

122.    As noted above, Public Storage sent Plaintiffs and the Class members through the United States Postal Service and other wire facilities monthly invoices charging them on a separate line item for self-storage insurance. (*See* Exs. 2, 4, 5-6). In labeling the charges as insurance, these invoices fostered the mistaken impression that these charges were for the cost of the insurance policy, when in fact the deductions also included a large kickback to Public Storage.  Public Storage had a duty to correct this mistaken impression.  This omission was material, because it significantly increased the amounts paid by the Plaintiffs and the Class members for insurance.

123.    For the purpose of executing the scheme to defraud, Public Storage sent, mailed, or transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the standard form rental agreements and the invoices described above.  Public Storage received payment for the insurance premiums from

Plaintiffs and the Class members through the United States Postal Service and wire facilities in violation of 18 U.S.C. §§ 1341 and 1343.   In furtherance of the scheme, Public Storage committed tens of thousands of separate mail and wire fraud violations on a monthly basis over more than six years through the transmission of its standard form contracts and invoices, each one constituting its own separate and distinct predicate act.  Each  of these violations was related because they shared the common purpose of defrauding the Class members by failing to disclose in its standard form contract and invoices that Public Storage was receiving a large kickback on the payment of the Plaintiffs' and the Class' members insurance premiums.  Public Storage also transferred between and among, and received sums from, NHIC, Willis, Perfect Solutions Storage Insurance, Public Storage of Hawaii, and other unnamed co-conspirators, including but not limited to the kickbacks, in furtherance of its scheme to defraud Plaintiffs and the Class members in violation of 18 U.S.C. § 1343.

124.    These related criminal acts had the same or similar purpose, results, participants, victims, and methods of commission, and are otherwise related by distinguishing characteristics which are not isolated events.

125.    Public Storage had the specific intent to participate in the overall RICO enterprise, which was evidenced by its scheme to defraud the Plaintiffs and the Class.  Public Storage's scheme was reasonably calculated to deceive the Plaintiff and the Class members, all of whom are of ordinary prudence and comprehension, through the execution of its complex and illegal kickback scheme. The Plaintiffs and the Class members relied on the uniform omissions in Public Storage's standard form contracts and invoices that failed to disclose that it was retaining an overwhelming majority of the Plaintiffs' and the Class members' insurance premiums as an illegal kickback, while stating that it would not insure their goods and was only

28

serving in an administrative capacity in collecting premium payments for the self-storage insurance.

126.    Public Storage received money from a pattern of racketeering activity and invested that money in the enterprise, and the enterprise affected interstate commerce. Furthermore, Public Storage used and invested the income it received through its pattern of racketeering activity to operate its business, which caused the Plaintiffs and the Class members to suffer damages.  The investment of the kickbacks obtained by Public Storage through the sale of self-storage insurance policies to the Plaintiffs and the Class members enabled Public Storage to perpetuate the operation of the enterprise and to continue to defraud the Plaintiffs and the Class members on an ongoing basis.

127.    By reason, and as a result thereof, Public Storage's conduct and participation in the racketeering activity described herein has caused Plaintiffs and the Class members to directly incur significant damages.

**COUNT VII**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**
**ACT ("RICO"), 18 U.S.C. § 1962(C)**
**(On behalf of the Class)**

128.    Plaintiffs re-allege paragraphs 1 through 76 as if fully set forth herein and further allege the following.

129.    At all relevant times, Public Storage was employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).  These acts include the sale of more than 150,000 self-storage insurance policies to Public Storage's

customers, hundreds of thousands of invoices sent through the mail and wire facilities, and the payments of premiums and kickbacks through both wire facilities and the U.S. Postal Service.

