UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:14-21559-CIV-UNGARO

COLIN BOWE and BRIAN MORGAN,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.

PUBLIC STORAGE, a Maryland
Real Estate Investment Trust,

      Defendant.

_____/

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
AND INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

I.    INTRODUCTION ..........................................................................................................1

II.   FACTUAL BACKGROUND .........................................................................................2

      A.    Public Storage Operates Throughout the United States.............................................3

      B.    Public Storage Offered Storage Insurance in a Materially Uniform Way to All
            of the Members of the Class.. ...................................................................................3

      C.    Public Storage Uniformly Deceived the Members of the Class. .............................6

      D.    Public Storage's Deceptive Practices Ensnared the Class Representative. ............9

III.  ARGUMENT AND CITATION OF AUTHORITIES.....................................................10

      A.    Plaintiff and this Case Satisfy the Requirements of Rule 23(a)............................11

            1.    The Class Is So Numerous that Joinder of All Members Is
                  Impracticable ...............................................................................................11

            2.    There Are Questions of Law and Fact Common to All Class
                  Members ......................................................................................................12

            3.    Plaintiff's Claims Are Typical of Those of the Class. ...............................14

            4.    Plaintiff Will Fairly and Adequately Protect the Interests of the Class.....14

                  a.    Plaintiff's Interests Do Not Conflict with the Interests of the
                        Class...................................................................................................14

                  b.    Plaintiff's Counsel Are Qualified ...................................................14

      B.    Plaintiff and this Case Satisfy the Requirements of Rule 23(b). ..........................15

            1.    Common Questions of Law or Fact Predominate.......................................16

                  a.    Common Issues Predominate Because Legal and Factual
                        Questions Will Be Resolved with Proof Common to All Class
                        Members. ...........................................................................................16

                  b.    Common Factual and Legal Issues Predominate in Plaintiff's
                        Causes of Action.. .............................................................................18

                  c.    Public   Storage's   Affirmative   Defenses   Do   Not   Vitiate

i

Predominance...................................................................................25

2.     A Class Action Is Superior to the Adjudication of Thousands of Individual Cases.................................................................................27

IV.     CONCLUSION...................................................................................................29

## MOTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs, pursuant to Federal Rule of Civil Procedure 23, respectfully moves for class certification based on the facts and authorities set forth in this memorandum of law. The proposed national Class is defined as follows:

> All persons who rented storage units from Public Storage within the United States and who purchased self-storage insurance policies through Public Storage within the applicable limitations period (the "Class Period").
>
> Excluded from this class are Public Storage, its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.[1]

Plaintiffs move that Brian Morgan be appointed representatives of the Class, and for the appointment of Grossman Roth, P.A. and Leon Cosgrove, LLC, as Class Counsel pursuant to Fed. R. Civ. P. 23(g).[2]

## I.     INTRODUCTION

Public Storage is engaged in an ongoing scheme designed with the express purpose of financially exploiting its own customers. This scheme, which Defendant describes as its tenant insurance program ("PSTIP"), operates in a uniform fashion with regard to all members of the proposed class. Public Storage provides its employees with a uniform training manual and script for use in luring class members into participating in the PSTIP, and it utilizes standard form contracts that provide identical misrepresentations and omissions regarding the PSTIP to all class members. All of this identical conduct toward class members is designed with a single purpose—to push class members into participating in the PSTIP while hiding the fact that Public Storage is profiteering at its customers' expense. Indeed, Public Storage goes to such lengths to hide the truth about the PSTIP from class members that it conceals its role in the PSTIP from its own employees—the same employees charged with convincing Defendant's customers to enroll

---

[1] Plaintiff also requests that the Court certify a Florida subclass for the non-RICO counts including breach of contract and the breach of the duty of good faith and fair dealing, unconscionability, unjust enrichment, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

[2] Plaintiffs seek to certify the proposed Classes with only Plaintiff Brian Morgan serving as lead plaintiff. Thus, all references to Plaintiff are to him.

in the PSTIP—and trains those that interact with the customers that Public Storage is *not* a part of the operations of the storage insurance program.

Public Storage owns and manages facilities throughout the United States that provide rental storage units to the general public.  Public Storage insists that it is not an insurance company, although it now makes over $75,000,000 per year in pure profit through hidden kickbacks it receives from its captive customers' purchase of an insurance product.  To maximize its profits in this area, "beginning in August 2006, the PS tenant self-storage agreement [was changed to] require[] that new tenants maintain insurance on property stored within a [Public Storage] facility."  Ex. 1 at PS000157039 (report excerpts).  To meet the insurance requirement it created, Public Storage offered the PSTIP, an insurance product it uniformly marketed at every one of its storage facilities throughout the United States.  At present, that product is called "Perfect Solutions Storage" ("Perfect Solutions").  The PSTIP is the largest source of ancillary business profits for Public Storage.

Through the PSTIP, Public Storage deceptively markets Perfect Solutions as an independent self-storage insurance product.  It is not.  Yet, neither Public Storage's managerial level employees, nor Public Storage's principal partners, much less Public Storage's customers, know this truth.  Public Storage omits to tell its customers that its wholly-owned subsidiary, PS Insurance Company Hawaii Limited ("PSICH"), retains 100% of the risk of loss for the insurance, and receives 98% of the premiums paid by customers for this supposedly independent insurance.  *See* Deposition of Francis Denis ("Denis Dep.") (Ex. 2) at 33.  Of that, roughly 75% of every premium dollar is kicked back to Public Storage itself through an undisclosed "access fee."  Ex. 3 at PS000156801 (report excerpts).  This undisclosed kickback amounts to tens of millions of dollars in profit each year for Public Storage.

The magnitude of this kickback is unprecedented.  An employee of Willis Storage Insurance ("Willis"), the former broker for the PSTIP, admitted that, despite his 40 years in the insurance business, he is not aware of any other program in which 75 cents of every premium dollar went to a non-insurance company that neither paid claims nor provided administrative services.  *See* Deposition of David A. Thoke ("Thoke Dep.") (Ex. 4) at 56.  Not only was the PSTIP's own broker unaware of a similar kickback of such magnitude, but the program manager at insurance giant AIG, who currently works in a key role with the PSTIP, also has not, in all his years in the industry, seen 75% of every premium dollar conveyed to a non-insurance company.

*See* Denis Dep. (Ex. 2) at 111. Not only are other corporate participants in the PSTIP unaware of any similar scheme of such magnitude, but *Public Storage's own managers are unaware that the kickback to Public Storage through the PSTIP even exists.* (*See* Deposition of Doug Mesmer ("Mesmer Dep.") (Ex. 5) at 76.

At trial, Plaintiffs will use common evidence to show how Public Storage operates the PSTIP to enrich itself at the expense of its customers. Not surprisingly, Public Storage's achievement is the result of deception. Public Storage engaged in deceptive conduct and a racketeering enterprise by intentionally creating the misimpression that the insurance it offered to rental customers at its storage locations was provided by an independent company, and not Public Storage itself. It intentionally omits to disclose that it controls the program and takes the lion's share of the profits from it and it hides the details of the program from its own management-level employees. Instead, Public Storage strives mightily to create the illusion that it is simply offering independent insurance as a convenience in order to disarm its customers.

Plaintiffs now move for certification of Counts I through VIII of the Amended Complaint, which include claims for violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"), breach of contract and the breach of the duty of good faith and fair dealing, unconscionability, unjust enrichment, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Because all required elements of Federal Rules 23(a) and (b)(3) are satisfied, the Court should certify the proposed classes.

## II.  FACTUAL BACKGROUND

Though discovery is ongoing, the evidence adduced to date establishes that class-wide issues predominate. Below is a sampling of the evidence that Plaintiff will present at trial to demonstrate how those common issues will be resolved on a class-wide basis. This evidence highlights the predominance of common issues, typicality of Plaintiff's claims, and the superiority of the class action as a vehicle for resolving these claims.

