UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 14-CV-21559-UNGARO/OTAZO-REYES

COLIN BOWE and BRIAN MORGAN,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.                                                                **CLASS ACTION**

PUBLIC STORAGE, a Maryland
Real Estate Investment Trust,

      Defendant.
_____/

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS .................................................................................3

    A.    Self-storage insurance is a regulated industry. ......................................3

    B.    The TIP offers better coverage due to its captive reinsurance structure. ................4

    C.    Public Storage's Lease/Rental Agreements and Insurance Addendum require the tenant to acknowledge her sole responsibility for obtaining insurance. .................5

    D.    Plaintiffs sue Public Storage on the theory that its failure to disclose access fees paid by a subsidiary caused them to pay excessive premiums—but they develop no evidence to support that theory. .........................................................6

III.    ARGUMENT .....................................................................................................8

    A.    Plaintiffs' RICO claims fail as a matter of law due to a complete failure of proof on the issues of causation and damages. ..............................................8

        1.    Plaintiffs must articulate and prove in detail a direct relationship between the nondisclosure and their payment of inflated premiums. .......................9

        2.    Plaintiffs cannot carry their causal burden. ................................11

    B.    Plaintiffs' FDUTPA claim fails as a matter of law because that statute, by its terms, does not apply to products like the TIP that are regulated by Florida's Office of Insurance Regulation and Department of Financial Services. ...............14

    C.    Plaintiffs' damages claim for breach of contract fails as a matter of law. ............17

    D.    Plaintiffs cannot assert an unconscionability claim when seeking only money damages. ................................................................................17

    E.    Plaintiffs cannot press a claim for unjust enrichment while seeking to enforce an express contract. ........................................................................18

    F.    Florida law does not authorize an independent cause of action for breach of the covenant of good and fair dealing. ........................................................19

    G.    Plaintiffs lack standing to assert claims for injunctive relief. ...............19

IV.    CONCLUSION ................................................................................................20

# TABLE OF AUTHORITIES

## Federal Cases

*Anza v. Ideal Steel Supply Corp.*
  547 U.S. 451 (2006)................................................................................................10

*British Ins. Co. of Cayman v. Safety Nat'l Cas.*
  335 F.3d 205 (3d Cir. 2003) ....................................................................................5

*Church v. City of Huntsville*
  30 F.3d 1332 (11th Cir. 1994) ................................................................................20

*Cibran Enters., Inc. v. BP Prods. N. Am., Inc.*
  365 F. Supp. 2d 1241 (S.D. Fla. 2005) ..................................................................17

*Cowin Equip. Co. v. Gen. Motors Corp.*
  734 F.2d 1581 (11th Cir. 1984) ..............................................................................18

*Crowley Am. Transport v. Richard Sewing Mach. Co.*
  172 F.3d 782 (11th Cir. 1999) ................................................................................17

*Gamboa v. Velez*
  457 F.3d 703 (7th Cir. 2006) ....................................................................................9

*Hemi Group, LLC v. City of N.Y.*
  559 U.S. 1 (2010)....................................................................................................10

*Holmes v. Sec. Investor Protection Corp.*
  503 U.S. 258 (1992)..............................................................................................9, 11

*In re Managed Care Litig.*
  430 F. Supp. 2d 1336 (S.D. Fla. 2006) ....................................................................9

*McCullum v. Orlando Reg'l Healthcare Sys.*
  768 F.3d 1135 (11th Cir. 2014) ..............................................................................19

*Miranda v. Ponce Federal Bank*
  948 F.2d 41 (1st Cir. 1991)......................................................................................9

*Simpson v. Sanderson Farms, Inc.*
  744 F.3d 702 (11th Cir. 2014) ...............................................................1, 10, 11, 12

*Star Disc. Pharmacy, Inc. v. MedImpact Healthcare Sys., Inc.*
  No. 5:11-CV-02206-AKK, 2014 WL 4470720 (N.D. Ala. Sept. 10, 2014)............11

*Wooden v. Bd. of Regents of the Univ. Sys.*
  247 F.3d 1262 (11th Cir. 2001) ..............................................................................20

**State Cases**

*Capitol Envtl. Servs., Inc. v. Earth Tech., Inc.*
  25 So. 3d 593 (Fla. 1st DCA 2009) .......................................................................17

*Lindon v. Dalton Hotel Corp.*
  49 So. 3d 299 (Fla. 5th DCA 2010) .......................................................................17

*Moynet v. Courtois*
  8 So. 3d 377 (Fla. 3d DCA 2009) .........................................................................18

*State v. Beach Blvd. Automotive, Inc.*
  139 So. 3d 380 (Fla. 1st DCA 2014) .....................................................................15

*Tobin & Tobin Ins. Agency, Inc. v. Zeskind*
  315 So. 2d 518 (Fla. 3d DCA 1975) ................................................................18, 19

**Federal Statutes**

RICO, 18 U.S.C. § 1964(c).......................................................................................9

**State Statutes**

10 Cal. Code Regs. § 2644.1..................................................................................13

Cal. Ins. Code § 1758.79..........................................................................................3

Cal. Ins. Code §§ 1861.01, 1861.05......................................................................13

Colo. Rev. Stat. §§ 10-4-401, 10-16-107..............................................................13

Fla. Stat. § 501.202(2)............................................................................................14

Fla. Stat. § 501.212(4)(a) & (d) .............................................................................14

Fla. Stat. § 624.15..................................................................................................16

Fla. Stat. § 624.155...........................................................................................15, 16

Fla. Stat. § 626.321.........................................................................................4, 15, 16

Fla. Stat. § 626.951................................................................................................14

Fla. Stat. § 626.9511..............................................................................................15

Fla. Stat. § 626.9521........................................................................................15, 16

Fla. Stat. § 626.9541..............................................................................................15

Fla. Stat. § 626.9611 ..................................................................................................................14

Fla. Stat. § 626.9641(2) ............................................................................................................15

Fla. Stat. § 626.112 ...................................................................................................................16

Ky. Rev. Stat. Ann. § 304.14-120 ............................................................................................13

N.Y. Ins. Law §§ 2305, 2310 ...................................................................................................13

Neb. Rev. Stat. Ann. § 44-7502, 44-7508 ...............................................................................13

Or. Rev. Stat. § 737.205 ...........................................................................................................13

Or. Rev. Stat. § 744.864(3)(a) ....................................................................................................3

Tex. Ins. Code § 2251.101 ........................................................................................................13

Wash. Rev. Code §§ 48.19.020, 48.19.060, 48.19.070 ...........................................................13

**State Regulations**

Ky. Admin. Regs. 13:150 ..........................................................................................................13

**MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING**

Defendant Public Storage moves this Court for summary judgment on all claims asserted in plaintiffs' First Amended Complaint, and requests a one-hour hearing focused on the legal issues raised by its arguments about plaintiffs' civil RICO and FDUTPA claims.

