UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-21559-CIV-UNGARO

BRIAN MORGAN,
on behalf of himself and all others
similarly situated,

Plaintiff,

vs.

PUBLIC STORAGE, a Maryland
Real Estate Investment Trust,

Defendant.

_____/

**CLASS ACTION**

## THE CLASS' RESPONSE TO THE OBJECTION TO THE PROPOSED SETTLEMENT

The Objection to the Proposed Settlement is filled with false allegations and claims that are neither supported by the facts nor the law.  In fact, Objector has already had to withdraw his fourth objection, which accused Class Counsel of colluding with Counsel for Public Storage, because there were no facts to support those salacious and entirely false allegations.   Not surprisingly, there are no facts to support the remaining three objections lodged by Objector:[1]  (1) the Proposed Settlement is not fair and reasonable; (2) the notice program violated the Class members' Constitutional Due Process rights; and (3) the attorneys' fees should not be paid from the common fund.    As will be shown below, Objector has fabricated the underlying factual allegations to make those objections and should be held to account for those misrepresentations to the Court.  Objector also misrepresents the state of the law to this Court in order to support those objections.

It is clear from the testimony of the Objector and the conduct of Objector's Counsel that the motivation here has nothing to do with a legitimate complaint about the Settlement Agreement. In fact, of the hundreds of thousands of Class members this was the only objection filed, which reflects the Class' overall satisfaction with the Settlement.  Rather, the "sole purpose [of this

---

[1] The Class reserves the right to seek sanctions as to the remaining three objections, based on the improprieties set forth below.

objection] is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto . . . [P]rofessional objectors can levy what is effectively a tax on class action settlement, a tax that has no benefit to anyone other than to the objectors." *In re Checking Account Overdraft Litig*., 830 F. Supp. 2d 1330, 1366 (S.D. Fla. 2011) (internal quotation and citations omitted).   Accordingly, the Objection should be denied.

## I.      BACKGROUND ON THE SETTLEMENT, NOTICE PROGRAM, AND OBJECTOR'S OBJECTION.

The Class filed its Unopposed Motion for Preliminary Approval Approving of Class Settlement on October 9, 2015.  [D.E. 367].  The Court granted preliminary approval on October 21, 2015.  [D.E. 371].  The sole objection to the Settlement Agreement in a class consisting of more than a hundred thousand Class members was filed on January 8, 2016, by Abdulqader Ahmed.  [D.E. 373].  Class Counsel filed its Motion for Final Approval of Class Settlement on January 15, 2016.  [D.E. 379].

### A.      THE CLASS' NOTICE PROGRAM

The Class' notice program provided notice to the Class members in multiple formats and consisted of the following: (1) email notice to all Class members for whom Public Storage had email addresses; (2) notice sent by U.S. first class mail to those Class members for whom Public Storage did not have email addresses; (3) a case specific website (www.PublicStorageInsuranceLawsuit.com) where the notice and other court related filings were posted; (4) notice published in *The Miami Herald* and *The Tampa Tribune*; and (5) a toll-free telephone number where Class members could call to hear a pre-recorded message and leave a message that was returned by the Claims Administrator.   (Supplemental Affidavit of Claims Administrator, Ex. 1, at ¶¶ 3-8).

*i.     Email Notice*

Public Storage primarily communicates with its customers through email and had the email addresses of more than 90% of the Class members.  (Declaration of Public Storage, Ex. 2, at ¶ 2). To deliver email notice to those Class members, the Claims Administrator partnered with an experienced third-party vendor that specializes in mass email notifications in class action settlements. (Ex. 1, at ¶ 3). In order to ensure a high degree of deliverability of the email notice and to avoid spam filters, the third-party vendor used a number of industry-recognized best practices and complied with the Can-Spam Act.  (*Id.* at ¶ 5).   Specifically, the third-party vendor

is pre-approved to send email notice from specific Internet Protocol ("IP") pools that are used solely for legal-related/Court-authorized emails to avoid spam filters. (*Id.* at ¶ 4). The email notice that was sent to the Class members contained text only with no attachments, to decrease the likelihood that the email would be captured by a spam filter. (*Id.* at ¶ 5). Similarly, and again using best practices, the email address that the notice was sent from was an actual, valid, and operational email address. (*Id.*) The subject line of the email notice was crafted to avoid spam-centric phrases and included the case caption as an accurate depiction of the subject of the email. (*Id.*) Finally, the email notice contained an option for recipients to unsubscribe from future emails. (*Id.*) All of these best practices significantly diminished the likelihood that the email notice would be captured by a spam filter and increased the likelihood of deliverability. (*Id.*)

Because the third-party vendor followed these industry-recognized best practices, only 11% of the email notices that were sent to Class members were returned to the third-party vendor as undeliverable. (*Id.*) For those 11% of the Class members for whom email notice was returned as undeliverable, the Claims Administrator took those names and utilized Public Storage's records and a search query of publicly available databases to obtain the mailing addresses for all of those individuals. [D.E. 379-1 at ¶ 5]. On December 22, 2015, the Claims Administrator sent all of those individuals notice through first class United States mail. [*Id.*].

> ii.     *Mailed Notice*

For those Class members for whom Public Storage did not have email addresses, the Claims Administrator sent those individuals notice through first class U.S. mail. [D.E. 379-1 at ¶ 4]. On November 11, 2015, the Claims Administrator sent mailed notice to 83,795 Class members. [*Id.*] Of the 83,795 mailed notices, 20,436 were returned to the Claims Administrator as undeliverable as addressed. [*Id.* at ¶ 5]. Thus, approximately 24% of the mailed notices were returned by the United States Postal Service as undeliverable as addressed. (Ex. 1, at ¶ 6). For the 20,436 mailed notices that were returned, the Claims Administrator took those names and utilized a search query of publicly available databases and was able to obtain updated mailing addresses for 17,251 individuals or 85% of the Class members for whom notice was returned as undeliverable as addressed. [D.E. 379 at ¶ 5]. On December 22, 2015, the Claims Administrator sent out a second mailed notice to those 17,251 Class members through first class U.S. Mail. [D.E. 379-1 at ¶¶ 3-5].