130.    The RICO enterprise, which Public Storage engaged in, and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities that included Public Storage, NHIC, Willis, Perfect Solutions Storage Insurance, Public Storage of Hawaii, and other unnamed co-conspirators.   A third-party consulting company worked with and assisted Public Storage, NHIC, and Willis in developing the self-storage insurance scheme to defraud Plaintiffs and the Class members by obtaining money through a series of fraudulent omissions via the U.S. mail and wires.   The association was structured by contracts between and among the participants.  Public Storage had a contract with Willis under which Willis agreed to serve as Public Storage's exclusive insurance broker for the sale of Public Storage's self-storage insurance policies in return for a fee.  When Public Storage replaced Willis with Perfect Solutions Storage Insurance, Public Storage entered into a contract with Perfect Solutions Storage Insurance to serve as its exclusive insurance broker in return for a fee.  Public Storage has a contract with NHIC whereby NHIC underwrites the master policy for Public Storage's self-storage insurance policies and receives 100% of the insurance premiums paid by Public Storage's customers, from which NHIC keeps a fee.   NHIC has a contract with Public Storage of Hawaii whereby NHIC transfers 100% of the risk of the insurance policies underwritten under the master policy to Public Storage of Hawaii along with 98% of the premiums paid by Public Storage's customers.  Public Storage of Hawaii has a contract with Public Storage pursuant to which the former pays, after the deduction of a small administrative fee, the remainder of the 98% in premium payments it receives from NHIC back to Public Storage.

131.    The enterprise originally consisted of Public Storage, Willis, NHIC, Public Storage of Hawaii, and various unnamed co-conspirators.  Willis, as described above, acted as the insurance broker, and NHIC served as the insurance underwriter for the master policy for the self-storage insurance policies Public Storage sold its customers.  NHIC transferred 100% of the risk of the self-storage insurance policies written under the master policy to Public Storage of Hawaii.  NHIC paid Public Storage of Hawaii 98% of the premiums collected and Public Storage of Hawaii paid the overwhelming majority of those premiums, after the deduction of a small administrative fee, to Public Storage.  Willis and NHIC paid Public Storage, as a kickback through Public Storage of Hawaii, the overwhelming majority of the insurance premium paid by the Plaintiffs and the Class members, in order to serve as Public Storage's exclusive broker and insurance underwriter, respectively. Public Storage, however, later replaced Willis with Perfect Solutions Storage Insurance as its exclusive insurance broker for the sale of self-storage insurance, and continued to use NHIC as the insurance underwriter.  In turn, NHIC continued to transfer 100% of the risk of the self-storage insurance policies written under the master policy to Public Storage of Hawaii and pay Public Storage of Hawaii 98% of the insurance premiums collected.  Public Storage of Hawaii, after deducting a small administrative fee, paid the overwhelming majority of those premiums right back to Public Storage.  Similarly, Perfect Solutions Storage Insurance and NHIC paid and continue to pay Public Storage through Public Storage of Hawaii a kickback that represents the overwhelming majority of the insurance premium paid by the Plaintiffs and the Class members, in order to serve as Public Storage's exclusive broker and insurance underwriter, respectively.  This RICO enterprise has existed for more than six years and continues to exist and operates pursuant to certain agreements entered

into between and among Perfect Solutions Storage Insurance, Public Storage, NHIC, Willis, Public Storage of Hawaii, and other unnamed co-conspirators.

132.    The members of the RICO enterprise all had a common purpose: to increase and maximize the revenues of Public Storage by requiring the Plaintiffs and the members of the Class to pay for self-storage insurance through a scheme that manipulated the premiums to cover kickbacks paid to Public Storage and allowed NHIC, Willis, and Perfect Solutions Storage Insurance to operate as Public Storage's exclusive insurance underwriter and insurance brokers. Public Storage, NHIC, Willis, Public Storage of Hawaii, and Perfect Solutions Storage Insurance shared the bounty of their enterprise, *i.e.,* by sharing the premiums generated by the joint scheme to defraud the Plaintiffs and the Class members.

133.    The RICO enterprise has functioned for more than six years as a continuing unit and has and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

134.    Public Storage conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.    Plaintiffs have attached standard form contracts and monthly invoices representing the continuity of Defendant's conduct over multiple years and on a monthly basis, representing multiple seperate and distinct examples of mail and wire fraud violations. (*See* Exs. 2, 4, 5-6).  Thus, Plaintiffs have demonstrated the continuity of Public Storage's conduct over a fixed period of time.  Furthermore, Public Storage continues to engage in these predicate acts and harm the Class members on a daily basis, which establishes a threat of long-term

racketeering activity and evidences the continuity of Public Storage's open-ended pattern of racketeering activity.

135.    As part and in furtherance of the scheme to defraud, Public Storage made numerous material omissions to the Plaintiffs and the members of the Class with the intent to defraud and deceive the Plaintiffs and the Class members.