### A.  Public Storage Operates Throughout the United States.

Public Storage is a Maryland real estate investment trust ("REIT"). *See* Ex. 6 at 5 (annual report excerpts). It represents to the public that it "acquire[s], develop[s], own[s], and operate[s] self-storage facilities which offer storage spaces for lease on a month-to-month basis, for personal and business use." *Id.* It purports to be "the largest owner and operator of self-

3

storage facilities in the United States" with "direct and indirect equity interests in 2,200 self-storage facilities (141 million net rentable square feet of space) located in 38 states within the U.S. operating under the 'Public Storage' brand name." *Id.*

**B.**   **Public Storage Offered Storage Insurance in a Materially Uniform Way to All of the Members of the Class.**

Since 2006, Public Storage has required all of its customers to have insurance for their stored goods, regardless of their value.  The materially uniform Insurance Addendum to Public Storage's rental agreement states, "the Lease/Rental Agreement requires [the customer] to maintain insurance that covers loss or damage for the personal property that I intend to store at this facility." *See, e.g.,* Ex. 7 at 1 (noting renter's "obligation to have insurance for the stored goods"); *see also* Ex. 8.  Originally, the PSTIP, offered self-storage insurance at four coverage levels: (1) $2,000 of coverage for $9 a month; (2) $3,000 of coverage for $14 a month; (3) $4,000 of coverage for $19 a month; and (4) $5,000 of coverage for $24 a month.  Nearly 91% of Public Storage customers opted for the $9 premium when it was available.  That coverage level was eliminated in large part to drive up the gross premium payments by Class members. *See* Denis Dep. (Ex. 2) at 90, 192-93; *see also* Ex. 9.  It succeeded.  Today the program offered Public Storage customers three coverage levels: (1) $3,000 in coverage for $11 per month; (2) $4,000 in coverage for $13 per month; and (3) $5,000 of coverage for $15 per month.

The program is so successful because "the customers of Public Storage [ ] do not have a practical alternative to buying" the insurance offered. *See* Ex. 1 at PS000157042; Ex. 10 at 28 (report excerpts); *see also* Deposition of Brian Morgan ("Morgan Dep.") (Ex. 11) at 9 (noting the lack of practical alternatives when a Public Storage employee insisted that he have storage insurance to rent a unit).  The effect of Public Storage requiring renters to have insurance meant that by 2012 more than 80% of new renters purchased that coverage from Public Storage. *See* Ex. 1 at PS000157042.  As Public Storage's accounting firm, Ernst & Young ("E&Y") noted in its analysis of the PSTIP:

> Public Storage's long-standing business operations and strategies produced the highly valuable marketing intangible embodied in the opportunity to sell insurance to Public Storage's substantial tenant base (about 1.1 million tenants). The very high percentage of Public Storage's tenants that purchase insurance through the PSTIP indicates the value of Public Storage's customer base.  The availability and convenience of the PSTIP, especially when coupled with the contractual requirement (beginning in August 2006) that all new tenant have

4

> insurance coverage is, no doubt, a powerful inducement to tenants. The additional value arising from the contractual obligation to purchase tenant insurance belongs to Public Storage, as only Public Storage had the ability to impose such a requirement on the prospective tenant.

Ex. 1 at PS000157042; Haga Dep. (Ex. 13) at 166. Conversely, this supposedly independently-offered insurance was available nowhere else, and when a facility ceased to be managed by Public Storage, so too was PSTIP insurance on stored goods there immediately canceled by Public Storage. *See* Ex. 14 at 2.

Public Storage marketed the PSTIP to its customers in a uniform manner throughout the country. Employees were trained and given a specific script to use in selling the program to customers so that the insurance would be presented in a consistent and uniform manner approved by upper management. *See* Hamden Dep. (Ex. 15) at 190; *see also id.* at 100; Ex. 16 at 1 (advising property managers that there would be "no changes to the standard storage insurance presentation you should use with every new customer."); Ex. 17 at 1 ("It is extremely important to present insurance in a consistent way…", thereafter setting out the "only approved method for presenting insurance" with specific script to be followed) (emphasis in original); Ex. 18 at PS000001830 (discussing annual training requirement). Accordingly, Public Storage employees presented the insurance to customers in the same way throughout the country. *See* Hamden Dep. (Ex. 15) at 202.

The Insurance Addendum attached to the rental agreements of every Class member who purchased insurance from Public Storage was in all material respects uniform across the country. *See* Denis Dep. (Ex. 2) at 77-79, 154-55. The only variation in these forms was the inclusion of state-specific language regarding insurance fraud at the bottom of some versions of the Insurance Addendum. *Id.* at 60-62, 150-51. That language is immaterial to this case.

**C.**     **Public Storage Uniformly Deceived the Members of the Class.**

Public Storage did not disclose its financial interest in the storage insurance offered to its customers. Instead, it deceived them by omitting the truth from its uniform, scripted statements to them, thereby creating false impressions about the nature of the insurance offered and Public Storage's role in it. In its standard rental agreement, which is in all material respects identical across the country, Public Storage states: "**OCCUPANT UNDERSTANDS THAT [PUBLIC STORAGE] WILL NOT INSURE OCCUPANT'S PERSONAL PROPERTY AND THAT**

**[CUSTOMER] IS OBLIGATED UNDER THE TERMS OF THIS LEASE/RENTAL AGREEMENT TO INSURE HIS OWN GOODS.**" *See also* Denis Dep. (Ex. 2) at 63 ("The intent [of this language] is that Public Storage would not insure the goods of the tenant while being stored on the premises of Public Storage."). Public Storage's deceptive conduct is likewise reflected in the form Insurance Addendum to its rental agreement, which is also in all material respects identical across the country, and which states, "I authorize [Public Storage] to conduct the administrative function of receiving premiums to send to the insurance company on my behalf." *See* Ex. 7 at 1; Ex. 20; *see also* Denis Dep. at 68-69 (administrative function is "[t]he collection of the premium as part of the monthly billing cycle."). Public Storage omits that it is not simply a pass-through the conduit for its customers' insurance premium payments, but in fact is the ultimate recipient of them, despite not having a license to sell insurance. These omitted facts are critical to any fair assessment of the insurance offered by Public Storage. Throughout the Class Period, the form contracts Public Storage provided to its customers, on a non-negotiable basis, suffered from these same material omissions.

Neither Public Storage nor any of the companies engaged in this enterprise (including Willis, New Hampshire Insurance Company ("NHIC"), Perfect Solutions, and Marsh Consumer Lines ("Marsh")) engaged in any underwriting of these policies. *See* Thoke Dep. (Ex. 4) at 34-35. Instead, NHIC issued a single master insurance policy that covered all of the hundreds of thousands of class members, each of whom received a certificate of insurance that made no mention of Public Storage or the kickback it receives. *See* Ex. 6 at 11; Denis Dep. (Ex. 2_) at 31, 80; Haga Dep. (Ex. 13) at 82; Ex. 21. NHIC transfers 100% of the risk of the self-storage insurance policies purchased by Public Storage's customers to Public Storage's captive reinsurer, PSICH. Haga Dep. (Ex. 13) at 82. NHIC, in turn, pays PSICH 98% of the premiums collected on the self-storage insurance. PSICH pays the overwhelming majority of the premiums it receives to Public Storage. Public Storage used NHIC's insurance license (referred to as "fronting"), in violation of Florida law, to sell insurance to its customers, because Public Storage is not a licensed insurance company. *See* Denis Dep. (Ex. 2) 35-36. Willis, NHIC, and Public Storage worked together to set the rates for this insurance. *Id.* at 142.

Beyond its omissions in the rental agreement, Public Storage took additional measures to carry out its deception. The Insurance Addendum to the Lease/Rental Agreement represents the insurance premium as a pass-through charge, and fails to disclose that Public Storage keeps an

6

overwhelming majority of the premium for itself in the form of a kickback. *See* Thoke Dep. (Ex. 4) at 20 (noting that a non-insurance company receiving payment out of insurance premiums paid by insureds was not a concept with which he was familiar). Additionally, the monthly premiums for these insurance policies are added to Public Storage's customers' monthly billing statements as a line-item separately designated as an insurance charge, with no indication that Public Storage obtains an overwhelming majority of this charge through its illegal kickback scheme. Charges for customers' insurance premiums appear on their monthly statements because Public Storage's rental agreement requires that "the additional amount for such insurance coverage must be included with the monthly payments[.]" *See* Ex. 19 at 1 at 2; Ex. 22 at PS000157078-80.

Public Storage made sure that its customers could not discover the truth about the insurance it provided. Neither the certificate of storage insurance provided by Public Storage to its customers, nor the Insurance Addendum, nor any other document, discloses the participation of Public Storage or PSICH in the PSTIP. *See* Ex. 23; Denis Dep. (Ex. 2) at 66-67, 79-80, 174-75; Thoke Dep. (Ex. 4) at 53; Haga Dep. (Ex. 13) at 70-72. To the contrary, Public Storage's storage insurance hotline manual, for use by those answering questions from consumers about the PSTIP, specifically instructs that if a consumer asks if this is a Public Storage insurance program, the consumer is to be told that it is not. *See* Ex. 24 at 6; Denis Dep. (Ex. 2) at 173-75; *see also* Haga Dep. (Ex. 13) at 130 (customer service representatives instructed that they must not call the PSTIP "our insurance."). Nor did Public Storage disclose the kickback it received on every premium payment to its customers. *See* Denis Dep. (Ex. 2) at 73-74. Likewise, the kickback was not disclosed to the various state insurance regulatory agencies. *See* Denis Dep. (Ex. 2) at 128-29. This may be the case in part because this "fronting" arrangement is illegal in some states.