## I.        INTRODUCTION

Although this is a civil suit, plaintiffs' RICO claims stand or fall on the premise that it should be deemed a federal crime—with crippling civil consequences that include trebled damages—for a company to sell insurance without disclosing how the profits from that sale are distributed among its business partners.

No court has ever held this. Yet the plaintiffs here seek a verdict of criminal fraud and enhanced RICO damages based on just such a theory. Specifically, they claim that they were induced to pay too much for self-storage insurance under Public Storage's Tenant Insurance Program ("TIP") because Public Storage did not tell them that its reinsurance subsidiary would pay roughly 75% of the premiums back to Public Storage as an access fee.

The problem with that claim lies in the words "too much" and "because"—words implying a showing of damages and causation that these plaintiffs just can't make. Given RICO's severe penalties, the Supreme Court and the Eleventh Circuit have imposed strict requirements on plaintiffs seeking to prove that RICO violations caused them economic harm—especially when the alleged harm consists of altering the dynamics of an entire market. Plaintiffs in such cases must plead and prove the precise market mechanism, or "multi-step causal chain," by which the RICO violation affected prices; they cannot rely on "a vague market theory" to assert injury and causation at "the highest order of abstraction and with only conclusory assertions." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 709–10, 713 (11th Cir. 2014).

Plaintiffs can't meet those requirements. First, they can't prove they paid "too much" for TIP insurance, because they lack any economic theory—let alone any evidence—as to what the market price for TIP insurance would have been had the disclosure been made. To the contrary,

TIP premium rates were comparable to those of programs offered by Public Storage's competitors—in fact, *lower* than those of two competitors that made the kind of disclosures that the plaintiffs claim were lacking here. Moreover, regulators in at least nine states reviewed the TIP rates and found them acceptable.

Second, the plaintiffs can't prove that they paid too much "because of" the nondisclosure, for they lack any theory—let alone any evidence—as to *how* that nondisclosure could have inflated the market price of the TIP premiums they paid. The plaintiffs simply assume—and asked their expert, a certified public accountant, to assume—that they are entitled to recover the access fees as their damages. But this left the plaintiffs with no explanation or expert evidence capable of demonstrating a direct relationship between the alleged RICO violation and their alleged injury. And without that, they cannot prove proximate causation or damages under RICO. Accordingly, summary judgment should be granted against the plaintiffs on Counts VI, VII, and VIII of the Amended Complaint.

Plaintiffs' state-law claims fare no better. Their claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count I) fails because that statute, by its terms, does not apply to any person or activity regulated by the Office of Insurance Regulation of Florida's Financial Services Commission or by the Department of Financial Services. Public Storage and the TIP *are* so regulated, and FDUTPA therefore doesn't apply. Their breach-of-contract claim (Count II) fails because they can't identify any contractual promise that Public Storage failed to keep (no breach) and because they seek only damages to which they're not legally entitled (no damages). Their unconscionability claim (Count V) fails because they no longer seek equitable relief, and monetary damages are not available under that theory. Their unjust-enrichment claim (Count III) fails because they cannot pursue that claim while asserting one for breach of express contract. And their claim for breach of the covenant of good faith and fair dealing (Count IV) fails because no such independent cause of action exists under Florida law.

Absent some specific disclosure duty that plaintiffs have yet to identify, it is not a crime, a tort, a breach of contract, or any other sort of actionable wrong for a business to refrain from

telling consumers how the proceeds of a sale will be distributed among business partners. Indeed, businesses almost never do so; and requiring such disclosures would turn every consumer transaction into a Byzantine discourse on corporate structure and internal accounting. The Court should grant summary judgment for Public Storage on all Counts.

## II.     STATEMENT OF FACTS

### A.     Self-storage insurance is a regulated industry.

Defendant Public Storage develops, owns, and operates self-storage facilities that are leased, usually on a monthly basis. (Defendant's Statement of Undisputed Facts ("SUF") ¶ 1). Like virtually every other self-storage company, Public Storage makes tenants responsible for insuring the goods they store, while allowing them to purchase insurance when they're renting the unit.  (SUF ¶¶ 3–5).

Tenant-insurance programs are highly regulated nationwide. In many states, specific laws authorize the programs and require rate approval and particular disclosures. Indeed, the TIP's premium rates have been approved as not excessive in at least nine states, including California, Colorado, Kentucky, Montana, Nebraska, New York, Oregon, Texas, and Washington. (SUF ¶ 30). Likewise, Public Storage makes all disclosures required by state regulators that regulate self-storage-insurance programs. (SUF ¶ 30).[1]

PSCC, Inc. is a subsidiary of Public Storage. It holds certain licenses, including a limited-lines license to act as an agent for in-transit and storage personal property insurance in Florida. PSCC, Inc. obtained that license from Florida's Department of Financial Services, after paying a required fee to that agency. (SUF ¶ 26).

---

[1] Notably, the contracts that plaintiffs claim are fraudulently misleading were, in some states, blessed by insurance regulators. *See, e.g.,* Cal. Ins. Code § 1758.79 ("Any insurer that provides insurance to be sold by a self-service storage facility…shall file a copy of the policy with the commissioner, who shall make that policy available to the public."); Or. Rev. Stat. § 744.864(3)(a) ("A licensee that offers to sell insurance to an occupant shall provide written material that the Director of the Department of Consumer and Business Services approves….").

Public Storage has more than 250 self-storage branches in Florida. Each Florida branch holds a branch limited-lines license, tied to PSCC, Inc.'s limited-lines license, authorizing that branch to act as an agent for in-transit and storage personal property insurance. Each branch obtained its license from Florida's Department of Financial Services, after paying a required fee to that agency. (SUF ¶ 28).