### iii.    Publication Notice

Public Storage has a large customer base in the South Florida and Tampa markets.  The Claims Administrator therefore ran the publication notice in both *The Miami Herald* and *The Tampa Tribune* on Friday, November 20, 2015. [D.E. 379-1 at ¶ 6].  *The Tampa Tribune* has the second largest circulation of any newspaper in Florida with an average daily circulation of 198,543 newspapers.[2]  *The Miami Herald* has the fifth largest circulation of any Florida newspaper with an average daily circulation of 141,188 newspapers.[3]  *The Miami Herald* was selected because it primarily circulates throughout the southern part of Florida, where a majority of Public Storage's Florida locations are concentrated.  *See* (Public Storage Florida Locations, Ex. 3, at 1-2).  The second largest concentration of Public Storage locations in Florida is in the Tampa region and through the central part of the state.  (*Id.*)   *The Tampa Tribune* circulates primarily in the Tampa region and throughout the central and northern parts of the state.  Given Public Storage's heavy concentrations in the South Florida and Tampa markets, these newspapers provided additional notice to the greatest number of Class members.

### iv.    The Settlement Website And Toll-Free Hotline

The Claims Administrator also created a case specific website where Class Members could obtain information about the Settlement and file a claim form online.  [D.E. 379-1 at ¶ 7]. In order to make sure that the website would be found through various search engines the website was named www.PublicStorageInsuranceLawsuit.com.  For example, when searching for information about this lawsuit on Google if the terms "Public Storage" and "Lawsuit" were searched the settlement website would appear on the first page of Google search results.  (Google Search Results, Ex. 4, at 1). The Claims Administrator posted the notice, Settlement Agreement, Order Granting Preliminary Approval, and other case related documents on the website to provide Class members with ready access to information about the lawsuit.  [D.E. 379-1 at ¶ 7].  The Settlement website also provided Class members with the ability to complete a claim form and submit it online, making it easier to submit a claim.  [*Id.*]

The Claims Administrator also established a toll-free number for Class members to call if they required additional information. (Ex. 1, at ¶ 7). The toll-free number had a pre-recorded

---

[2] http://www.cision.com/us/2014/08/top-10-daily-newspapers-in-florida/ (last accessed Feb. 4, 2016).

[3] http://www.cision.com/us/2014/08/top-10-daily-newspapers-in-florida/ (last accessed Feb. 4, 2016).

message, which consisted of the information described in the notice.  (*Id.*)  If the Class members required additional information, they were able to leave a message at the end of the recording and the Claims Administrator would return their call. (*Id.*)

       v.       *The Objector Received Email Notice Of The Settlement And Did Not Have Any Complaints With How The Class Was Noticed.*

The Objector voluntarily provided Public Storage with his email address at the time he signed his rental agreement.  *See* (Deposition of Ahmed, Ex. 5, at 27-28); *see also* (Ex. 2, at ¶ 3). Public Storage communicated with the Objector through email, informing him about various matters.  (Ex. 5, at 22-23); *see also* (Ex. 2, at ¶ 5).  The Objector first learned about the Settlement when he allegedly received the email notice in his spam filter.  (Ex. 5, at 23-24).[4]  Because of his pre-existing relationship with Public Storage and having received communications from it in the past, he opened the email and reviewed the contents of the email notice.  (*Id.* at 24).  The Objector then printed out the email notice and took it to his attorney to review.  (*Id.* at 16-18). The Objector was not aware of any other Class members that had the email notice go into their spam filter.  (*Id.* at 25).  The Objector also testified that he did not have any complaints about the Class' notice program in this case.  (*Id.*. at 12).

**B.**    **THE OBJECTOR'S KNOWLEDGE ABOUT THE LAWSUIT, HIS ROLE AS AN OBJECTOR, AND HIS OBJECTION.**

The Objector cannot articulate, or does not understand, precisely what his objection is to the Settlement Agreement.  At his deposition on January 27, 2016, the Objector was asked repeatedly what his objections were to the Settlement Agreement.  (Ex. 5, at 5).  At first he testified that his only objection with the Settlement was that it was not fair that Public Storage required people to pay for insurance but that the insurance was not provided to them.  (*Id.* at 5).   The Objector did not know whether this lawsuit had ended or whether there was even a Settlement Agreement in this lawsuit.  (*Id.* at 7).  The Objector was entirely unaware of the amount of the Settlement or the identity of the Class representative.  (*Id.* at 7-8, 11).  In fact, the Objector testified that he was only unhappy about the settlement amount because Public Storage had not made the

---

[4] There is reason to question the legitimacy of this claim.  Objector's counsel, Jabreal Hindi, Esq., was one of the very few opt-outs in this case. [D.E. 379-1 at 23].  Thus, he clearly received notice and affirmatively took steps to remove himself from the Class.  This knowledge evidenced by Objector's counsel, when coupled with Objector's complete ignorance about the Settlement, strongly suggests that counsel, and not Objector, was the real impetus for the objection.

settlement offer to him.  (*Id*. at 11).  The Objector testified that he did not believe that the amount of the settlement was insufficient or inadequate in any way.  (*Id*. at 12).  Similarly, as noted above, the Objector had no objections with how the Class was noticed about the Settlement Agreement. (*Id*. at 12).  The Objector did not understand what his role was as an Objector and how that impacted the litigation.  (*Id*. at 14).  To summarize, when asked under oath, Objector had no complaints about the settlement, fees, or notice, the three supposed objections that counsel submitted on his behalf.

## II.    ARGUMENT

The objections to the Settlement Agreement are frivolous and based on factual and legal misrepresentations.  On those grounds alone they should be denied.  First, the Objector had no knowledge about the lawsuit, the terms of the Settlement, or even the basis for his own objections but rather this is simply an attempt by Objector's Counsel to extract a payment from Class Counsel. Second, contrary to the Objector's claims, the settlement amount is fair, adequate, and reasonable. Third, the notice program provided the Class members with the best practicable notice and complied with the Class members' Constitutional Due Process rights.  Finally, the Class' attorneys' fees should be paid from the common fund.  For those reasons, the Court should deny the Objection.