136.    Public Storage required Plaintiffs and the Class members to obtain self-storage insurance as a condition of renting a self-storage unit at Public Storage.  Public Storage informed the Plaintiffs and the Class members in its standard form contract that it would not "insure occupant's personal property" stored in its storage units, but omitted to disclose that it would, in fact, collect nearly the entire premium for itself.  Accordingly, Plaintiffs' and the Class members were "obligated under the terms of this lease/rental agreement to insure [their] own goods."

137.    To satisfy the self-storage insurance requirement, Public Storage at the time of rental provided the Plaintiffs and the Class members with a standard form contract enabling the Plaintiffs and the Class members to purchase self-storage insurance from a purportedly "independent" insurer.  Typically, Willis and later Perfect Solutions Storage Insurance acted as the insurance broker, with the insurance being underwritten by NHIC.  As required by the terms of the standard lease/rental contract that Plaintiffs and the Class members entered into with Public Storage, each month the Plaintiffs and the Class members paid the self-storage insurance premium to Public Storage through the U.S. Postal Service and wire facilities instead of directly to the insurance company or insurance broker.  Public Storage uniformly represented through its standard form contracts to Plaintiffs and the Class members that it would pass the insurance premium directly to the "independent" insurer by "conduct[ing] the administrative function of receiving the premium to send to the insurance company on [the customer's] behalf."  Public

Storage communicated this information to Plaintiffs and the Class members through the U.S. Postal Service and other wire facilities.

138.    Public Storage billed Plaintiffs and the Class members each month by sending them an invoice through the United States Postal Service and other wire facilities charging them for self-storage insurance.  (*See* Exs. 2, 4, 5-6).  Public Storage deceived the Class members by intentionally failing to disclose in its standard form contacts or the tens of thousands of invoices its sent each month to Plaintiffs and the Class members that it actually retained an overwhelming majority of the Plaintiffs' and the Class members' premiums for self-storage insurance for itself through its illegal kickback scheme.  Public Storage received an overwhelming majority of the self-storage insurance premiums paid by Plaintiffs and the Class in the form of kickbacks from Willis, NHIC, and Perfect Solutions Storage Insurance.

139.    In making these statements in its standard form rental agreement, Public Storage deceived Plaintiffs and the Class members by intentionally fostering the mistaken impression that the insurance premiums paid by the Plaintiffs and the Class members for the insurance policy was the cost of the policy, when in fact the premium also included a large kickback to Public Storage.  Public Storage had a duty not to foster this mistaken impression but instead actively created and supported it in order to increase the amount of kickbacks it received through the sale of more self-storage insurance policies at the highest rate possible.  This omission was material, because it significantly increased the cost of the Plaintiffs' and the Class members' insurance premiums.

140.    As noted above, Public Storage sent Plaintiffs and the Class members through the United States Postal Service and other wire facilities monthly invoices charging them on a separate line item for self-storage insurance. (*See* Exs. 2, 4, 5-6). In labeling the charges as

insurance, these invoices fostered the mistaken impression that these charges were for the cost of the insurance policy, when in fact the deductions also included a large kickback to Public Storage. Public Storage had a duty not to foster and create this mistaken impression. This omission was material, because it significantly increased the amounts paid by the Plaintiffs and the Class members for insurance.

141.     For the purpose of executing the scheme to defraud, Public Storage sent, mailed, or transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the standard form rental agreements and the invoices described above. Public Storage received payment for the insurance premiums from Plaintiffs and the Class members through the United States Postal Service and wire facilities in violation of 18 U.S.C. §§ 1341 and 1343. In furtherance of the scheme, Public Storage committed tens of thousands of separate mail and wire fraud violations on a monthly basis over more than six years through the transmission of its standard form contracts and invoices, each one constituting its own separate and distinct predicate act. Each of these violations was related because they shared the common purpose of defrauding the Class members by failing to disclose in its standard form contract and invoices that Public Storage was receiving a large kickback on the payment of the Plaintiffs' and the Class' members insurance premiums. Public Storage also transferred between and among, and received sums from, NHIC, Willis, Perfect Solutions Storage Insurance, Public Storage of Hawaii, and other unnamed co-conspirators, including but not limited to the kickbacks, in furtherance of its scheme to defraud Plaintiffs and the Class members in violation of 18 U.S.C. § 1343.