Given the shroud of secrecy that Public Storage placed over the PSTIP, and the fact that so few executives at Public Storage or its co-venturers were even aware of these facts, there was simply no way the members of the Class could have discovered the truth. *See, e.g.,* Hamden Dep. (Ex. 15) at 61 (admitting lack of knowledge); Thoke Dep. (Ex. 4) at 21 (no understanding of whether Public Storage was profiting from the PSTIP); Ex. 25 at 22 (PSICH – NHIC reinsurance agreement requiring both parties to keep the agreement and its terms confidential "as against third parties, with the exception of" Public Storage); Ex. 26 at 4 (PSICH – Public Storage

access fee agreement requiring that the parties not disclose "any information relating to the affairs of Public Storage . . . or [PSICH] nor the relationship of the Parties one to another" and that they "prevent any such disclosure by their employees and agents"). The secrecy pervading the operation of the PSTIP was so elaborate that Public Storage did not tell its own management-level employees about the existence of PSICH or the kickbacks, despite the fact that these employees received financial incentives for pushing customers into purchasing insurance through the PSTIP. *See* Ex. 5, Mesmer Dep. at 75-76; 70 ("Q. Do you know – have you ever heard of a company called Public Storage of Hawaii, again, other than from counsel? A. Not until yesterday. ... Q. And you were unaware that any Public Storage affiliates were involved in reinsurance, correct? A. Correct." * * * "Q. – what are the metrics, to your recollection, based on that bonus template? ... Is insurance one of the metrics? A. Insurance is one of the metrics of the 15.").

Public Storage also concealed the fraudulent nature of its undisclosed kickback by referring to it as an "access fee." This too is part of the fraudulent enterprise. When questioned, several witnesses could not even explain what was meant by this term. *See* Denis Dep. (Ex. 2) at 106 ("Q: What is an access fee?" "A: I don't know."); Thoke Dep. (Ex. 4) at 19 ("Q: Do you know . . . what an access fee is in the insurance context?" "A: No." "Q: Never heard that phrase before?" "A: No."). Moreover, the way the amount of the "access fee" kickback was set was fraudulent. Capri Haga, one of the Public Storage executives in charge of the PSTIP (and apparently the only employee of PSICH), negotiated the fee on behalf of PSICH, while the counter-party to this supposedly "arms-length" transaction, representing Public Storage, was her boss. *See* Haga Dep. (Ex. 13) at 12-13,18, 96-102. Haga did not even have access to the Ernst & Young report that supposedly provided the basis for the "access fee" and, according to her, established its reasonableness. *Id.* at 99.[3] That is, PSICH kicked back to Public Storage roughly 75% of every premium dollar paid, based on a negotiation between Capri Haga and her boss at which Haga did not even have access to the most basic information she would need to negotiate effectively. It is thus little surprise that Public Storage ended up with most of the money. Further, because the loss ratio on the PSTIP was only about 10% (and in some years even less),

---

[3] Capri Haga testified that the access fee paid by PSICH to Public Storage was the amount of money left over after subtracting the costs of administration of the insurance program (including fees to Willis and the other co-venturers) and claims, and leaving PSICH what an independent insurance company would expect as an "acceptable" profit. *See* Haga Dep. (Ex. 13) at 100-102.

the vast majority of premium payments were pure profit to Public Storage. *See* Denis Dep. (Ex. 2) at 87, 113; Haga Dep. (Ex. 13) at 92; *see also* Ex. 27 (2008 and 2009 payment to Public Storage of over $41 million each year on collected premiums of $56 million and $62 million and 9% and 10% loss ratio respectively); Ex. 1 at PS000157042; Ex. 28 at 16 (2011 estimated pre-tax profits of $58 million on premiums of $70 million).

Public Storage acted in concert with a number of other entities to perfect its deceptive scheme. At various times during the formulation of the PSTIP, and throughout its life, Public Storage worked with, among others, Willis, NHIC, Perfect Solutions, and Marsh. *See* Hamden Dep. (Ex. 15) at 70 (discussing meetings with NHIC and Willis or Marsh about eliminating the lowest-cost insurance option to up-sell Public Storage customers into more expensive insurance products); Denis Dep. (Ex. 2) at 117 (describing NHIC, Willis and Public Storage as "a partnership . . . on the day-to-day activities" of the PSTIP); 125 (Public Storage worked with NHIC and Willis on the design, marketing and execution of the PSTIP); Haga Dep. (Ex. 13) at 30, 39, 115 (same).[4]

**D.    Public Storage's Deceptive Practices Ensnared the Class Representative.**

The proposed Class representative has claims that are typical of the claims of other Class members. Just like each Class member, Brian Morgan purchased an insurance policy from Willis Storage Insurance for the goods he stored in a Public Storage unit, the first in approximately the fourth quarter of 2011 and another for the goods he stored in a different Public Storage unit on February 14, 2013. Declaration of Brian Morgan ("Morgan Decl.") (Ex. 22) at 1; Morgan Dep. (Ex. 11) at 6. In approximately 2011, Mr. Morgan rented self-storage space at the Public Storage located at 2336 Biscayne Boulevard, Miami, Florida 33137. Morgan Decl. at 1. Consistent with the requirement found in his Public Storage rental agreement that he maintain

---

[4] Ironically, while it omitted material facts regarding its participation in and profit from the PSTIP from its disclosures to its customers, Public Storage insisted that its co-venturers make complete disclosures of their role in any underlying insurance product to it, as well as the fees they were receiving and whether there were alternatives available. *See* Ex. 29 at 2; Ex. 12 at 3; Thoke Dep. (Ex. 4) at 50-53 (Willis-Public Storage agreement requires that if Willis uses a wholesale insurance broker as part of the PSTIP, it must disclose to Public Storage whether it (Willis) will benefit in any way, whether directly or indirectly, because being "transparent and properly disclos[ing] any intermediaries we may be using and any compensation they may be earning" is "just good business practice"); Haga Dep. (Ex. 13) at 64-66, 70 (admitting that she negotiated this language on behalf of Public Storage)

insurance for his stored belongings, Mr. Morgan purchased $2,000 of coverage for $9 a month. *Id.* Each month since renting his self-storage space and purchasing self-storage insurance, Mr. Morgan was charged $9 on his monthly statement from Public Storage, which he paid. *Id.* On February 14, 2013, Mr. Morgan also rented self-storage space at Public Storage location number 00501, located at 3700 NW 29th Avenue, Miami, Florida 33142. *Id.* at 2. Consistent with the requirement found in his Public Storage rental agreement that he maintain insurance for his stored belongings, Mr. Morgan purchased $2,000 of coverage for $9 a month. *Id.* Each month since renting this self-storage space and purchasing self-storage insurance, Public Storage charged Mr. Morgan $9 on his monthly, which he paid by credit card over the telephone or the internet. *Id.* None of Mr. Morgan's documents disclose, in any way, Public Storage's participation in the PSTIP. *See* Ex. 22.

### III.    ARGUMENT AND CITATION OF AUTHORITIES

Class actions have long been recognized as an essential tool for adjudicating cases involving multiple claims that have similar factual and/or legal inquiries and that might be too modest to warrant prosecuting on an individual basis. In crafting Rule 23, "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Class actions thus give voice to plaintiffs who "would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). Class actions also serve an important deterrent function. "The public at large . . . benefit[s] from a class action and expeditious adjudication of the issues involved, since class actions reinforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public enforcement or by single-party private enforcement." *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 733 (N.D. Ill. 1977) (citations and quotations omitted).

Thus, "[i]t is well-established that class actions are a particularly appropriate and desirable means of redressing common claims for uniform legal violations that affect large numbers of persons in the same way." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 603 (S.D. Fla. 2003); *see also Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 41-42 (1st Cir. 2003) (classes of consumers are particularly appropriate for certification). The policies underlying class action litigation require that the standards for certification under Rule 23 be

liberally construed. *See, e.g., Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) (citations omitted) ("The interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action."); *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984) ("Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule.").