The limited-lines licenses do not mean that Public Storage branches function as an insurer or insurance broker. Rather, they merely allow the branches to "issue certificates or other evidences of insurance to" self-storage customers who purchase insurance. Fla. Stat. § 626.321. (SUF ¶ 29).

The Florida statute governing the limited-lines licenses requires licensees to make certain disclosures in connection with the sale of self-storage insurance. Specifically, it requires licensees to give prospective purchasers written notice that their homeowner's policy may provide coverage for the loss of personal property and that the storage lease does not require the purchase of special self-storage insurance. *See* Fla. Stat. § 626.321(1)(g). As discussed below, Public Storage complies with this requirement. The Florida statute does *not* require licensees to disclose reinsurance arrangements, or how proceeds from the sale of self-storage insurance will be distributed among business partners; nor does any other state do so.

### B.   The TIP offers better coverage due to its captive reinsurance structure.

Public Storage customers have many options for insuring their stored property. One such option is the Public Storage TIP. Since 2008, New Hampshire Insurance Company ("New Hampshire") has been the insurer that underwrites the TIP. New Hampshire is the licensed insurer in all states where the TIP is sold. It issues the Master Policy and is contractually bound to directly pay all valid claims under the terms of the Master Policy and to adhere to all other contractual and legal obligations that apply to the insurer under that Policy. (SUF ¶ 12).

Since 2008, Public Storage's employees have collected the insurance premiums paid by the insureds and have transferred 100% of those premiums to the broker, acting as New

Hampshire's agent. This administrative function is disclosed to each TIP purchaser in the Insurance Addendum to the Lease/Rental Agreement. (SUF ¶¶ 14–15).

The TIP is a standard captive reinsurance program. A captive insurance company is a corporation that insures the liabilities of its owner. (SUF ¶ 16). The captive reinsurance structure enabled TIP to offer more options and better coverage to customers. For example, when the TIP was developed, the insurer, New Hampshire, would not have agreed to provide flood insurance or coverage for mold- or vermin-related damage. Because PS Hawaii reinsured the risk borne by New Hampshire, however, expanded TIP coverage could be offered that included flood insurance and coverage for mold and vermin. (Haga Decl. ¶ 15).

The captive subsidiary here—PS Insurance Company–Hawaii ("PS Hawaii")—reinsures 100% of the risk insured by New Hampshire, up to $5 million per occurrence.[2] PS Hawaii pays Public Storage an "access fee" allegedly equal to roughly 75% of TIP premiums to compensate Public Storage for, among other things, its administrative services in collecting the insurance premiums from customers, and giving the TIP exclusive access to Public Storage's large customer base. (SUF ¶ 16).

### C.   Public Storage's Lease/Rental Agreements and Insurance Addendum require the tenant to acknowledge her sole responsibility for obtaining insurance.

Public Storage's customers sign two documents when they rent a self-storage unit and buy TIP insurance: a Lease/Rental Agreement and an Insurance Addendum. (SUF ¶¶ 2, 6).

Public Storage's Lease/Rental Agreements emphasize that the tenant (or "Occupant") personally bears all risk of loss, bears sole responsibility for insuring her stored property, and is obligated to insure her own goods. But Public Storage does not monitor or demand proof of

---

[2] In a reinsurance contract, one insurance company (the "ceding insurer" or the "reinsured") cedes all or part of the risk that it has underwritten under an insurance policy to another insurer (the "reinsurer"), in return for a percentage of the premium. The reinsurer's only obligation is to indemnify the ceding insurer on the transferred risk. Reinsurance thus diversifies the risk of loss and reduces the need for required insurance reserves. *See British Ins. Co. of Cayman v. Safety Nat'l Cas.*, 335 F.3d 205, 211–12 (3d Cir. 2003).

compliance with this "requirement." (SUF ¶¶ 3–4). Rather, Public Storage protects itself by requiring the Occupant to release all claims for damage to the stored property. The onus is then placed on the Occupant to obtain insurance any way she prefers—whether from Public Storage's TIP, from another self-storage insurer, from the Occupant's existing homeowner's insurance policy, or by self-insuring—that is, bearing the risk of loss personally. (SUF ¶ 4).

An Occupant who agrees to apply for coverage under the TIP signs an Insurance Addendum acknowledging that "I am solely responsible to insure my stored property" and that "the Lease/Rental Agreement requires me to maintain insurance that covers loss or damage for" that property. The result of failing to obtain insurance is that the Occupant is "personally responsible for any loss or damage to [her] goods." As required by law, the certification further cautions that "[t]his facility and its employees are not qualified or authorized to evaluate the adequacy of any insurance you may have. The insurance policy offered by this self-storage agent may provide a duplication of coverage already provided by your homeowner's insurance policy or by another source of coverage." And the certification further states: "I understand this insurance is not required in order to store my goods at this facility." The Addendum also authorizes Public Storage to "conduct the administrative function of receiving the premium to send to the insurance company on my behalf." (SUF ¶¶ 6–8).

The Addendum makes no representations about how much profit any entity involved in the TIP earns from the sale of TIP insurance, how those profits are divided among corporate entities, the identity of such entities, or the relationships between them.  (SUF ¶ 9).

> **D.    Plaintiffs sue Public Storage on the theory that its failure to disclose access fees paid by a subsidiary caused them to pay excessive premiums—but they develop no evidence to support that theory.**

The gravamen of plaintiffs' Amended Complaint is that Public Storage's form agreements and monthly statements failed to disclose that PS Hawaii is a Public Storage subsidiary that pays access fees to Public Storage, and that these nondisclosures caused TIP purchasers to pay monthly premiums that are "significantly higher than self-storage insurance

rates available to consumers on the open market (but not available at Public Storage locations)." Dkt. 79 (First Amended Complaint, "FAC") ¶ 8. The Amended Complaint alleges three RICO counts on behalf of a putative national class of Public Storage customers, and, on behalf of a putative Florida class, also alleges causes of action under Florida law for violating the FDUTPA, breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and unconscionability. Discovery proceeded for eight months and is now closed.

Plaintiffs do not claim that they would have avoided buying TIP insurance had they known about the access fees and that PS Hawaii is a captive reinsurer. Indeed, their class-certification papers disavow that theory. Dkt. 154 at 7. Rather, they claim that TIP rates would have decreased by 100% of the access fees had these facts been disclosed. *Id.* (Meyer Decl., Ex. 1 (Plaintiffs' Supp. Interrog. Responses) at 2). But plaintiffs have developed no evidence whatsoever that a disclosure of how insurance proceeds were distributed would have altered the market rates for TIP insurance, let alone that the market would have reduced the rate by the amount of the access fees. For example, plaintiffs have not offered testimony from any expert economist to define the self-storage-insurance market or to opine, based on a scientifically valid methodology, that such a disclosure would have changed the dynamics of the entire market, causing the rates for TIP insurance to drop.