### A.    THE OBJECTOR FUNDAMENTALLY MISUNDERSTANDS THE SETTLEMENT AND OBJECTOR'S COUNSEL IS SIMPLY ATTEMPTING TO OBTAIN A PAY-OUT FROM CLASS COUNSEL.

The Objector had no understanding of the lawsuit or the terms of the Settlement Agreement and could not even articulate the basis for his objection.  The Objector was entirely unaware of the amount of the Settlement, believed it was unfair because the Settlement offer had not been made to him, and ultimately testified that the amount of the Settlement was not insufficient or inadequate in any way.  (Ex. 5, at 7-8, 11-12).  Similarly, the Objector had no objections with how the Class was noticed about the Settlement Agreement.  (*Id*. at 12). The Objector's abject lack of knowledge about the Settlement and his objections are grounds for dismissing his objection in its entirety. *Wilson v. EverBank,* 2016 WL 457011, at *1 (S.D. Fla. Feb. 3, 2016) ("After carefully reviewing the submissions on that objection, including recent deposition testimony given by the objectors, the Court finds that the objection lacks merit and is based on fundamental misunderstandings of the terms of the Settlement and the law."); *Perez v. Asurion Corp.*, 501 F.Supp.2d 1360, 1382

(S.D. Fla. 2007) (denying various objectors' objections finding that "it appears that most of the objectors have simply misread and/or misunderstood the Settlement documents and/or desired to 'have a better deal.'").

Furthermore, "Courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first." *Lee v. Ocwen Loan Servicing, LLC,* 2015 WL 5449813, at *14 (S.D. Fla. Sep. 4, 2015) (internal quotations omitted). Courts have expressed concern for so-called professional objectors:

> [M]ost if not all of the Objections are motivated by things other than a concern for the welfare of the Settlement Class. Instead, they have been brought by professional objectors and others whose sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto . . . . [P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing.

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1366 (internal quotation and citations omitted). Here, Objector's Counsel's motivations are not in the best interest of the Class but to levy a tax on this settlement and obtain a fee for themselves. It is clear from the deposition of the Objector that he had no knowledge about the Settlement or the objection and that it is really Objector's Counsel that is behind this objection. Objector's Counsel's motivation is evident in that, unable to find any valid basis for objecting to the Settlement, they fabricated claims that Class Counsel and Public Storage colluded, which they had to withdraw, and that the email notice failed to take into account any best practices to avoid being captured by spam filters is blatantly false. Furthermore, Objector's Counsel on November 26, 2015, sent counsel for Public Storage an email improperly attempting to renegotiate the terms of the Settlement in what appears to be an attempt to obtain a fee for themselves. (Email from Hindi to Silbert, Ex. 6, at 1-2). Objector's Counsel intentionally and inappropriately excluded Class Counsel from that discussion even though Objector's Counsel did not represent the Class. Objector's Counsel's conduct is not in the best interest of the Class and the objection should be dismissed on these grounds as well.

**B.     THE OBJECTOR SELECTIVELY QUOTES THE LAW REGARDING THE COURT'S REVIEW OF THE SETTLEMENT.**

The Objector misstates the law regarding the standard of review of a class action settlement. Objector leans heavily on *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292

7

(S.D. Fla. 2007), but he quotes only those parts of Judge Altonaga's holding that suit him. The other parts of her opinion provide the necessary context and balance. As the Class asserted, "[a] proposed class action settlement should be approved as long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Id.* at 1319 (citation omitted); Fed. R. Civ. P. 23(e). In assessing the factors for analyzing a settlement set out by the Eleventh Circuit in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984), "the Court 'should be hesitant to substitute . . . her own judgment for that of counsel.'" *Figueroa*, 517 F. Supp. 2d at 1320 (citations omitted).

Moreover, *Figueroa* involved very different facts, and is not instructive here. First, the settlement presented to the court there was a coupon settlement. These types of settlements have a checkered history, and as a result were specifically referenced in the Class Action Fairness Act for special treatment. *See id.* at 1321 (citing 28 U.S.C. § 1712(e)). As Judge Altonaga observed:

> [T]he undersigned interprets the statutory directive [of § 1712(e)] to imply the application of a greater level of scrutiny to the existing criteria than existed pre-CAFA. In any event, coupon settlements have been severely criticized by commentators in the field, including Professor Leslie, and, as is evident here, are strongly disfavored by the Attorneys General of most of the states.

*Id.* This is not, however, a coupon settlement. Class members here will be paid cash. Second, many of the objectors in *Figueroa* were plaintiffs in other class actions filed against defendant Sharper Image, and objected to the settlement in *Figueroa* because that settlement threatened to obviate their ongoing litigation. *Id.* Here, by contrast, the Objector never brought his own claim, nor does he seek to do so now.

The Objector also cites Florida case law as "persuasive" on the procedural standards to be applied by this Court. [D.E. 373 at 4]. It is not. As the United States Supreme Court made clear in *Shady Grove Orthopedic Assocs. P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399, 404, (2010), federal courts are bound to follow the Federal Rules of Civil Procedure, including specifically Rule 23. To the extent that state law varies from or exceeds federal law on those procedures, which Florida law appears to do here, it is preempted. *See id.* at 399, 404. Rule 23(e) sets forth all of the requirements for settlement of class actions in federal court. In any event, whatever standard of review is applied, the settlement in this case is fair, adequate, and reasonable under the facts and circumstances of this case.

C.    THE   SETTLMENT   AMOUNT   IS   FAIR,   ADEQUATE,   AND
      REASONABLE.

Objector is represented by two lawyers who were admitted to the Florida Bar in September of 2015.  *See* (Florida Bar Attorney Directory, Ex. 7, at 1-2).  With their combined 10 months of experience, they conclude that "$38,600,000 is nearly certain to be awarded to the Class if the matter is simply prosecuted with competence."  [D.E. 373 at 8].  The remainder of his argument flows from this belief—namely—that because the settlement is less than $38,600,000, it is inadequate.  The Objector misstates the standard for reviewing a settlement.  More importantly, he and his counsel ignore the record of this litigation, set out in the motions for preliminary and final approval, and discount to zero all of the risks actually facing the Class at a trial of this matter, set forth therein.  Of course, the Objector never had to shoulder any of these risks, about which he and his recently-minted lawyers are apparently blissfully unaware.  Class Counsel is not so naïve.