142.    These related criminal acts had the same or similar purpose, results, participants, victims, and methods of commission, and are otherwise related by distinguishing characteristics which are not isolated events.

143.    Public Storage had the specific intent to participate in the overall RICO enterprise, which was evidenced by its scheme to defraud the Plaintiffs and the Class.  Public Storage's scheme was reasonably calculated to deceive the Plaintiff and the Class members, all of whom are of ordinary prudence and comprehension, through the execution of its complex and illegal kickback scheme.  The Plaintiffs and the Class members relied on the uniform omissions in Public Storage's standard form contracts and invoices that failed to disclose that it was retaining an overwhelming majority of the Plaintiffs' and the Class members' insurance premiums as an illegal kickback, while stating that it would not insure their goods and was only serving in an administrative capacity in collecting premium payments for the self-storage insurance fee.

144.    Public Storage used and invested the income it received through its pattern of racketeering activity to operate its business which caused the Plaintiffs and the Class members to suffer direct damages.  The investment of the kickbacks obtained by Public Storage through the sale of self-storage insurance policies to the Plaintiffs and the Class members enabled Public Storage to perpetuate the operation of the enterprise and to continue to defraud the Plaintiffs and the Class members.

145.    By reason, and as a result thereof, Public Storage's conduct and participation in the racketeering activity described herein has caused Plaintiffs and the Class members to directly incur significant damages.

**COUNT VIII**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**
**ACT, 18 U.S.C. § 1962(d)**
**(On behalf of the Class)**

146.     Plaintiffs re-allege paragraphs 1 through 76, 111 through 127, and 129 through 145 as if fully set forth herein and further allege the following.

147.     At all relevant times, Public Storage, NHIC, Willis, Public Storage of Hawaii, and Perfect Solutions Storage Insurance were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(a) and (c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

148.     NHIC, Willis, and Perfect Solutions Storage Insurance paid 98% of the premiums it received from Public Storage for the sale of self-storage insurance policies to Public Storage of Hawaii.  Public Storage of Hawaii, in turn, paid an overwhelming majority of those premiums to Public Storage in the form of illegal kickbacks.

149.     Public Storage, Public Storage of Hawaii, NHIC, Willis, and Perfect Solutions Storage Insurance committed, and caused to be committed, a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

150.     As a result of Public Storage's violations of 18 U.S.C. § 1962(d), Plaintiffs and the Class members suffered direct damages.

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves, the Class, and the Florida Class request the following relief:

a.   Certification of the Class and the Florida Class;

b.  A jury trial and judgment against Defendant Public Storage;

c.  An order requiring the Defendant to make full disclosure to consumers of its retention of self-storage insurance premiums sold in its stores and the amount of the kickback it receives;

d.  The cost of suit, including reasonable attorneys' fees, in accordance with FDUTPA;

e.  Compensatory and treble damages, attorneys' fees, and costs under the federal RICO statute;

f.  General, actual, and compensatory damages in an amount to be determined at trial;

g.  Restitution of all insurance premiums paid by Plaintiffs and members of the Class and Florida Class, as a result of the wrongs alleged herein, in an amount to be determined at trial;

h.  Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law; and

i.  Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated this 28th day of October, 2014.

/s/ Scott B. Cosgrove
Scott B. Cosgrove, Esq.
Fla. Bar No. 161365
Alec H. Schultz, Esq.
Fla. Bar No. 35022
David Karp
Fla. Bar No. 69226
LEÓN COSGROVE LLC
255 Alhambra Circle, Suite 424
Coral Gables, Florida 33134
Tel:     305.740.1975
Email: scosgrove@leoncosgrove.com
Email: jbryan@leoncosgrove.com
Email: aboese@leoncosgrove.com
Email: aschultz@leoncosgrove.com
Email: jkessler@leoncosgrove.com

and

David M. Buckner, Esq.
Fla. Bar No.: 60550
Seth E. Miles, Esq.
Fla. Bar No.: 385530
Brett E. von Borke, Esq.
Fla. Bar No.: 0044802
GROSSMAN ROTH, P.A.
2525 Ponce de Leon, Suite 1150
Coral Gables, Florida  33134
Email: dbu@grossmanroth.com
Email: sem@grossmanroth.com
Email: bvb@grossmanroth.com

*Counsel for Plaintiffs and the Class*