Although the Court must undertake a rigorous analysis of the Rule 23 prerequisites, the Court has broad discretion to certify. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004). In making the decision, the Court does *not* determine whether the plaintiff will ultimately prevail on the merits and is generally bound to accept substantive allegations in the complaint as true. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *see also In re Checking Account Overdraft Litig.*, 275 F.R.D. at 671. But it may consider the factual record in deciding whether the requirements of Rule 23 are satisfied. *Valley Drug. Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003). Courts "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000). In other words, the Court undertakes "an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or are susceptible of common proof equally applicable to all class members." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D. Mich. 2001) (quotation omitted).

Public Storage concedes that certification is appropriate here by virtue of its filing of a motion for partial summary judgment [D.E. 110] which seeks judgment as a matter of law against the class as a whole, not simply the lead plaintiffs. While such relief is not warranted for a number of reasons that Plaintiffs will discuss in their response to that motion, including that the facts do not exonerate Public Storage but instead prove its liability, that the facts apply equally to all class members is a point about which Plaintiffs and Public Storage agree. Based on this concession the Court should grant the instant motion without more.

A.   **Plaintiff and this Case Satisfy the Requirements of Rule 23(a).**

Rule 23(a) requires a party seeking class certification to affirmatively satisfy four prerequisites:   (i) numerosity;   (ii) commonality;   (iii) typicality;   and   (iv) adequacy of representation. *Klay*, 382 F.3d at 1250; *also Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551 (2011).

1.      **The Class Is So Numerous that Joinder of All Members Is Impracticable.**

Rule 23(a)(1) requires that the proposed Class be so numerous that joinder of all members is impracticable.  Joinder need not be impossible.  The rule only requires that the difficulty or inconvenience of joining all members makes use of the class action appropriate. "[A] numerical yardstick is not the determinant for class certification; rather a court should examine the numbers involved to see if joinder of all is impossible or impracticable." *Hastings-Murtagh v. Texas Air Corp.*, 119 F.R.D. 450, 459 (S.D. Fla. 1988).  There is "no definite standard as to the size a given class must attain in order to satisfy Rule 23(a)(1)." *Tapken v Brown*, No. 90-691-CIV, 1992 WL 178984 at *27 (S.D. Fla. March 13, 1992).  It is generally the rule in this circuit that a class of more than 40 members satisfies the numerosity requirement. *See AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 680-81 (N.D. Ala. 2005) (citing *Cox v. American Cast Iron Pipe Co.*, 784 F. 2d 1546, 1553 (11th Cir. 1986)); *Kuehn v. Cadle Co.*, 245 F.R.D. 545, 548 (M.D. Fla. 2007).

This case easily satisfies the numerosity requirement**.**  Public Storage operates approximately 2,200 facilities nationwide, including 250 facilities in Florida.  In 2013 alone, Public Storage issued 759,000 insurance certificates for policies sold to its customers. *See* Ex. 6 at 11.  Although the exact number of Class members is unknown at this time, Public Storage's documents and public disclosures indicate that the proposed Class is comprised of hundreds of thousands of customers who are geographically dispersed across 38 states, making joinder of them all impracticable. *Kilgo v. Bowman Transp., Inc.*, 789 F.3d 859, 878 (11th Cir. 1986) (numerosity satisfied by class of 31 members who were geographically dispersed across Florida, Georgia, and Alabama).  In addition, the class members can be readily identified from Public Storage's records, as the company maintains data including customer names, addresses, the location of the unit they rented, and their monthly insurance premium payments. *See* Ex. 30.

2.      **There Are Questions of Law and Fact Common to All Class Members.**

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted." *Williams v. Mohawk Indus., Inc.*, 568 F. 3d 1350, 1356 (11th Cir. 2009).  It only requires "at least one issue common to all class members." *Brown*, 212 F.R.D. at 604; *see also In re Checking Account Overdraft Litig.*, 275 F.R.D. at 674 (finding commonality where counsel for defendant conceded that there was at least one common issue).  Where the defendant is alleged to have "engaged in a

standardized course of conduct that affects all class members," commonality is satisfied. *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685-86 (S.D. Fla. 2004). Commonality "will often be satisfied in cases of form contracts such as insurance policies, so long as the policy documents are uniform or largely the same throughout the case." *Mills v. Foremost Ins. Co.*, 269 F.R.D. 67, 74 (M.D. Fla. 2010); *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action"). "Plaintiffs' legal claims need not be completely identical and factual differences concerning treatment or damages will not defeat a finding of commonality." *Brown*, 212 F.R.D. at 604.

The Class satisfies the commonality test. The allegations and proof (summarized above) focus on the existence, scope, duration, and efficacy of Public Storage's standardized conduct, including in particular the use of form contracts. The liability proof will focus on the omissions of Public Storage – proof common to all of the Class members. Public Storage's disclosures to all Class members, and the information they omitted, were materially uniform.

Thus, while only one question of law *or* fact is required, there are many questions of law and fact common to the proposed Class, including:

- Whether Public Storage engaged in a deceptive and unfair business practice by concealing from the Class its financial interest in its self-storage insurance;

- Whether the representations made and insurance premiums collected by Public Storage would lead a reasonable consumer to believe it was a pass-through charge;

- Whether Public Storage receives undisclosed kickbacks from its self-storage insurance;

- Whether Public Storage manipulated the Class through the sale of insurance products in order to maximize its own profits;

- Whether and to what extent the Defendant's conduct injured Plaintiff and the Class members;

- Whether Public Storage breached its contract with the Class members, and violated the implied covenant of good faith and fair dealing, by keeping kickbacks provided by its insurers, while representing in the rental agreement that it would not insure the property of the members of the Class;

- Whether Public Storage unlawfully enriched itself at the expense of the Class;

- Whether Public Storage engaged in a racketeering enterprise; and

- Whether Public Storage's conduct is unconscionable.

### 3.      Plaintiff's Claims Are Typical of Those of the Class.

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." This "typicality" requirement is met when the claims of the representative plaintiffs arise from the same course of conduct that gives rise to the claims of the other class members, and where the claims are based upon similar legal theories and are not antagonistic to those of the class. *Pottinger v. Miami*, 720 F. Supp. 955, 959 (S.D. Fla. 1989). Typicality and commonality are related, with commonality referring to the group characteristics of the class as a whole, and typicality focusing on the named plaintiff's claims in relation to the class. *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 686 n.23.

Typicality does not require identical claims or defenses, and a "factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Indeed, any alleged atypicality between the named plaintiff's claims and those of the class "must be clear and must be such that the interests of the class are placed in significant jeopardy." *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996). Nor do variations in the amount of damages vitiate typicality. *Kornberg*, 741 F.2d at 1337; *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 687.

Plaintiff's claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Class members. Plaintiff and the members of the Class, governed by materially uniform agreements, were damaged in the amount of their contribution to the kickback to Public Storage. Plaintiff and the Class seek redress via common legal claims. Thus, Plaintiff satisfies Rule 23(a)(3).

### 4.      Plaintiff Will Fairly and Adequately Protect the Interests of the Class.

Rule 23(a)(4) requires that the representative party will "fairly and adequately protect the interests of the class." This requirement is satisfied when (i) the class representative has no interests conflicting with the class; and (ii) the representative and his attorneys will properly prosecute the case. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Valley Drug*, 350 F.3d at 1189. Both prongs are satisfied here.

a.     Plaintiff's Interests Do Not Conflict with the Interests of the Class.

The lead plaintiff is adequate if he shares common interests with the class members and seeks the same type of relief for himself as he seeks for the class. *Pottinger*, 720 F. Supp. at 959. Even the existence of minor conflicts of interest between the plaintiff and the class "alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Valley Drug*, 350 F.3d at 1189. A fundamental conflict exists where the economic interests and objectives of the class representatives "differ significantly from the economic interests and objectives of unnamed class members," such as when other members of the class actually benefitted from the conduct challenged by the plaintiffs. *Id.* at 1189-90. No such conflict exists here.

Neither Plaintiff nor his counsel have any interests that are antagonistic to those of the absent Class members. The central issues in this case – the existence, unlawfulness, and effect of Public Storage's scheme – are common to the claims of Plaintiff and the Class. Plaintiff, like each absent Class member, has a strong interest in proving Public Storage's scheme, establishing its unlawfulness, demonstrating the impact of the illegal conduct, and obtaining redress. As Plaintiff proves his own claims, he also will be proving the claims of hundreds of thousands of Class members. Plaintiff thus "share[s] the true interests of the class." *Texas Air*, 119 F.R.D. at 459; *see also Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997) (the "common goal of each member of the class" is to remedy the unlawful conduct, and "[i]f the Plaintiffs succeed, the benefits will inure to all class members"). There is no conflict between Plaintiff and the absent Class members, and Plaintiff satisfies the requirements of Rule 23(a)(4).

b.     Plaintiff's Counsel Are Qualified.