Plaintiffs' sole damages expert, Certified Public Accountant Robert Stone, developed no evidence to support the plaintiffs' theory that the access fees equal the damages. Rather, Mr. Stone admitted that he had merely obeyed instructions by plaintiff's counsel to *accept* that theory without analyzing independently whether it was reasonable. (SUF ¶¶ 32, 34; Meyer Decl., Ex. 3 (Stone Expert Report) at 2; Meyer Decl., Ex. 2 (Stone Dep.) at 14:12–18:3,19:23–20:9, 22:15–22, 24:17–25:15, 38:10–39:4, 56:3–24). Mr. Stone further admitted that he was not an expert in insurance or in self-storage, that he hadn't consulted with any such expert (SUF ¶ 35; Meyer Decl., Ex. 2 (Stone Dep.) at 18:10–19, 42:16–46:1), and that his opinions were not supported by any business, market, or economic analysis of the self-storage insurance market (SUF ¶ 35; Meyer Decl., Ex. 2 (Stone Dep. ) at 29:4–8, 40:8–15, 41:19–25, 42:1–15). Accordingly, he had

no opinion as to how consumers, class members, or prices would have reacted had Public

Storage disclosed, at the time of sale, that it would profit from the TIP insurance by collecting an

access fee.[3] Nor did he have any opinion as to whether class members had gotten more or less

than they'd paid for in relation to the market.[4] Indeed, Mr. Stone would not even opine on

whether Public Storage's alleged insurance-sales practices had caused any class members any

harm. (SUF ¶ 38; Meyer Decl., Ex. 2 (Stone Dep.) at 24:6–10).[5]

Mr. Stone's reticence was justified. In fact, the premiums charged by the Public Storage

TIP are *less* costly than the premiums of two competitors that (unlike most self-storage

companies) do make the additional disclosures that the plaintiffs deem necessary. That is exactly

the opposite of what the plaintiffs' damages theory would predict. And the coverage provided by

TIP is at least as good, if not better. (SUF ¶¶ 17–23).

## III.   ARGUMENT

### A.   Plaintiffs' RICO claims fail as a matter of law due to a complete failure of proof on the issues of causation and damages.

Plaintiffs allege three RICO claims. Count VI alleges violation of section 1962(a), which

prohibits *use or investment of funds obtained through* a pattern of racketeering activity in any

---

[3] Specifically, Mr. Stone had no opinion as to whether the price of the insurance would have decreased (or changed at all) if Public Storage hadn't collected the access fee (SUF ¶ 36; Meyer Decl., Ex. 2 (Stone Dep.) at 57:12–58:23), whether customers and class members cared whether Public Storage profited from the insurance (SUF ¶ 36; Meyer Decl., Ex. 2 (Stone Dep.) at 59:9–13), or what percentage of customers or class members would have purchased the insurance if Public Storage had disclosed at the time of sale that it profited from the insurance. (SUF ¶ 36; Meyer Decl., Ex. 2 (Stone Dep.) at 39:22–40:2).

[4] Specifically, Mr. Stone had no opinion as to the market value of the insurance purchased by class members (SUF ¶ 37; Meyer Decl., Ex. 2 (Stone Dep.) at 53:3–17), whether class members had overpaid for their insurance (SUF ¶ 37; Meyer Decl., Ex. 2 (Stone Dep.) at 28:3–25), or whether Public Storage's insurance cost more or less than that offered by its competitors (SUF ¶ 37; Meyer Decl., Ex. 2 (Stone Dep.) at 40:8–12, 41:14–18).

[5] Mr. Stone also knew next to nothing and had no opinion about the access fee itself. He had no opinion (other than what could be gleaned from PS Hawaii's own public disclosures) about what the fee was for, why it was paid, or whether it was an arms-length transaction. (SUF ¶ 39; Meyer Decl., Ex. 2 (Stone Dep.) at 49:13–50:2). He had little or no idea what the relevant TIP entities were, what functions they performed, how the premium revenues flowed through them, or even which one was the primary insurer. (SUF ¶ 39; Meyer Decl., Ex. 2 (Stone Dep.) at 42:16–46:1).

enterprise involved in interstate commerce. Count VII alleges violation of section 1962(c), which prohibits *conducting an enterprise's affairs through* a pattern of racketeering activity. Count VIII alleges violation of section 1962(d), the RICO *conspiracy* section, and essentially rises or falls with the other RICO counts. All three claims fail as a matter of law because, after eight months of discovery, plaintiffs have no evidence that they suffered any cognizable injury to their business or property "by reason of" the alleged RICO violation.

### 1. Plaintiffs must articulate and prove in detail a direct relationship between the nondisclosure and their payment of inflated premiums.

Civil RICO is an extraordinarily potent weapon—"the litigation equivalent of a thermonuclear device." *In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1340 (S.D. Fla. 2006) (quoting *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 (1st Cir. 1991)). A prevailing plaintiff has the potential to receive treble damages and attorneys' fees. *Miranda*, 948 F.2d at 44. Because of this potential for crippling liability, the burden on the civil RICO plaintiff is also substantial. Not every "garden-variety business dispute" may be transformed into a federalized treble damages action through civil RICO. *See Gamboa v. Velez*, 457 F.3d 703, 710 (7th Cir. 2006). As discussed below, the statute's proximate-cause requirement plays a critical role in curbing its otherwise outsized reach.

RICO grants a civil remedy to "[a]ny person injured in his business or property *by reason of* a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c) (emphasis added). Section 1964(c) was modeled on Section 4 of the Clayton Act and—like its antitrust progenitor—has been held to contain a proximate-cause requirement. *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 267–68 (1992). Proximate cause curbs the potentially limitless reach of mere "but-for" causation by "demand[ing] . . . some direct relation between the injury asserted and the injurious conduct alleged." *Id*. at 268. One purpose of this direct-relation requirement is to avoid the difficulties associated with attempting to "ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Id*. at 269.