This litigation presents considerable risks, and a trial of this matter is not "nearly certain" to result in a $38,600,000 verdict.  Under the *Bennett* criteria requiring analysis of the range of possible recovery and the point on the range at which a settlement is fair, "[n]ot surprisingly, the range of possible recovery 'spans from a finding of non-liability through varying levels of injunctive relief.'" *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1322 (S.D. Fla. 2005) (citation omitted).[5]  "The existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable." *Id.* at 1323 (citing *Bennett*, 737 F.2d at 986); *see also Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery.").  "In determining whether a settlement is fair in light of the potential range of recovery, the Court is guided by the important maxim [ ] that the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *In*

---

[5] Objector summarily claims throughout his pleading that the Class misstates or mischaracterizes the law. It seems that he believes that this is a sufficient substitute for legal and factual analysis. *See, e.g.*, [D.E. 373 at 6 n.4].  However, contrary to the Objector's assertion, the quote from *Lipuma* found in the Motion for Preliminary Approval of the Settlement is accurate and in the proper context, and the observation of the court in *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 460 (W.D. Tex. 1999), quoted in *Lipuma*, does not say otherwise.  The risks of litigation favor settlement, a fact observed repeatedly by this Court and the Eleventh Circuit.  While the Objector does not seem to like the concept that appellate review can cause delay, it happens to be true, and it favors settlement.  That is the law of this circuit as well.  Objector's counsel may be unaware of the fact that the Eleventh Circuit does not render instantaneous rulings.  But ignorance of that fact does not suffice to render the objection valid.

*re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1350 (S.D. Fla. 2011) (internal quotations omitted) (approving settlement that provided recovery of 9% to 45% of potential recovery that could have been obtained through trial); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1380-81 (S.D. Fla. 2007) ("These benefits to Defendants' approximately 40 million customers—when viewed against the backdrop of all of the uncertainties, risks, and problems that have surfaced in this litigation . . . and the reasonable possibility that Plaintiffs would not have recovered anything if they had proceeded to trial—weigh heavily in favor of approving this Settlement.").

Neither this litigation nor any trial is a "sure thing," and only lawyers who have never tried a case of this magnitude would make such an arrogant, and, quite frankly, ignorant statement. Public Storage consistently defended its conduct by highlighting the language in the Lease Rental Agreement and Insurance Addenda, claiming that it advised the Class that the insurance it was purchasing was likely duplicative of other coverage and that it did pass the premium through to an independent insurance company. Public Storage also had a survey expert who would testify, at trial, that, based upon the survey he created, additional disclosures would have been immaterial to customer's purchasing decisions. The jury may well have accepted any of these arguments, resulting in zero recovery for the Class. Public Storage also asserted that the insurance exemption applied to the Class' FDUTPA claim. While the Court correctly rejected that argument, *see Bowe v. Public Storage*, No. 14-cv-21559, 2015 WL 3440418, at *11-14 (S.D. Fla. May 19, 2015), the Court of Appeals may have felt differently, resulting in zero recovery for the Class. Public Storage asserted a number of affirmative defenses, which the Court ruled would not be addressed until the claims administration process. *See* [D.E. 330 at 4]. Had Public Storage succeeded in any of those, some or all Class members might have had their claims denied, resulting in zero recovery for some or all of the Class. In any event, the litigation of affirmative defenses and Public Storage's inevitable appeal of any adverse verdict would have tied this matter up for years, delaying any recovery for the Class.

Further, the Objector underestimates Class Counsel. Collectively, we have more than 50 years of trial experience, most of it in federal court, and we have been certified as Class Counsel by courts around the country. We did not settle this case before a motion to dismiss or the motion for class certification was decided. Instead, we were on the eve of trial, having succeeded in overcoming a motion to dismiss, litigating the disqualification of Public Storage's prior counsel, certifying a class, surviving a motion for summary judgment, and keeping at least some evidence

after the Court's rulings on various motions *in limine*.  On the very eve of trial, for which Class Counsel spent innumerable hours and tens of thousands of dollars preparing, the Court allowed Public Storage to bring back an expert the Court had previously stricken.  That expert would testify that, on average, consumers would have purchased the insurance at issue here even if Public Storage had disclosed that it was reaping profits from the program.  Based on this testimony, the jury may have found that a reasonable consumer would have purchased the self-storage insurance regardless of any knowledge of Defendant's profits and, therefore, that Defendant's concealment of those profits caused no damages to consumers.  The Court also had under consideration the parties' proposed jury instructions for the FDUTPA count.  Based on statements made by the Court at the several pre-trial conferences immediately preceding trial, it was very possible that the instruction the Court ultimately gave would have seriously undermined the Class' chances of success.  Experienced counsel, particularly those like Class Counsel with long experience with jury trials, understand the importance of jury instructions.

If we thought we could go to trial and recover $38 million with certainty, we would not have hesitated.  It is what we are in the business of doing, and we have successfully tried class actions to jury verdicts in the past.  However, in light of the state of play days before trial, we judged the risks to the Class of a zero verdict to be too high.  Objector's Counsel would have no idea of how that works, having never been in that position in their very short legal careers.  As the Court noted, "Class Counsel was extremely well-positioned to confidently evaluate the strengths and weaknesses of the Class' claims and prospects for success at trial and on appeal."  *See* [D.E. 371 at 18].[6]  This compares favorably with the Objector's Counsels' abject lack of any searching analysis of the record, the positions of the parties on the eve of trial, and the relative strengths of and risks to the Class' case.  This basis for objection, which is not even shared by the actual Objector, should be denied.  It is completely groundless and uninformed.

---

[6]   This is precisely why the endorsement of well-informed, experienced class action attorneys is strong support for the final approval of a settlement.  *See Warren v. City of Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988).  A court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in [the] litigation."  *Id.*; *see also In re Domestic Air Transp.*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993) ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. The trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.") (internal quotation omitted)); *Mashburn v. Nat'l Healthcare, Inc.,* 684 F. Supp. 660, 669 (M.D. Ala. 1988) ("If plaintiffs' counsel did not believe that these factors all pointed substantially in favor of this settlement as presently structured, this Court is certain that they would not have signed their names to the settlement agreement").