Class counsel must be qualified to represent the Class, and the plaintiff must participate in the prosecution of the litigation. *Brown*, 212 F.R.D. at 605. The law firms seeking to represent the Class here include very qualified lawyers experienced in the prosecution of consumer class actions, and they have collectively recovered over a billion dollars for class members in other litigation. In support of the determinations required under Federal Rules 23(a)(4) and 23(g), the undersigned firms seeking appointment as Class Counsel have included resumes setting forth their experience and expertise in class actions. *See* Ex. 31. Likewise, Plaintiff has expressed his commitment to overseeing the attorneys and participating in the prosecution of the case. *See* Ex. 22.

**B.      Plaintiffs and this Case Satisfy the Requirements of Rule 23(b).**

In addition to establishing the elements of Rule 23(a), Plaintiff also must satisfy at least one of the conditions of Rule 23(b). *Klay*, 382 F.3d at 1250. Under Rule 23(b)(3), certification is appropriate if: (i) common questions of law or fact predominate over questions affecting individual class members only; and (ii) class treatment is superior to other methods available for adjudicating the controversy. Certification is particularly appropriate where the focus of the claim is on the defendant's common course of conduct, as it is here. *See, e.g., Amchem Prods. Inc., v. Windsor*, 521 U.S. at 625 ("[p]redominance is a test readily met in certain cases alleging consumer . . . fraud"); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003); *Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir. 1978).

**1.      Common Questions of Law or Fact Predominate.**

a.      Common Issues Predominate Because Legal and Factual Questions Will Be Resolved with Proof Common to All Class Members.

"Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)); *see also Moore v. Painewebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (common issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof"). It is not necessary that all questions of law or fact be common; only some questions must be common, and they must predominate over individual questions. *Klay*, 382 F.3d at 1254; *see also In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (the rule "calls only for predominance, not exclusivity, of common questions"); *Aranaz v. Catalyst Pharm. Partners Inc.*, No. 13-CV-23878-UU, 2014 WL 4814352, at *6 (S.D. Fla. Sept. 29, 2014) (Ungaro, J.) (citing *Klay* and granting motion for class certification). Numerous courts have held that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001)).

The predominance inquiry seeks to determine the evidentiary effect of adding plaintiffs to

the Class.  If adding more plaintiffs requires the introduction of "significant amounts of new evidence," this suggests that individual issues are important.  Conversely, if adding more plaintiffs leaves the amount of evidence needed to prove the claims "relatively undisturbed," common issues likely predominate. *Klay*, 382 F.3d at 1255.

Rule 23(b)(3) is satisfied here.  As the evidentiary proffer summarized above demonstrates, the salient evidence necessary to establish Plaintiff's claims is common to both Plaintiff and all members of the Class; they all seek to prove that Public Storage's material omissions and deceptive conduct were wrongful.  And the evidentiary presentation changes little if there are 100 class members or 100,000:  in either instance, Plaintiffs would present the same evidence of (i) Public Storage's form contracts and Insurance Addenda, with similar terms, applicable to Plaintiff and all Class members; (ii) Public Storage's universal failure to disclose to its customers that, despite its statements to the contrary in those uniform contracts and Insurance Addenda, it does in fact receive the vast majority of their insurance premium payments and its subsidiary is in fact the insurer of their goods.  In the words of the Eleventh Circuit, the foregoing evidence has a direct impact on every Class member's effort to establish liability and entitlement to relief.  *Klay*, 382 F.3d at 1255.  Therefore, common issues predominate.

Courts routinely hold that common questions of law and fact predominate for purposes of Rule 23(b) in cases, such as this, based on alleged omissions and misrepresentations transmitted in standard contracts distributed to all class members.  For example, in another case against Public Storage involving fraudulent insurance disclosures, *Bang v. United States Fidelity and Guaranty Co.*, 2010 WL 9072984 (Ca. Super. Ct. Mar. 11, 2010), the trial court rejected Public Storage's claim that individual issues would predominate because the degree to which each member of the class relied on the alleged misrepresentations would vary by person.  The court determined that because "[t]he written sales materials were common and the materiality of the alleged misrepresentations will be based on a reasonable consumer standard," "[t]he evidence of common representations might support a classwide inference of reliance." *Id.* at *5.  The court then certified a class of tenants who had suffered damages as a result of Public Storage's misrepresentations in the offering of insurance in violation of California's Unfair Competition Law. *Id.* at *8.  Because Public Storage's omissions were part of standard contracts distributed to all class members, common issues predominate.

Likewise, damages will be calculated using Public Storage records.  Under the theories of

liability advanced by Plaintiff, the damages here are the undisclosed kickbacks to Public Storage. Those sums are calculated by Public Storage on a regular basis. After that, it is simply a matter calculating each Class member's share of the total payments for storage insurance to determine what portion of the kickback is theirs and should be refunded to them. *See also* Exs. 30.

      b.    <u>Common Factual and Legal Issues Predominate in Plaintiff's Causes of Action.</u>

***Breach of Contract and the Duty of Good Faith and Fair Dealing***. The common law implies the duty of good faith and fair dealing in every contract in terms of performance and enforcement. *See* RESTATEMENT (2D) OF CONTRACTS §205 (1981) (the "RESTATEMENT OF CONTRACTS"). Under Florida law, a contract action requires three elements: (1) a valid contract; (2) a material breach; and (3) damages. *Friedman v. New York Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008). Florida courts treat the implied covenant of good faith and fair dealing as part of a breach of contract claim.

      Claims for breach of contract are regularly certified, even where the laws of multiple states are at issue. *See In're Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010) (certifying 48-state breach of contract class in a case involving form policy contracts); *In re Checking Account Overdraft Litig.*, 275 F.R.D. at 677-78 (common issues predominate and certification is appropriate where "the focus of the litigation concerns the alleged common course of unfair conduct embodied in" the defendant's scheme). In *Allapattah Services*, for example, the Eleventh Circuit upheld certification of a class of 10,000 dealers in 35 states including Florida. Among the claims brought by the Exxon dealers was that Exxon breached their contracts and violated the duty of good faith and fair dealing. Exxon promised dealers that it would offset a credit card processing fee by reducing the wholesale price that each dealer paid for gasoline. However, Exxon only provided the offset for approximately six months, then stopped the offset but omitted to inform the dealers. 333 F.3d at 1251. In focusing on the materially similar nature of both the agreements and the breach, the Court rejected Exxon's plea that individual issues inherent in each dealer's breach of contract claim predominated:

> Because all of the dealer agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole. Whether it breached that obligation was a

question common to the class and the issue of liability was appropriately determined on a class-wide basis.

*Id.* at 1261. Thus, "[o]nce the plaintiffs proved that Exxon engaged in this behavior, each individual plaintiff's breach of contract claim was substantially advanced" by this class-wide evidence. *Klay*, 382 F.3d at 1266 (describing *Allapatah Services*).

Here, the Class is made up of all Public Storage customers who bought storage insurance from the PSTIP. Class members can be readily identified from Public Storage's records. *See Roper*, 578 F.2d at 1112. All of the Class members have materially identical contracts with Public Storage which omitted to disclose the kickback to Public Storage. *See* Denis Dep. (Ex. 2) at 77-79, 154-55. Those contracts uniformly stated that Public Storage would "not insure Occupant's Personal Property." *See, e.g.*, Ex. 19 at 2; *see also* Denis Dep. (Ex. 2) at 63. All of the members of the Class have materially identical Insurance Addenda to those contracts, which state that Public Storage will only "conduct the administrative function of receiving premiums to send to the insurance company" but omit to disclose that roughly 75 cents of every dollar of those premium payments will be kicked back to Public Storage. *See* Denis Dep. (Ex. 2) at 68-69; Ex. 20. Each received a certificate of insurance, derived from a single master insurance policy, that again made no mention of Public Storage or the kickback it receives. *See* Ex. 6 at 11; Denis Dep. (Ex. 2) at 31, 80; Haga Dep. (Ex. 13) at 82; Ex. 21. Thus, because of these uniform documents, when the jury determines that Public Storage breached its contract with Plaintiff by concealing these facts and acting contrary to its representations, it will determine Public Storage's liability to the Florida Class as a whole. *Klay*, 382 F.3d at 1255.