Those difficulties are particularly pronounced where a RICO violation allegedly affected prices, "causing" the plaintiff to pay too much for something it purchased, or to be paid too little for something it sold. Accordingly, RICO's proximate-cause element requires the plaintiff in such cases to plead and prove the precise market mechanism, or "multi-step causal chain," by which the RICO violation affected prices. *See Simpson*, 744 F.3d at 713. Plaintiffs cannot rely on "a vague market theory" to assert injury and causation "at only the highest order of abstraction and with only conclusory assertions." *Id*. at 709–10. Nor is "'an allegation of improper motive'" a "'panacea'" that can save a RICO claim despite a remote or speculative connection between the injurious conduct and the allegedly affected market price. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460–61 (2006) (citation omitted). The fact that the alleged injury was a foreseeable or even desired consequence of the RICO violation is likewise insufficient. *See Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1, 12 (2010).

The Eleventh Circuit's *Simpson* decision illustrates these points and dictates the result here. In that case, plaintiffs alleged that their former employer had engaged in a pattern of hiring illegal immigrants and certifying their "obviously fake" identification documents—*thereby* depressing the wages that the employer paid to the plaintiffs and other genuinely work-authorized employees. *Id*. at 707. The district court dismissed the case for failing to plead proximate cause adequately under the *Twombly/Iqbal* standard; and the Eleventh Circuit affirmed on that ground and also because the plaintiffs had failed to adequately plead injury in the form of depressed wages. *Id*. at 708, 715.

As to RICO's injury element, the Eleventh Circuit held that the plaintiffs had pled injury "at only the highest order of abstraction and with only conclusory assertions." *Id*. at 709. The "only actual wage data" in the complaint showed that the plaintiffs' wages actually had *risen* substantially while the defendant employed them. *Id*. at 709. Although this did not rule out injury—perhaps they could have earned even more—the plaintiffs had offered "no market data that might permit [the court] plausibly to infer a gap between the wages they *actually* received . . . and the wages they *would have* received but for the alleged . . . misconduct." *Id*. (emphases

10

in original). Instead, plaintiffs had relied on "a vague market theory" that the labor pool contained enough illegal workers for a factfinder to "logically infer" that legal workers received depressed wages. *Id*. at 709–10. But that conclusion was not "self-evident in all markets," and the plaintiffs had alleged "no facts to render it plausible here"—e.g., they had "entirely failed to describe the relevant . . . market in *quantifiable* terms" by estimating the number of unskilled workers in that market and the percentage of those workers who were work-authorized; nor had they defined the market geographically. *Id*. at 710 (emphasis in original). The court concluded that, "because the plaintiffs' theory of injury turn[ed] peculiarly on assertions about the relevant labor market, the amended complaint [could not] plausibly show injury without pleading *any* of these market facts or data." *Id*. at 712 (emphasis in original).

As to RICO's causation element, the Eleventh Circuit held that the plaintiffs had at best pled that the defendant's practices were a "but-for" cause of depressed wages, but had failed to plead facts capable of showing—as proximate cause requires—that wage depression was a "natural consequence" of the alleged misconduct. *Id*. at 713. "Without pleading population data, the relevant geographic market, before-and-after wage rates, or wage data from comparable . . . employers, the plaintiffs [had] failed to define too many crucial, operative variables in their theory of causation." *Id*. The "multi-step causal chain they posit[ed] was not straightforward" and, as pled, "the relationship between injury and injurious conduct [was] not direct." *Id*.[6]

### 2.     Plaintiffs cannot carry their causal burden.

Here, the plaintiffs have developed no evidence capable of proving either that they suffered injury, or that any such injury was the "natural consequence" of the alleged misconduct and not attributable to "other, independent causes," such as prevailing conditions in the market for self-storage insurance. *Id*.; *see also Holmes*, 503 U.S. at 269.

---

[6] *Simpson* was decided on a motion to dismiss; but a RICO plaintiff's failure to submit evidence of proximate causation or to articulate a legally viable proximate-cause theory warrants summary judgment as well. *See, e.g., Star Disc. Pharmacy, Inc. v. MedImpact Healthcare Sys., Inc.*, No. 5:11-CV-02206-AKK, 2014 WL 4470720, at *7 (N.D. Ala. Sept. 10, 2014).

As to RICO injury, plaintiffs have no evidence that they paid too much for the TIP insurance relative to the market price for *comparable* insurance—insurance that covers the same risks and pays the same benefits. Indeed, plaintiffs' expert, Robert Stone, admitted that he had conducted no market analysis and had no opinion as to whether the plaintiffs were charged too much for the TIP insurance. (SUF ¶¶ 35–37).[7] Plaintiffs therefore have no evidence of—or even a position on—what the proper *market price* of the TIP premiums should have been.

As to RICO causation, plaintiffs totally fail to meet their *Simpson* burden of showing how they would prove a direct relationship between the nondisclosure and the payment of inflated premiums. Instead, they have tried to obscure their lack of any viable causal theory or evidence with rhetoric about "financial exploit[ation]," "profiteering," "deception," and "kickbacks."[8]

To understand why plaintiffs cannot meet their causal burden, one need only consider their own damages contentions. The plaintiffs *don't* claim that "[c]lass members *would have rejected* Public Storage insurance had they known of" the access fees. Dkt. 154 at 7 (emphasis added). Instead, they assert that "the damages here *are* the . . . 'access fee.'" (Meyer Decl., Ex. 1 (Plaintiffs' Supp. Interrog. Responses) at 3 (emphasis added)). Mr. Stone likewise confirmed that he was "asked to *assume that the Access Fees* paid to Public Storage by PS Hawaii *represent the damages* for the entire National Class." (SUF ¶ 32 (emphasis added)).

Since the access fees allegedly represent roughly 75% of the premiums (Meyer Decl., Ex. 1 (Plaintiffs' Supp. Interrog. Responses) at 3–4; *see also* Dkt. 163 at 2), the plaintiffs' causal theory must be that, if Public Storage had disclosed to them the nature and amount of the access

---

[7] Indeed, two competitors—ExtraSpace Storage ("ESS") and SmartStop Storage ("SS")—actually charge *more*, not less, for comparable insurance—*despite* making the type of disclosures that the plaintiffs say Public Storage should have made. (SUF ¶¶ 17–23). Indeed, ex-plaintiff Geoff Geiger bought ESS's insurance despite such disclosures. (SUF ¶ 22). And while the Amended Complaint alleges that SafeStor's insurance is cheaper, Dkt. 79 ¶¶ 7, 28, it fails to mention that SafeStor's coverage is much skimpier—unlike the TIP, it only covers 50% of burglary losses—and isn't even available in Florida. (SUF ¶¶ 24–25).