### D. THE CLASS' NOTICE PROGRAM COMPLIED WITH CONSTITUTIONAL DUE PROCESS REQUIREMENTS.

Objector's Counsel argues that the Class' notice program failed to satisfy Constitutional Due Process requirements. [D.E. 373 at 8-12]. Unfortunately for Objector's Counsel, the Objector does not agree. (Ex. 5, at 12). As the Objector testified, he had no complaints with the way Public Storage customers were notified about the proposed settlement of this lawsuit. (*Id.*) On that point, the Class and the Objector agree—the notice program provided the best practicable notice to the Class and complied with Constitutional Due Process requirements. Objector's Counsel's claim that email notice is "unprecedented" in class actions is undermined by the number of cases cited by the Class where courts approved of notice exclusively or primarily by email. Of course, Objector's Counsel simply ignores these cases in an effort to misrepresent the state of the law to this Court. In order to further support their argument, Objector's Counsel makes a series of baseless allegations that the email notice failed to take into account any best practices to avoid spam filters. Objector's Counsel has yet again simply fabricated facts to support their baseless objection. As the affidavit from the Claims Administrator establishes, email notice was sent in compliance with the Can-Spam Act and utilized industry recognized best practices to prevent the email notice from being caught in Class members' spam filters. (Ex. 1 at ¶¶ 3-6).

#### i.    The Best Practicable Notice Standard

"For a court to exercise jurisdiction over the claims of absent class members, there must be minimal procedural due process protection." *Perez v. Asurion Corp.,* 501 F. Supp. 2d 11360, 1377 (S.D. Fla. 2007). "The notice provisions of Rule 23, which are meant to protect the due process rights of absent class members, set forth different notice requirements to different kinds of cases and even to different phases of the same case." *Juris v. Inamed Corp.,* 685 F.3d 1294, 1317 (11th Cir. 2012) (internal quotations omitted). To satisfy due process requirements, the notice must be the "best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

However, the "best practicable" notice standard does not require that every class member actually receive notice. 5-23 Moore's Federal Practice - Civil § 23.102. "The relevant question is not whether every absent class member actually receives notice, but whether the notice that the

court orders is reasonably calculated to reach the absent members.  The fact that some class members may not actually receive timely notice does not render the notice inadequate as long as the class as a whole had adequate notice."  *Id.*  Thus, as the Eleventh Circuit has held, "[c]ourts have consistently recognized that, even in Rule 23(b)(3) class actions, due process does not require that class members actually receive notice." *Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012); *see also Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (explaining that the class notice standard is "best practicable" as opposed to "actually received"); *In re Adelphia Commc'ns Corp. Secs. & Derivatives Litig.*, 271 F. App'x 41, 44 (2d Cir. 2008) (holding that the fact that some class members may not actually receive timely notice does not render the notice inadequate so long as the notice was reasonably calculated to reach all members) (quoting *Weigner v. New York*, 852 F.2d 646, 649 (2d Cir. 1988) ("It is clear that for due process to be satisfied, not every class member need receive actual notice, as long as class counsel 'acted reasonably in selecting means likely to inform persons affected.'"); *In re Agent Orange Prod. Liabl. Litig.,* 818 F.2d 145, 168-69 (2d Cir. 1987) (holding that with respect to a 23(b)(3) class, unidentified absent class members that could not be located through reasonable efforts did not need to be provided with individual notice in order to be bound); Newberg on Class Actions § 8:36 (5th ed.) ("[N]either Rule 23 nor the Constitution requires that a class member actually receive notice: notice suffices if it is reasonably calculated to reach the absent parties."); 7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1789.1 (3d ed. 2005) ("[A]s long as the notice scheme that is adopted meets [the constitutional standards], courts generally have ruled that an absent class member will be bound by any judgment that is entered, even though the absentee never actually received notice.").   "In reviewing the class notice to determine whether it satisfies the [] requirements [of due process], we look solely to the language of the notices and the manner of their distribution." *Adams v. S. Farm Beureau Life Ins. Co.,* 493 F.3d 1276, 1286 (11th Cir. 2007).

The Class' notice program was comprehensive and provided actual notice to nearly all of the Class members through a combination of email and U.S. mail and constructive notice to all Class members through notice publication in *The Miami Herald* and *The Tampa Tribune*, a toll-free hotline, and a case-specific informational website. Courts have routinely held that notice programs that provide notice through a variety of media, including through email notice, satisfy the requirements of Federal Rule of Civil Procedure 23.  *See Kelly v. Phiten USA Inc.*, 277 F.R.D. 564, 569-70 (S.D. Iowa 2011) (approving class notice where notice was sent through email relying

on defendant's records of class members' email addresses and constructive notice was provided by publication in two newspapers and on defendant's Facebook page); *Browning v. Yahoo! Inc.*, [case number?] 2007 WL 4105971, at *4-7 (N.D. Cal. Nov. 16, 2007) (finding that notice program for settlement was "best practicable under the circumstances" under Rule 23(c)(2)(B) and satisfied due process  where email notice was provided  for Class members whose email addresses were known; mailed notice was provided for class members whose email addresses were unknown or where email notice was returned as undeliverable a website was established; and there was  a one-time publication in a newspaper).

   ii.     *Email Notice Satisfies Constitutional Due Process Requirements.*

   The email notice provided to more than 90% of the Class members in this lawsuit was the best practicable notice and was reasonably calculated to apprise them of their rights.  Courts consistently approve notice programs where notice is provided primarily through email because email is an inexpensive and appropriate means of delivering notice to class members. *Stuven v. Texas De Brazil (Tampa) Corp.*, 2013 WL 610651, at *6 (M.D. Fla. Feb. 19, 2013) (declining to "impose a presumption that notice by mail is the preferred method of providing notice" and approving notice by email because "the better course is to determine what constitutes fair and proper notice based on the facts of each case."); *Kelly*, 277 F.R.D. at 569-70 (approving settlement class notice where notice was primarily provided by email); *see also Guy v. Casal Inst. of Nevada, LLC*, 2014 WL 1899006, at *7 (D. Nev. May 12, 2014) (permitting notice in an opt-in class to be sent by email and/or U.S. Mail).  For example, the court in *Kelly* only required that direct notice be sent to the class through the class' email addresses and by Facebook notification. 277 F.R.D. at 569-70.