**Unjust Enrichment.** Under Florida law, the essential elements that must be proven under a theory of unjust enrichment are a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. *Jackson-Jester v. Aziz*, 48 So. 3d 88, 90 (Fla. 2d DCA 2010). Claims alleging unjust enrichment are regularly certified, even where the laws of multiple states are at issue. *See Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 697 (certifying 17-state unjust enrichment subclass where the gravamen of the claim was that defendants "were unjustly enriched by . . . illegal overcharges and equity requires disgorgement"); *In re Mercedes Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 119 (D.N.J. 2010). As the court in *Muzuco v.*

19

*Re$ubmitIt, LLC*, 297 F.R.D. 504, 521 (S.D. Fla. 2013), observed, where "Defendants' business operations are the same to all members of the putative class," predominance is satisfied. In that case, the court found predominance satisfied because the manner in which the defendants were alleged to have collected unauthorized NSF fees were the same for all members of the class. *Id.* Likewise, here, Public Storage surreptitiously took a roughly 75% kickback from every customer who purchased insurance through the PSTIP in contravention of its uniform contracts which uniformly omitted the fact of the kickback and the manner in which Public Storage in fact participated in the program. *See supra* at 18-19; *infra* at 20-21; *see also In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 657 (S.D. Fla. 2012) (King, J.) (certifying unjust enrichment class where bank uniformly manipulated posting order of deposit and withdrawal items and extended secret lines of credit to maximize overdraft fees) ; *Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 674 (S.D. Fla. 2012) (Scola, J.) (certifying unjust enrichment claim where bank and insurer concealed kickback from forced-place homeowner's insurance); *County of Monroe, Fla. v. Priceline.com, Inc.*, 265 F.R.D. 659, 671 (S.D. Fla. 2010) (Moore, J.) (certifying unjust enrichment claim where "Defendants' business operations are the same to all members of the putative class").[5] Public Storage's ill-gotten gains – the "access fee" kickback – are the damages due the class. *See, e.g., Commodity Futures Trading Comm'n v. Fleury*, No. 03-61199-cv-Marra, 2010 WL 3835134, at *2 (S.D. Fla. Sept. 29, 2010), *aff'd* 479 F. App'x 940 (11th Cir. 2012).

*Unconscionability*.   Under Florida law, unconscionability requires a showing of both procedural and substantive unconscionability. *Basulto v. Hialeah Automotive*, 141 So. 3d 1145, 1158-59 (Fla. 2014); *Woebse v. Health Care & Ret. Corp. of Am.*, 977 So. 2d 630, 632 (Fla. 2d DCA 2008).   Procedural unconscionability concerns the manner in which the contract is entered, whereas substantive unconscionability asks whether the contractual terms are unreasonable and unfair. *Basulto v. Hialeah Automotive*, 141 So. 3d at 1157-58 n. 3, 4.   These two elements need not be present in the same degree, and the greater one is present the less is required to establish

---

[5] Public Storage will likely attempt to argue that that the panel's observation in *Vega v. T-Mobile USA, Inc.*, 564 F. 3d 1256, 1274 (11th Cir. 2009), that because of individualized equities common questions with regard to unjust enrichment claims will rarely predominate means that this claim should not be certified.   However, as the post-*Vega* decisions above explicitly recognize, that assertion is not applicable where the members of the class have, as here, all been subjected to the same business conduct by the defendant.

the other. *Id.* at 1159 (discussing "sliding scale").

Public Storage's contracts and Insurance Addenda are presented on a take it or leave it basis. They are pre-printed forms that do not allow for modification, and certainly do not allow for modification of the kickback to Public Storage, as this is nowhere disclosed to the consumer. *See* Denis Dep. (Ex. 2) at 66-67, 73-74, 79-80, 174-75; Thoke Dep. (Ex. 4) at 53; Haga Dep. (Ex. 13) at 70-72. Public Storage marketed the PSTIP to its customers in a uniform manner throughout the country. Hamden Dep. (Ex. 15) at 202. Employees were trained and given a specific script to use in selling the program to customers. This was done so that the insurance would be presented in a consistent and uniform manner approved by upper management. *See id.* at 190; *see also id.* at 100; Ex. 16 at 1; Ex. 17 at 1; Ex. 18 at 7.

As noted above, *supra* at 18-19, the contracts and Insurance Addenda that Public Storage entered into with consumers in Florida are the same in all material respects. Thus, in deciding whether those terms in Plaintiff's contract and Insurance Addendum are unreasonable and unfair (that is, substantively unconscionable), the jury will necessarily decide that question for the Florida Class as a whole. *Klay*, 382 F.3d at 1255   Once again for this claim, common factual and legal issues predominate. *See In re Checking Account Overdraft Litig.*, 286 F.R.D. at 657 (certifying unconscionability claims).

**Florida Deceptive and Unfair Trade Practices Act.** FDUTPA makes unlawful "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204. FDUTPA claims are especially good candidates for class certification because the statute contemplates an objective standard. That is, if an "objective reasonable person would have been deceived" by the defendant's conduct and suffered damages, he has suffered a compensable loss under the statute. *See Fitzpatrick v. General Mills, Inc.*, 635 F. 4d 1279, 1283 (11th Cir. 2011). It does not matter what the plaintiff *actually* thought when consummating the transaction. *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 702-703 (Fla. 3d DCA 2000).[6] Thus, the "members of a class proceeding under [FDUTPA] need not individually prove reliance on the alleged misrepresentations. It is

---

[6] *See also Davis v. Powertel, Inc.*, 776 So. 2d 971, 975 (Fla. 1st DCA 2000); *Turner Greenberg Assocs., Inc. v. Pathman*, 885 So. 2d 1004, 1009 (Fla. 4th DCA 2004); *S.D.S. Autos, Inc. v. Chrzanowski*, 982 So. 2d 1 (Fla. 1st DCA 2008) (following *Davis*); *Cole v. Echevarria, McCalla, Raymer, Barnett & Frappier*, 965 So. 2d 1228, 1232 (Fla. 1st DCA 2007).

sufficient if the class can establish that a reasonable person would have relied on the representations." *Id.* at 703 (quotation omitted). Whether a defendant's "conduct would deceive an objective reasonable consumer is a common issue for all the putative class members, amenable to classwide proof." *Fitzpatrick*, 635 F.3d at 1283 (brackets omitted). Consequently, the absence of individual reliance issues means that common issues predominate. *See Davis*, 776 So. 2d at 975; *S.D.S. Autos*, 982 So. 2d at 1; *Cole*, 965 So. 2d at 1232. Whether Public Storage's omissions in its materially uniform contracts and Insurance Addenda, *see supra* at 18-19, would have deceived an objective consumer is a question that predominates over any potential individual issues. Class members were damaged in the amount of their premiums that went to pay the undisclosed kickback to Public Storage. *See Latman*, 758 So. 2d at 703; *Turner Greenberg Assoc., Inc.*, 885 So. 2d at 1008 (damages are undisclosed profits); *see also* Haga Dep. (Ex. 13) at 100-102 (defining "access fee" kicked back to Public Storage as the amount in excess of what insurance would cost to offer, including overhead and profit for carrier).

**RICO.** In counts VII, VIII, and IX, Plaintiff alleges several different RICO violations on behalf of the nationwide Class based on allegations that (1) Public Storage operated a scheme through a "RICO enterprise" that "included Public Storage, NHIC, Willis, Perfect Solutions Storage Insurance, Public Storage or Hawaii, and other unnamed co-conspirators (Compl. ¶¶ 112, 130); (2) the "common purpose" of this enterprise was to maximize Public Storage's revenues by "manipulate[ing] premiums to cover kickbacks paid to Public Storage" (*id.* ¶¶ 114, 132); (3) Public Storage made material omissions to Class Members in their standard rental agreements, "intentionally fostering the mistaken impression that the insurance premiums paid by the Plaintiffs and the Class Members for the insurance policy was the cost of the policy, when in fact the premiums also included a large kickback to Public Storage"; (*id.* ¶¶ 121, 139); and that (4) Public Storage used the United States mail and wire facilities to facilitate the scheme (*id.* ¶ 122-23, 140-41). *See* D.E. 78 at 5. The evidence necessary to establish these well-pleaded allegations (D.E. 78 at 5), is common to all Class Members. Namely, to prove their RICO claims, all Class Members would have to prove:

> (i)     the existence of a RICO enterprise built and managed by Public Storage and comprised of insurance brokers, an independent insurance company, and a captive reinsurer, through which Public Storage hid from Class members that Public Storage was actually insuring their goods and receiving the majority of the premium payments (*see supra* at 4-10);

(ii)    Public Storage's form rental agreements and insurance addenda, with identical disclosures and omissions regarding insurance, applicable to all Class Members, in which (1) Public Storage failed to disclose that it would insure the Class Members' belongings, and instead asserted that it would not and that it would instead act solely in an administrative capacity in collection the premiums and (2) failed to disclose in those that it would receive a substantial kickback from the sale of the required insurance amounting to 75% of the cost of the insurance premiums paid by all Class members (*see supra* at 4-5); and

(iii)    Public Storage's use of the mail and wires in furtherance of the scheme (*see* Exs. 19, 22), and directing the proceeds of the scheme (the Class' premium payments) to the various entities comprising the RICO enterprise via these same instrumentalities.