[8] *See* Dkt. 163 at 1–3.

fee, *they would have purchased TIP insurance from Public Storage* for only *one-fourth* of what they actually paid, and only a fraction of what competitors charged in the open market.[9]

What specific market mechanism or "multi-step causal chain" makes that theory plausible? And what are the "crucial, operative variables in" that chain? Plaintiffs have no answer—and no evidence. They cannot be saying that every customer who learned about the nature and amount of the access fee would have successfully negotiated the TIP premium down to just 25% of the initially quoted rate. To begin with, plaintiffs have adduced no evidence that states that regulate rates would have approved a 75% rate reduction.[10] Moreover, plaintiffs fail to explain why Public Storage would have caved in to these hypothetical demands that it sell customers insurance at a fraction of the prevailing market price. And plaintiffs performed no survey to test their facially implausible theory. Their expert, Mr. Stone, therefore had no opinion as to what customers and class members would have done had the disclosures been made. Indeed, he wasn't even willing to opine on whether the plaintiffs paid more for TIP insurance than they should have, or whether they were harmed by Public Storage's nondisclosure. (SUF ¶¶ 36–38). Thus, the *only* evidence on this subject is a survey by defense expert Dr. Stephen Nowlis demonstrating that the disclosure wouldn't have had a significant impact on customers' willingness to purchase TIP insurance.[11]

---

[9] Reducing the TIP premium for $4,000 of coverage by 75% would result in a premium of $3.25 per month. Yet, even the non-comparable SafeStor policies referred to in the Amended Complaint (which are not even available in Florida, and which provide substantially worse coverage) charge premiums of $6 per month for $4,000 of coverage. (SUF ¶ 24; *see also* Haga Decl., Ex. 11 (SafeStor webpage)).

[10] *See* Cal. Ins. Code §§ 1861.01, 1861.05; 10 Cal. Code Regs. § 2644.1; Colo. Rev. Stat. §§ 10-4-401, 10-16-107; Ky. Rev. Stat. Ann. § 304.14-120; 806 Ky. Admin. Regs. 13:150; Neb. Rev. Stat. Ann. § 44-7502, 44-7508; N.Y. Ins. Law §§ 2305, 2310; Or. Rev. Stat. § 737.205; Tex. Ins. Code § 2251.101; Wash. Rev. Code §§ 48.19.020, 48.19.060, 48.19.070.

[11] (Meyer Decl. ¶ 8; *id.*, Ex. 6). Plaintiffs dispute Dr. Nowlis's methodology and conclusions, but have performed no survey of their own and therefore fail to carry their evidentiary burden on summary judgment.

In sum: Plaintiffs have not even adequately *articulated* a theory of RICO causation and damages, much less submitted evidence tending to *prove* any such theory. Accordingly, the Court should grant summary judgment for Public Storage on Counts VI, VII, and VIII.

**B.** **Plaintiffs' FDUTPA claim fails as a matter of law because that statute, by its terms, does not apply to products like the TIP that are regulated by Florida's Office of Insurance Regulation and Department of Financial Services.**

Plaintiffs allege that Public Storage violated FDUTPA by deceptively failing to disclose material facts in TIP-related contracts. That claim fails as a matter of law because insurance-related activities are exempt from FDUTPA.

FDUTPA is one of several Florida consumer-protection laws enacted "to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices." Fla. Stat. § 501.202(2). But FDUTPA, by its own terms, "does not apply to . . . any person or activity regulated under laws administered by . . . [t]he Office of Insurance Regulation of the Financial Services Commission" or by "the Department of Financial Services." Fla. Stat. § 501.212(4)(a) & (d). FDUTPA carves out insurance because an entirely separate Florida statute—the Florida Unfair Insurance Trade Practices Act ("FUITPA")—defines and regulates all unfair or deceptive insurance-industry practices. Fla. Stat. § 626.951. The Florida Legislature exempted insurance-related activities from FDUTPA to avoid the overlap and inconsistency that would result from applying both statutes to the same conduct. *See* Fla. Stat. § 501.212(4)(a) & (d). This left FUITPA as the sole consumer-protection statute regulating insurance-related activities in Florida.

The Office of Insurance Regulation ("OIR") enforces FUITPA, *see* Fla. Stat. § 626.9611, and has promulgated regulations under that authority. *See, e.g.*, Fla. Admin. Code R. 69B-153.001 *et seq.* FUITPA section 626.9561 grants OIR the power "to examine and investigate the affairs of *every* person involved in the business of insurance in this state in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair

or deceptive act or practice." *Id.* (emphasis added). FUITPA only authorizes *individual* private rights of action. Fla. Stat. § 624.155(5)(f)(6). And FUITPA's "policyholder's bill of rights" does not create *any* civil cause of action. Fla. Stat. § 626.9641(2).

Plaintiffs' claims concern insurance-related activities within the scope of FUITPA and expressly exempted from FDUTPA.[12] "Florida courts resolve questions about the applicability of [FDUTPA's insurance exemption] by looking to the activity that is the subject of the lawsuit and determining whether the activity is subject to the regulatory authority of the [OIR]." *State v. Beach Blvd. Automotive, Inc.*, 139 So. 3d 380, 387–88 (Fla. 1st DCA 2014) (affirming dismissal of FDUTPA claim). Here, plaintiffs' FDUTPA claims relate exclusively to activity regulated under laws administered by the OIR.

For example, FUITPA empowers the OIR to regulate "every person" who engages in an insurance-related "unfair or deceptive act or practice," explicitly defined to include "misrepresenting the . . . conditions, or terms of any insurance policy" as well as "knowingly making . . . any statement . . . with respect to the business of insurance, which is untrue, deceptive, or misleading." Fla. Stat. §§ 626.9521 & 626.9541. Plaintiffs' allegations that Public Storage made misleading and deceptive statements to consumers about TIP fall squarely within the purview of FUITPA.