   Furthermore, email notification is particularly appropriate where a majority of the defendant's contact and communications with class members occur electronically.  For example, in *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012), the primary delivery of notice was through email because contact with the class members was primarily through electronic means.  Direct email notice in *Lane* was supplemented with constructive notice provided through notice publication in *USA Today*, the creation of an informational website, and the establishment of an informational toll-free number.  Similarly, in *In re Sony Corp. SXRD Rear Projection Telev. Mktg, Sales Practices & Prods. Liab. Litig.*, 2010 WL 1993817, at *5 (S.D.N.Y. May 19, 2010), the court approved of a notice program where notice of a settlement to a class of 350,000 individuals

could be sent by either mail or email.  *See also Kelly*, 277 F.R.D. at 569 (approving email notice "sent based upon [defendant]'s customer email data"); *Cranney v. Carriage Servs., Inc.,* 2008 WL 608639, at *5 (D. Nev. Feb. 29, 2008) (permitting defendant to provide direct notice of opt-in class through email while requiring constructive notice through publication).

Email notice to the Class members is particularly appropriate in this case because Public Storage has the email addresses for more than 90% of them and Public Storage's primary method of communication with the Class was through email.  (Ex. 2, at ¶¶ 2, 5).  Public Storage collected Class members' email addresses at the time they signed their leases, communicated with them through email, and had a portal where Class members could update their email addresses.  (*Id.* at ¶¶ 3-5).  This creates a strong presumption that the email addresses were valid and operational.  That assumption was correct because only 11% of the emails were returned to the third-party email vendor as undeliverable.  (Ex. 1, at ¶ 6).  In other words, 89% of the emails were successfully delivered to the Class members through email.  (*Id.*)  Furthermore, the third-party vendor that sent the email notice complied with the Can-Spam Act and used recognized industry-standard best practices to ensure that the email was not captured by a spam filter.  Most importantly though, **email notice was significantly more effective than mailed notice** and had a higher delivery rate; only 11% of emails were returned as undeliverable in comparison with the 24% of mailed notices that were returned as undeliverable as addressed.  (*Id.*)  For those individuals whose emails were bounced back, the Claims Administrator provided them with notice through U.S. first class mail.  (*Id.* at ¶¶ 3-5).   Accordingly, email notice to the Class was the best practicable notice and complied with the Class' Constitutional Due Process rights.  *See Lane*, 696 F.3d at 818; *In re Sony Corp.*, 2010 WL 1993817, at *5; *Kelly*, 277 F.R.D. at 569; *Phelps*, 2011 WL 3298414, at *6.

Furthermore, as the Objector testified, email notice worked precisely as intended.  The Objector received notice by email, printed it out, and took it to his attorney.  (Ex. 5, at 15-19, 22-25).  The Objector claimed that the email was caught in his spam filter but acknowledged that based on his pre-existing relationship with Public Storage, he opened the notice because he believed it to be important.  (*Id.* at 22).  While he did not read the notice himself, he printed it out and took it to his attorney.  (*Id.* at 16-19).  Thus, the notice program worked as it was supposed to—the Objector received notice.  *See* (*Id.* at 15-19, 22-25).  Because of the effectiveness of the notice program, the Objector acknowledged that he did not have any complaints with the way that Public Storage customers were notified about the Proposed Settlement of the lawsuit.  (*Id.* at 12).

### iii.   Objector's Counsel's Objections About Email Notice Are Entirely Without Merit.

Even though the Objector did not have any complaints about the notice program, his counsel raises a series of false and meritless objections about the email notice.  (Ex. 5, at 12). Objector's Counsel's primary argument is that notice by email was not the best notice practicable and therefore violated the Class members' Due Process rights.  [D.E. 373 at 8-12].  As Objector's Counsel claims, "Notice administered *primarily* through e-mail is completely improper and, for that matter, unprecedented."  [D.E. 373 at 10] (emphasis in original).  Like many of the arguments made by these lawyers, this too finds no support in the law.  As noted above, email notice in class actions is used regularly and has been approved in many federal courts throughout the United States.  *See Lane*, 696 F.3d at 818; *In re Sony Corp.*, 2010 WL 1993817, at *5; *Kelly*, 277 F.R.D. at 569; *Phelps*, 2011 WL 3298414, at *6; *Stuven*, 2013 WL 610651, at *6; *Guy v. Casal Inst. of Nevada, LLC*, 2014 WL 1899006, at *7.

Failing to address the overwhelming body of cases that establish that email notice is an appropriate way to provide class members with notice of a class action settlement, Objector's Counsel relies on the 2010 Federal Judicial Center's Checklist ("FJC Checklist"):

> If available, parties should use postal mailing addresses, which are generally more effective than e-mail in reaching class members: mail-forwarding services reach movers, and the influx of "SPAM" e-mail messages can cause valid e-mails to go unread.  If e-mail will be used – e.g., to active e-mail addresses the defendant currently uses to communicate with class members – be careful to require sophisticated design of the subject line, the sender, and the body of the message, to overcome SPAM filters and ensure readership.

[D.E. 373 at 11] (emphasis not included).  Based on the FJC Checklist, Objector's Counsel argues that the email notice failed to comply with the FJC Checklist because it "did not have a 'sophisticated design of the subject line, the sender, and the body of the message, to overcome SPAM filters and ensure readership.'"  [D.E. 373 at 11].  Once again, Objector's Counsel makes an entirely false statement to support their objection about the notice program.

First, Objector Counsel's reliance on the FJC Checklist is misplaced.  The FJC Checklist is outdated because it is more than five years old, based on flawed assumptions, and does not recognize the current trend among federal courts in approving email notice.   The FJC Checklist's preference for U.S. mail is based on its outdated belief that mail delivery is "generally more effective than email in reaching class members."  As the data here demonstrates, that five-year old

16

assumption is no longer correct.  As the Claims Administrator noted, only 11% of the email notices sent to Class members were returned as undeliverable whereas 24% of the mailed notices were returned as undeliverable as addressed.  (Ex. 1, at ¶ 6).  Thus, more than twice as many mailed notices were returned as undeliverable by mail than by email on a percentage basis.  (*Id*).  This is not entirely unsurprising because the Class is comprised of individuals storing goods, reflecting a more transient population in general.  Moreover, individuals typically use an email address for longer periods of time than a mailing address, and take them with them as they move from place to place.