Because this evidence has "a direct impact on every Class member's effort to establish liability" for mail and wire fraud and entitlement to relief, classwide issues predominate over individual issues under Rule 23(b). *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.*, 100 F.R.D. 685, 699 (N.D. Ga. 2001), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)).

The RICO claims Plaintiff asserts are exactly the type of claims the Eleventh Circuit held should be resolved on a classwide basis in *Klay*. In that case, the court considered the class certification of RICO claims brought by a putative class of doctors against the health maintenance organizations ("HMOs") to which they subscribed. *Id.* at 1246. The Eleventh Circuit reversed the district court's order denying class certification, determining that because the HMO defendants "operate[d] nationwide and allegedly conspired to underpay doctors across the nation," "numerous factual issues relating to the conspiracy [were] common to all plaintiffs." *Id.* at 1256. The court explained that the plaintiffs' "RICO claims [we]re not simply individual allegations . . . lumped together . . . [i]nstead, the very gravamen of the RICO claims is the 'pattern of racketeering activities' and the existence of a national conspiracy . . . these very facts constitute essential elements of each plaintiff's RICO claims." *Id.*

Here, as in *Klay*, the alleged scheme was perpetrated through standard form contracts applicable to all Class Members. In *Klay*, the court found that the HMOs' "official corporate policy," through which the defendants perpetrated their conspiracy, "constitute[d] the very heart of the plaintiffs' RICO claims" and "would necessarily have to be re-proven by every plaintiff if each doctor's claims were tried separately." *Id.* at 1257. The court then went on to hold that even though some individual questions of fact existed, "the common issues of fact [in a RICO

action], concerning the existence of a[n enterprise and] a pattern of racketeering activity . . . are quite substantial" and "would tend to predominate over all but the most complex individualized issues." *Id.* at 1258–59. Here too, the Class Members' RICO claims against Public Storage will turn on proof of a coordinated scheme, the contents of the rental agreements sent to all Class Members, and the materiality of the omissions in those agreements. These issues predominate. *See, e.g. id.*; *Williams v. Mohawk Industries, Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009) (reversing a district court's denial of a motion for class certification of a RICO claim, finding that the plaintiffs' RICO claim was "not dependent on proof of individual acts of disparate treatment," although there were certain "decentralized" issues of fact about the defendant's conduct). Public Storage's ill-gotten gains are once again the damages due the class. *See, e.g., United States v. Philip Morris, Inc.*, 273 F. Supp. 2d 3, 8 (D.D.C. 2002) (disgorgement of ill-gotten profits is relief available through RICO).

Public Storage will likely attempt to argue, as it has in earlier filings, that establishing proximate causation for RICO requires a showing of individual reliance. *See, e.g.*, D.E. 70. The United States Supreme Court and this Court have soundly rejected this notion. Citing to the United States Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648-49 (2008), this Court recognized in its own Order on Motion to Amend, that to state a RICO claim, "Plaintiff is not required to show that he relied on any alleged misrepresentations or omissions." (D.E. 78 at 5). As the Court acknowledged in this section of its Order, the Supreme Court clearly held in *Phoenix Bond* that direct reliance is not an element of proximate cause in a civil RICO case based on mail fraud. 553 U.S. at 648-49 ("[N]o showing of reliance is required to establish that a person has violated § 1962 by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud.").

Moreover, even assuming *arguendo* that reliance were an element of Plaintiff's RICO claims, that element can be established at trial on a class-wide basis because it can be inferred from circumstantial evidence. Even before *Phoenix Bond*, the Eleventh Circuit recognized in *Klay* that reliance for purposes of RICO can be inferred from circumstantial evidence and proven on a classwide basis. In *Klay*, the court held that even where "each plaintiff must provide reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue.)" *Klay*, 382 F.3d at 1259. Therefore, it "does not strain credulity to conclude that each plaintiff, in entering into contracts"

with Public Storage, relied on its omissions. *See id.* at 1259; *see also Negrete v. Allianz Life Ins. Co. of North America*, 238 F.R.D. 482, 491 (W.D. Cal. Nov. 21, 2006) (holding that "[g]eneralized proof that the common, uniform written sales marketing materials are misleading" because of material omissions "would give rise to a common sense inference that no rational class member would purchase the annuities in questions upon adequate disclosure of the facts, regardless of their individual circumstances"); D.E. 110 at 12 (Public Storage conceding omissions because its "Lease/Rental Agreement is Silent as to Whether Public Storage or Any Affiliate Would Receive Compensation For Their Respective Roles Within The [Tenant Insurance Program])."[7]

c.    Public Storage's Affirmative Defenses Do Not Vitiate Predominance.

In scattershot fashion, Public Storage asserts a number of what it terms affirmative defenses. These assertions lack any detail or foundation, making it difficult to discern what they mean or what facts, if any, support them. A number of them are not proper affirmative defenses, but instead are simply denials of Plaintiff's allegations. Consequently, Plaintiffs have moved to strike them under *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). *See Castillo v. Roche Labs., Inc.*, 2010 U.S. Dist. LEXIS 87681, at *5 (S.D. Fla. Aug. 2, 2010) (noting that "a majority of district courts in Florida have applied this heightened pleading standard to affirmative defenses"). (*See* D.E. 81.) Because the Court has not yet ruled on that issue, we will attempt to address some of these defenses briefly here, to the extent that we can guess at their meaning.[8]

---

[7] The Court recognized in its Order on Motion to Amend that Public Storage had a duty based on *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1359-60 (11th Cir. 2004) "to correct the mistaken impression it had fostered." (D.E. 78 (citing *Kemp*, 393 F.3d at 1359-61)). *See also Negrete v. Allianz Life Ins. Co. of North America*, 238 F.R.D. 482, 491 (W.D. Cal. Nov. 21, 2006) (holding that "[g]eneralized proof that the common, uniform written sales marketing materials are misleading" because of material omissions "would give rise to a common sense inference that no rational class member would purchase the annuities in questions upon adequate disclosure of the facts, regardless of their individual circumstances").

[8] Further, "shotgun" pleadings such as Public Storage's affirmative defenses are frowned upon because they are asserted *en masse*, with little thought, and are indicative of automatic list-making rather than any serious consideration of applicable defenses. Accordingly, courts are encouraged to dismiss them *sua sponte. See, e.g., Byrne v. Nezhat*, 261 F. 3d 1075, 1132-33 & n.114 (11th Cir. 2001) (explaining the district court's duty to dismiss shotgun pleadings *sua sponte*, whether they are in a complaint or an answer); *see also* Fed. R. Civ. P. 12(f) (noting that a court "may strike from a pleading an insufficient defense . . . on its own").

Public Storage's purported affirmative defenses cannot defeat certification.  For example, the affirmative defenses of failure to state a claim and variations thereof (First, Fourth, and Sixth defenses) have already been denied by the Court under a Rule 12(b)(6) standard or are otherwise moot.  *See* D.E. 27, 78; *see also Grovenor House, L.L.C. v. E.I. DuPont De Nemours & Co.*, 2010 U.S. Dist. LEXIS 91905, at *10 (S.D. Fla. Aug. 12, 2010) (noting that a "Motion to Dismiss addressing these exact arguments" was denied and thus the affirmative defenses were "clearly invalid as a matter of law" and dismissing them "with prejudice").  Other purported affirmative defenses (Eleventh defense – failure to mitigate; Eighteenth defense – waiver) (D.E. 80 at 25, 27) require full knowledge on the part of Plaintiff and members of the Class of material facts to make their actions knowing and intentional.  *See Alston v. Alston*, 960 So.2d 879, 881 (Fla. 4th DCA 2007); *Smilow*, 323 F.3d at 39 (waiver defense common to the class).  To the contrary, Plaintiff has alleged, and the evidence shows, that Public Storage concealed the facts of its conduct, and omitted to disclose critical information to the Class.  *See* Denis Dep. (Ex. 2) at 66-67, 79-80, 173-75; Thoke Dep. (Ex. 4) at 53; Haga Dep. (Ex. 13) at 70-72, 130 (customer service representatives instructed that they must not call the PSTIP "our insurance.").