Additionally, plaintiffs contend that Public Storage is violating the very Florida statutes that OIR enforces. For example, plaintiffs' insurance-industry expert, Tim Ryles, had a field day in his expert report concluding that Public Storage violated numerous Florida insurance regulations:

---

[12] Although Public Storage is not the insurer or broker for the TIP, it is nonetheless subject to FUITPA. FUITPA states that "no person shall engage in this state" in any unfair trade practice involving the insurance business, Fla. Stat. § 626.9521, where "person" is defined as "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511. As discussed in more detail below, Public Storage is a corporation involved in the business of insurance, because it issues certificates of insurance to its customers pursuant to Section 626.321 of the Florida Insurance Code.

- "These premiums shouldn't be charged at all because the *entire* TIP is in violation of the regulatory framework within which insurers and producers *are required* to function." (SUF ¶ 31).

- "For instance, Florida Statutes Section 626.112 prohibits anyone from describing the benefits or terms of insurance coverage, including premiums; distributing an invitation to contract to prospective purchasers; [and] completing orders of applications for insurance products . . . . Public Storage is violating Section 626.112, a third degree felony in Florida." (SUF ¶ 31).

- "Such a disclaimer in no way insulates Public Storage agents from insurance regulatory requirements." (SUF ¶ 31).

- "My conclusion is that the conduct of Public Storage employees satisfies the elements necessary to establish that they are acting as insurance producers and are engaged in practices restricted to licensed insurance agents." (SUF ¶ 31). [13]

As their expert's testimony suggests, plaintiffs' allegations fall within the scope of FUITPA provisions banning certain "unfair method[s] of competition" and "unfair or deceptive act[s] or practice[s]" involving the insurance business (Fla. Stat. § 626.9521), including the dissemination of "untrue, deceptive, or misleading" statements. *Id.* § 626.9541. Notably, FUITPA does **not** provide a private right of action for any of the alleged violations. *See* Fla. Stat. § 624.155. Instead, the OIR is authorized to investigate them. *See id.* § 626.9561. Thus, the alleged violations cannot be appropriately resolved in this action.

Moreover, Public Storage itself is regulated by the Department of Financial Services ("DFS"). Since 2008, every Florida branch of Public Storage has obtained from DFS a "limited lines" insurance license for "in-transit and storage personal property insurance." Fla. Stat. § 626.321. (SUF ¶ 28). Those licenses authorize each Public Storage branch to offer the TIP. Because Public Storage is licensed by the DFS, and because DFS regulates Public Storage's TIP-related activities and representations, the FDUTPA claims set forth in Count 1 must be dismissed.

---

[13] Plaintiffs also appear to allege that Public Storage committed a *per se* violation of FDUTPA by violating Florida's Anti-Fronting Statute. *See* Dkt. 154 at 10 n.10 (citing Fla. Stat. § 624.404(4)(A)). The Anti-Fronting Statute is part of Florida's insurance code and is enforced by the Office of Insurance Regulation. *See generally* Fla. Stat. § 624.15.

**C.      Plaintiffs' damages claim for breach of contract fails as a matter of law.**

Plaintiffs claim that Public Storage breached its contracts by stating that Public Storage would "conduct the administrative function of receiving premiums to send to the insurance company" while failing to disclose that Public Storage profits from the TIP. But plaintiffs can't identify any contractual promise that Public Storage didn't perform. Public Storage *did* forward the premiums to the insurer, and made no contractual promise that it wouldn't profit on TIP insurance sales. (SUF ¶ 14). Count II therefore fails.

Count II also fails because plaintiffs seek damages that they cannot have. Under Florida law, a party injured by a contract breach is entitled only to monetary damages that will "put it in the same position it would have been" but for the breach. *Capitol Envtl. Servs., Inc. v. Earth Tech., Inc.*, 25 So. 3d 593, 596 (Fla. 1st DCA 2009). The injured party "is not entitled to be placed . . . in a position better than that which he would have occupied had the contract been performed." *Lindon v. Dalton Hotel Corp.*, 49 So. 3d 299, 305–06 (Fla. 5th DCA 2010).

Here, the alleged nondisclosure did not affect the quality or amount of insurance that the contract promised and that the plaintiffs undisputedly received. If the plaintiffs received *both* the insurance they purchased *and* a partial premium refund, they would be placed in a position better than the one they would have occupied had the alleged breach not occurred. Accordingly, their breach-of-contract claim fails and the Court should grant summary judgment for Public Storage on Count II (and also on Count IV, to the extent that it encompasses the same cause of action).[14]

**D.      Plaintiffs cannot assert an unconscionability claim when seeking only money damages.**

Count V sought relief on the theory that Public Storage's self-storage insurance "policies and practices" were "unconscionable." But plaintiffs' decision to drop their request for equitable

---

[14] Plaintiffs' breach-of-contract claim also fails for the same reason discussed in Part III.A with respect to the civil RICO claims—namely, failure to adduce any evidence of causation or damages. A party cannot recover damages for breach of contract "unless it can prove that the damages were proximately caused by the breach." *Crowley Am. Transport v. Richard Sewing Mach. Co.*, 172 F.3d 782, 784 (11th Cir. 1999); *see also Cibran Enters., Inc. v. BP Prods. N. Am., Inc.*, 365 F. Supp. 2d 1241, 1258 (S.D. Fla. 2005).

relief on this claim bars them from continuing to pursue the claim as an independent cause of action. Therefore, the Court should grant summary judgment for defendant on Count V.

The Court previously noted that "it is unclear whether Florida law recognizes a separate cause of action for unconscionability." Dkt. 27 at 9 (citing *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4368980, at *7 (S.D. Fla. Sept. 19, 2011)). Even if it does, though, "the equitable theory of unconscionability has never been utilized to allow for the affirmative recovery of money damages." *Cowin Equip. Co. v. Gen. Motors Corp.*, 734 F.2d 1581 (11th Cir. 1984). The Court allowed the plaintiffs to pursue an unconscionability claim because they requested equitable relief in the form of a declaration that Public Storage's self-storage insurance policies and practices are unconscionable. Dkt. 1 at 20. But the Amended Complaint omits any such request, *see* Dkt. 79 at 38, and now seeks only damages for unconscionability. *Id.* ¶ 109.

Because plaintiffs no longer seek any equitable relief on their unconscionability claim, the Court should grant summary judgment for Public Storage on Count V.