Furthermore, Objector's Counsel claims that "[t]he parties failed to undertake any measures whatsoever to ensure that the e-mail notice was able to overcome SPAM filters—and as a result—as in Mr. Ahmed's situation, the notice was labeled SPAM and diverted from the inbox, or the notice dispatched went undelivered altogether."  [D.E. 373 at 11 n.23].  Objector's Counsel cites the FJC Checklist in support that the email notice failed to employ any best practices to avoid spam filters.  Of course, the Objector's Counsel's claims are entirely contradicted by the Claims Administrator's affidavit about email notice.  Here, the third-party vendor hired by the Claims Administrator to send out the email notice complied with the Can-Spam Act and used industry recognized best practices to ensure that the emails were not caught in a spam filter.  (Ex. 1, at ¶¶ 3-5).  The email notice addressed all of the issues raised by the FJC Checklist and more: (1) the email notice was sent from specific IP pools that are used solely for legal related/Court-authorized emails; (2) the email notice contained text only with no attachments; (3) the from email address was an actual, valid and operational email address; (4) the subject line of the email notice avoided certain spam-centric phrases and included the case caption as an accurate depiction of the subject email; and (5) the email notice contained an option for recipients to unsubscribe from future emails.  (*Id.* at ¶¶ 4-5).

In addition, the Objector claims that if the email notice was caught in his spam filter it must have occurred to other Class members.  However, as the Objector testified, he was unaware of any other Class member having the email notice caught in its spam filter.  (Ex. 5, at 25).  The court in *Browning* addressed similar objections to email notice and held:

> The Court acknowledges evidence indicating that some number of class members may have deleted the email notice out of concern that it was an identity theft scam. However, no objector has presented evidence of how widespread this concern was throughout the class.  There are tradeoffs involved in any form of notice, especially

> with a settlement class of this size.  For approval, the notice need not have been
> perfect.  Rather, it needed to be the 'best notice practicable under the circumstances'
> and directed 'in a reasonable manner to all members who would be bound.'  The
> email notice program adopted in this case met these requirements.

2007 WL 4105971, at *8 (internal citations omitted).  Here, Objector's Counsel has offered no

evidence that any other Class member other than the Objector received email notice in their spam

filter.[7]  In other words, Objector's Counsel has simply made up these allegations.

Objector's Counsel takes issue with the Class' reliance on *Lane* where actual notice was

provided to the Class primarily through email and posts on their Facebook page.  [D.E. 373 at 10

n. 17].  Objector's Counsel claims that *Lane* is distinguishable from this case because: "(1) the

defendant was Facebook; (2) Facebook is an internet based enterprise; and (3) the Facebook

notification was administered to the entire class, not just a portion of thereof."  [*Id.*]  Objector's

Counsel's distinguishing grounds are absurd.  While it is true that the defendant here is not

Facebook, nor is it an internet based company, those facts have no bearing on whether email notice

is appropriate. As the case law makes clear, the propriety of email notice turns on the totality of

the notice program and whether the defendant has valid email addresses for the class members and

regularly communicates with them through email.  *See In re Sony Corp. SXRD Rear Projection*

*Telev. Mktg, Sales Practices & Prods. Liab. Litig.,*2010 WL 1993817, at *5; *Kelly*, 277 F.R.D. at

569; *Stuven*, 2013 WL 610651, at *6.  It did and it does.  Furthermore, Objector's Counsel's point

that the entire class in *Lane* was noticed primarily through email does not support its argument at

all, but rather actually undermines it.  The court in *Lane* found it appropriate to rely exclusively

on email notice as the primary manner to inform the class about the settlement, whereas here notice

by first class U.S. mail was provided to those Class members for whom there was no email address

or the email notice was returned as undeliverable.  Thus, the Due Process rights of the absent Class

members were better protected here than they were in *Lane.*[8]

---

[7] Furthermore, the FJC Checklist does acknowledge that notice by email can be appropriate where the defendant communicates with the class members by email and where best practices are used to decrease the likelihood that the email will be caught by a Spam filter.  Here, Public Storage collects email addresses from the tenants at the time they sign their lease and communicates primarily with their tenants through email. (Ex. 2, at ¶¶ 3-5.)  The third-party vendor hired by the Claims Administrator complied with the Can-Spam Act and used best practices to avoid spam filters.  (Ex. 1, at ¶¶ 4-6).  Thus, even under the FJC Checklist, the Class' email notice complied with its requirements.

[8] Objector's Counsel does not appear to take issue with the remainder of the notice program.  As noted above, for those individuals whose email notice was returned as undeliverable along with the Class

### E.   CLASS COUNSEL'S ATTORNEYS' FEES APPROPRIATELY ARE A PERCENTAGE OF THE COMMON FUND.

The Objector argues that utilizing the common fund approach for payment of Class Counsel's attorneys' fees in this case is improper.  He insists that FDUTPA's fee shifting provision abrogates federal common fund case law, and that Class Counsel's fees should be calculated based on our lodestar, and not as a percentage of the common fund.  While this would result in far higher fees being awarded to Class Counsel, incentivizing us to agree with him, we cannot.  The Objector is wrong.