Still other purported affirmative defenses apply equally to all members of the proposed Class.  This includes, for example, the Fifth, Sixth, Ninth, Fourteenth, and Seventeenth defenses (which are not affirmative defenses but denials) that Public Storage allegedly "did not engage in any deceptive or unlawful act or unfair practice" and "did not have a duty to disclose the information that was allegedly omitted" and "acted reasonably and in good faith" and that the Class members suffered no damages and would be unjustly enriched if they recovered.  (D.E. 80 at 24-27.)  The answers to these questions "have a direct impact on every class member's effort to establish liability" and are ultimate issues in the case.  *Klay*, 382 F.3d at 1255.  These are the very common questions that predominate and this supports certification.  *In re Checking Account Overdraft Litig.*, 275 F.R.D. at 677-78 (finding that bank would present common evidence in support of its affirmative defenses that applies equally to all class members).  The Eighth defense, lack of reliance, is irrelevant to Plaintiff's claims, as discussed above.  (D.E. 80 at 24.)

Defenses like these lead courts to find that affirmative defenses do not upset the predominance of common issues as long as a sufficient constellation of common issues binds the class together.  *Smilow*, 323 F.3d at 39 ("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against

26

individual members"). Many of those raised by Public Storage, if they have merit at all (and it is impossible to tell given the insufficiency of their pleading) are regularly dealt with by courts in cases like these and present no impediment to certification. *Compare* D.E. 80 at 23, 27 (Second defense – statute of limitations; Nineteenth defense – laches) *with Waste Mgmt. Holdings*, 208 F.3d at 296 (statute of limitations defenses do not vitiate Rule 23(b)(3) predominance); *Allapattah Servs.*, 333 F.3d at 1262-63 (jury was instructed on statute of limitations and law of fraudulent concealment in 35 states). Thus, if these defenses survive the motion to dismiss despite their obvious shortcomings, and Public Storage can present sufficient facts to survive a motion for summary judgment, the jury can decide their application on a class-wide basis.

**2.    A Class Action Is Superior to the Adjudication of Thousands of Individual Cases.**

The superiority analysis of Rule 23(b) requires that the Court examine whether the class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). The focus is "not on the convenience or burden of a class action suit *per se*, but on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269. There are four non-exhaustive factors a court should consider in assessing whether a class action is superior to individual litigation:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and  nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (C) the desirability or undesirability of concentrating the litigation of the  claims in the particular forum; [and]
>
> (D) the difficulties likely to be  encountered in the management of a class action.

*Id*. (citing Fed. R. Civ. P. 23(b)(3)). All of these factors favor class treatment here.

With respect to the first factor, all of the Class members in this case have claims that are so small that it would cost them much more to litigate an individual case than they could ever hope to recover in damages. Thus, "[t]here is no reason to believe that the putative class members in this case have any particular interest in controlling their own litigation[.]" *Id*. The second factor also favors class certification. There are no other actions pending against Public

Storage on these issues at this time.  This too suggests that it is simply too expensive to pursue these actions individually, making a class action the only realistic avenue for relief.

Concentrating the litigation in this forum is also logical and desirable for other reasons, which tilts the third superiority factor in favor of certification.  First, through handling defendants' serial *de facto* motions to dismiss, this Court has become familiar with the factual and legal issues.  *Id.* at 1271 ("it is desirable to concentrate claims in a particular forum when that forum has already handled several preliminary matters").  As this court recognized in *Texas Air*, controversies are often "best managed as a class action, for this method allows all the [parties] to conduct all relevant discovery without repetition."  119 F.R.D. at 460.  Second, holding separate trials for claims that could be tried together would be costly, inefficient, and burden the court system.  They should instead be tried together.  *Klay*, 382 F.3d at 1270.  Neither the parties nor the judicial system would benefit from redundant litigation.  *See  Brand Name Prescription Drugs*, 1994 U.S. Dist. LEXIS 16658, at *15 ("[w]e fail to see the logic in defendants' contention that 50,000 individual actions are less complex than a single class action").  Indeed, "[w]here predominance is established, this consideration will almost always mitigate in favor of certifying a class."  *Klay*, 382 F.3d at 1270.  Third, the small value of the individual claims supports certification, especially where, as here, the amounts in controversy make it unlikely that individual plaintiffs could find legal representation on a contingency fee basis "when the defendants are corporate behemoths with a demonstrated willingness and proclivity for drawing out legal proceedings for as long as humanly possible and burying their opponents in paperwork and filings."  *Id.* at 1271.

The final superiority factor – manageability – focuses on the "practical problems that may render the class action format inappropriate for a particular suit."  *Eisen*, 417 U.S. at 164.  The question is whether multiple individual lawsuits would be more manageable than a class action, and not whether a class here will create significant management problems.  *Klay*, 382 F.3d at 1273.  Indeed, this fourth factor "will rarely, if ever, be in itself sufficient to prevent certification."  *Id.* at 1272; *see also Visa Check/MasterMoney*, 280 F.3d at 140 (refusal to certify a class solely on grounds of manageability is disfavored and "should be the exception rather than the rule"); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 356 (E.D. Pa. 1976) ("denial of class certification because of suspected manageability problems is disfavored").  Here, Plaintiff cannot foresee any serious manageability problems and certainly none that make thousands of

individual actions a better alternative.

## IV.   <u>CONCLUSION</u>

Plaintiff has demonstrated that he can satisfy all of the elements of Rule 23(a) and (b)(3). The class action mechanism is not only the best and most efficient way to adjudicate the Class members' claims in this case, it is also the only viable method of doing so.   For all of the foregoing reasons, Plaintiff respectfully requests that the Court grant their motion to certify the Class pursuant to Federal Rule 23(b)(3).

DATED:  December 29, 2014.

Respectfully submitted,

/s/ David M. Buckner
David M. Buckner, Esq.
Fla. Bar No.: 60550
Seth E. Miles, Esq.
Fla. Bar No.: 385530
Brett E. von Borke, Esq.
Fla. Bar No.: 0044802
Rachel Furst
Fla. Bar No.: 45155
GROSSMAN ROTH, P.A.
2525 Ponce de Leon, Suite 1150
Coral Gables, Florida  33134
Email: dbu@grossmanroth.com
Email: sem@grossmanroth.com
Email: bvb@grossmanroth.com
Email: rwf@grossmanroth.com

Scott B. Cosgrove, Esq.
Fla. Bar No. 161365
Alec H. Schultz, Esq.
Fla. Bar No. 35022
David Karp
Fla. Bar No. 69226
LEÓN COSGROVE LLC
255 Alhambra Circle, Suite 424
Coral Gables, Florida 33134
Tel:    305.740.1975
Email: scosgrove@leoncosgrove.com
Email: aschultz@leoncosgrove.com
Email: dkarp@leoncosgrove.com

*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was conventionally filed under seal with the Clerk of Court on December 29, 2014.  Pursuant to the Court's Order on Motions to File Under Seal [D.E. 162] the foregoing was re-filed and served electronically via the Court's CM/ECF system on all counsel of record on this 29th day of January, 2015.

/s/ David M. Buckner
David M. Buckner, Esq.
Fla. Bar No. 60550
Seth E. Miles, Esq.
Fla. Bar No. 385530
Brett E. von Borke, Esq.
Fla. Bar No. 0044802
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Blvd., Suite 1150
Coral Gables, FL 33134
Tel:  (305) 442-8666; Fax:  (305) 285-1668
Email:  dbu@grossmanroth.com
Email:  sem@grossmanroth.com
Email:  bvb@grossmanroth.com

and

Scott B. Cosgrove, Esq.
Fla. Bar No. 161365
James R. Bryan, Esq.
Fla. Bar No.  696862
Andrew B. Boese, Esq.
Fla. Bar No. 824771
Alec H. Schultz, Esq.
Fla. Bar No. 35022
Jared R. Kessler, Esq.
Fla. Bar No. 096020
LEON COSGROVE LLC
255 Alhambra Circle, Suite 424
Coral Gables, FL 33134
Tel:  (305) 740-1975
Email:  scosgrove@leoncosgrove.com
Email:  jbryan@leoncosgrove.com
Email:  aboese@leoncosgrove.com
Email:  aschultz@leoncosgrove.com
Email:  jkessler@leoncosgrove.com

*Counsel for Plaintiffs and the Class*