### E.   Plaintiffs cannot press a claim for unjust enrichment while seeking to enforce an express contract.

Count III, alleging unjust enrichment, fails as a matter of law. "Where there is an express contract between the parties, *claims arising out of that contractual relationship* will not support a claim for unjust enrichment." *Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. 3d DCA 2009) (emphasis added). Therefore, Florida plaintiffs generally cannot pursue an action that simultaneously "seek[s] to enforce an express contract" while "also attempting to disavow the existence of" that contract and to "accomplish the same purpose under quantum meruit." *Tobin & Tobin Ins. Agency, Inc. v. Zeskind*, 315 So. 2d 518, 520 (Fla. 3d DCA 1975).

But that's exactly what the plaintiffs are attempting here—as their own pleadings confirm. For example, their class-certification motion states that "Public Storage surreptitiously took a roughly 75% kickback from every customer who purchased insurance through the PSTIP *in contravention of its uniform contracts . . . .*" Dkt. 163 at 20 (emphasis added).

The Court allowed plaintiffs to proceed with an unjust-enrichment claim only because they "disputed the validity of certain provisions of the [express] contract based on unconscionability." Dkt. 27 at 8.  But plaintiffs' unconscionability claim now fails as a matter of law for reasons discussed above at Part III.D; accordingly, their unjust-enrichment claim falls with it. The Court should grant summary judgment for Public Storage on Count III.

> **F.     Florida law does not authorize an independent cause of action for breach of the covenant of good and fair dealing.**

As the Court noted in its Order on defendant's motion to dismiss, "Florida does not recognize a claim for a breach of covenant of good faith and fair dealing independent of an action for breach of contract." Dkt. 27 at 8 (citing *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005)).  At that time, however, it was unclear whether plaintiffs were seeking certification of a national class for their breach-of-contract claim.  *Id.* Now we know that they aren't. Their class-certification motion only seeks certification of a Florida class for the breach-of-contract claim. Dkt. 163 at 1 n.1. Thus, plaintiffs' breach-of-contract claims are governed by Florida law, which does not recognize an independent cause of action for a breach of the covenant of good faith and fair dealing.  The Court should grant summary judgment for Public Storage on Count IV.[15]

> **G.     Plaintiffs lack standing to assert claims for injunctive relief.**

The Court should grant summary judgment for Public Storage as to all of plaintiffs' claims for injunctive relief. "A plaintiff has standing to assert a claim for injunctive relief only when the threatened harm is real and immediate, not conjectural or hypothetical." *McCullum v. Orlando Reg'l Healthcare Sys.*, 768 F.3d 1135, 1145 (11th Cir. 2014). Here, plaintiff Brian Morgan (the sole proposed class representative) terminated his tenancy with Public Storage in

---

[15] In addition, as explained above, plaintiffs have failed to produce legally sufficient evidence of damages suffered as a result of any breach. This failure of proof applies equally to plaintiffs' claim for breach of the covenant of good faith and fair dealing, and the Court should grant summary judgment for Public Storage.

May of 2013. (SUF ¶ 11). Thus, there is no threat of real and immediate harm to Morgan, and plaintiffs lack standing to seek injunctive relief. *See Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994).[16]

## IV.    CONCLUSION

After eight months of discovery, plaintiffs still have no evidence that they paid too much for TIP insurance; and even assuming that they did, they still have no evidence or even a theory of the causal link between that overpayment and Public Storage's failure to disclose that it shares revenues with a captive reinsurance subsidiary. For these reasons and the many others discussed above, the Court should grant summary judgment in favor of Public Storage.

---

[16] It makes no difference that putative class members may have standing to seek prospective injunctive relief, because "it must be established that the proposed class representatives have standing to pursue the claims as to which classwide relief is sought." *Wooden v. Bd. of Regents of the Univ. Sys.*, 247 F.3d 1262, 1287 (11th Cir. 2001); *see also id.* at 1288 ("Thus, just as a plaintiff cannot pursue an individual claim unless he proves standing, a plaintiff cannot represent a class unless he has standing to raise the claims of the class he seeks to represent.").

Dated March 6, 2015                    Respectfully submitted,


                                       *s/David P. Ackerman*_____
                                       David P. Ackerman (Florida Bar No. 374350)
                                       dackerman@alslaw.com
                                       Ackerman, Link & Sartory, P.A.
                                       777 South Flagler Drive
                                       Suite 800 East
                                       West Palm Beach, Florida  33401
                                       Tel:  (561) 838-4100
                                       Fax:  (561) 838-5305

                                       *and*
                                       Keker & Van Nest LLP
                                       633 Battery Street
                                       San Francisco, CA  94111-1809
                                       Tel:  (415) 391-5400
                                       Fax:  (415) 397-7188

                                       John W. Keker
                                       (unopposed *pro hac vice* motion to be filed)
                                       jkeker@kvn.com
                                       Steven A. Hirsch
                                       (unopposed *pro hac vice* motion to be filed)
                                       shirsch@kvn.com
                                       David J. Silbert
                                       (unopposed *pro hac vice* motion to be filed)
                                       dsilbert@kvn.com
                                       Quyen Ta
                                       (unopposed *pro hac vice* motion to be filed)
                                       qta@kvn.com
                                       Paven Malhotra
                                       (unopposed *pro hac vice* motion to be filed)
                                       pmalhotra@kvn.com

                                       *Counsel for Defendant Public Storage*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2015, a true and correct copy of the foregoing was filed electronically via CM/ECF and a copy served *via hand delivery* upon counsel for plaintiffs at the addresses listed below.

<u>*s/David P. Ackerman*</u>
David P. Ackerman

### <u>SERVICE LIST</u>
*Colin Bowe and Brian Morgan v. Public Storage*
*Case No. 14-21559-Civ-Ungaro/Otazo-Reyes*
*United States District Court, Southern District Of Florida*

Scott B. Cosgrove
scosgrove@leoncosgrove.com
James R. Bryan
jbryan@leoncosgrove.com
Andrew B. Boese
aboese@leoncosgrove.com
Alec H. Schultz
aschultz@leoncosgrove.com
León Cosgrove, LLC
255 Alhambra Cir. Ste. 424
Coral Gables, FL 33134

David M. Buckner
dbu@grossmanroth.com
Seth E. Miles
sem@grossmanroth.com
Brett E. von Borke
bvb@grossmanroth.com
Grossman Roth, P.A.
2525 Ponce de Leon, Ste. 1150
Coral Gables, FL 33134