Once again, the Objector advances the plainly incorrect notion that Florida law trumps federal law.  It is true that Florida courts follow the lodestar approach in common fund class action cases.  The federal courts in this circuit, however, do not, and have not at least since the Eleventh Circuit declared in *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991), that "[a]ttorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."  *See also Poertner v. Gillette Co.*, 618 F. App'x 624, 628 (11th Cir. 2015) (quoting *Camden I* in affirming district court's award of percentage of the common fund attorneys' fees in FDUTPA class action); *Francisco v. Numismatic Guaranty Corp. of Am.*, 2008 WL 649124, at *14 (S.D. Fla. Jan. 31, 2008) (awarding percentage of the common fund attorneys' fees in case involving FDUTPA and unjust enrichment claims).   This follows Supreme Court precedent.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A]

---

members for whom Public Storage did not have email addresses, notice was provided to them through U.S. First Class mail.  [D.E. 379-1 at ¶¶ 1-7].  Thus, almost every Class member received actual notice by either email or U.S. mail.  [*Id.*]  The notice was also run in both *The Miami Herald* and *The Tampa Tribune* on Friday, November 20, 2015.  *The Tampa Tribune* has the second largest circulation of any newspaper in Florida and *The Miami Herald* has the firth largest circulation.  [D.E. 379-1 at ¶ 6]. Most importantly, these newspapers were selected because they are the newspapers of record in the communities where Public Storage locations are most heavily concentrated—South Florida and the Tampa and Central Florida region—in an effort to provide constructive notice in the areas with the likely largest concentration of Class members.  (Ex. 3, at 1-2).  Constructive notice was further supplemented with a case specific website (www.PublicStorageInsuranceLawsuit.com) that had detailed information about the lawsuit, including pertinent pleadings and orders, long form notice, and the Settlement Agreement.  [D.E. 379-1 at ¶ 7].  This website was highly visible and on Google's first page of results when the terms "Public Storage" and "Lawsuit" were searched.  (Ex. 4, at 1).  Finally, a toll free number was established where Class members could receive information about the settlement, leave a message, and the Claims Administrator would return their call.  (Ex. 1, at ¶ 7).  The notice program was robust, similar to other notice programs approved by numerous federal district and appellate courts, and complies with Constitutional Due Process, and the Court should so find.

lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.").

Objector cites a few cases that he claims support his position. They do not. The Second Circuit in *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1327 (2d Cir. 1990), considered the question of whether, because the plaintiff might be able to recover its attorneys' fees under the fee shifting provision of RICO, it should *also* receive fees from a fund set up to cover attorneys' fees as part of a settlement. The court held that the plaintiff could recover its attorneys' fees from the fund even if it might also recover some of them under RICO. That is, this case stands for exactly the opposite of what Objector claims it does in his selective quotation. Indeed, the Second Circuit notes that, "[i]n our view, fee-shifting statutes are generally *not* intended to circumscribe the operation of the equitable fund doctrine." *Id.* (emphasis added). *Horowitch v. Diamond Aircraft Indus., Inc.*, 645 F.3d 1254 (11th Cir. 2011), was not a class action, and thus the court never considered the relationship between the fee-shifting provision of FDUTPA and its holding in *Camden I.* It did, however, preview how that would turn out, writing that, "a statute allowing for the recovery of attorney's fees, like the FDUTPA fee-shifting provision at issue in this case, generally applies in federal court *so long as it does not conflict with a valid federal statute or rule*." *Id.* at 1259 (emphasis added). Objector's reading of FDUTPA puts it in direct conflict with *Camden I.* Accordingly, it does not aid the Objector.

### III.    CONCLUSION

For the reasons set forth above, the Class respectfully requests that the Court deny the Objector's Objection.

Dated: February 12, 2016                          Respectfully submitted,

                                                   */s/ David M. Buckner*
                                                   David M. Buckner, Esq.
                                                     Fla. Bar No.: 60550
                                                   Seth E. Miles, Esq.
                                                     Fla. Bar No.: 385530
                                                   Brett E. von Borke, Esq.
                                                     Fla. Bar No.: 0044802
                                                   Buckner + Miles
                                                   3350 Mary Street
                                                   Coconut Grove, Florida  33133
                                                   E-mail: david@bucknermiles.com
                                                   E-mail: seth@bucknermiles.com
                                                   E-mail: vonborke@bucknermiles.com

                                                   AND

                                                   */s/ Scott B. Cosgrove*
                                                   Scott B. Cosgrove, Esq.
                                                     Fla. Bar No. 161365
                                                   Alec H. Schultz, Esq.
                                                     Fla. Bar No. 35022
                                                   Constantine P. Economides, Esq.
                                                     Fla. Bar No. 118177
                                                   LEÓN COSGROVE LLC
                                                   255 Alhambra Circle, Suite 800
                                                   Coral Gables, Florida 33134
                                                   Tel:    305.740.1975
                                                   Email: scosgrove@leoncosgrove.com
                                                   Email: aschultz@leoncosgrove.com
                                                   Email: ceconomides@leoncosgrove.com

                                                   *Counsel for Plaintiff and Class*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing was served by e-mail via the CM/ECF system on

February 12, 2016, on the counsel listed below and all counsel of record in this matter.

*/s/ David M. Buckner*
David M. Buckner, Esq.

## SERVICE LIST

John Keker
Steven A. Hirsch
David J. Silbert
Quyen Ta
Paven Malhotra
Michelle Ybarra
Erin E. Meyer
Anjali Srinivasan
Keker & Van Nest, LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
Email: jkeker@kvn.com
Email: shirsch@kvn.com
Email: dsilbert@kvn.com
Email: qta@kvn.com
Email: pmalhotra@kvn.com
Email: mybarra@kvn.com
Email: emeyer@kvn.com
Email: asrinivasan@kvn.com

*Counsel for Defendant Public Storage*

David Paul Ackerman
Scott Jeffrey Link
Kristen Lee McKeever
Elio Raul Novoa , Jr.
Ackerman Link & Sartory
777 South Flagler Drive
Suite 800 East
West Palm Beach, FL 33401
Telephone: (561) 838-4100
Facsimile: (561) 838-5305
Email: dackerman@alslaw.com
Email: slink@alslaw.com
Email: kmckeever@alslaw.com
Email: rnovoa@alslaw.com

*Counsel for Defendant Public Storage*

Thomas John Patti, III
Thomas-John Law, P.A.
110 SE 6th Street, Suite 1700
Fort Lauderdale, FL 33301
Telephone: (877) 575-0020
Email: tpatti@thomasjohnlaw.com

*Counsel for Objector Abdulqader Ahmed*

Jibrael Jarallah Said Hindi
The Law Offices of Jibrael S. Hindi
110 SE 6th Street, 17th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 907-1136
Email: hindijs1@gmail.com

*Counsel for Objector Abdulqader Ahmed*

23