UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 14-cv-21559-Ungaro/Otazo-Reyes

BRIAN MORGAN,
on behalf of himself and all others
similarly situated,

      Plaintiffs,

v.

PUBLIC STORAGE, a Maryland           **<u>CLASS ACTION</u>**
Real estate Investment Trust,

      Defendant.
_____/

## <u>OMNIBUS ORDER GRANTING FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT, APPROVING CLASS COUNSEL'S AWARD OF ATTORNEYS' FEES AND COSTS, AND DENYING THE OBJECTORS' OBJECTIONS TO THE SETTLEMENT</u>

THIS MATTER is before the Court on the Class' Motion for Final Approval of Class Settlement [D.E. 379]; the Class' Motion for Attorneys' Fees, Expenses, and Incentive Award for Brian Morgan [D.E. 380]; the Objection to Settlement by Abdulqader Ahmed [D.E. 373]; and the Objection to the Settlement by Arthur Putman [D.E. 399].  The Class moves for Final Approval of the Settlement Agreement and Release attached as Exhibit A to the Class' Motion for Preliminary Approval ("Settlement" or "Agreement") [D.E. 367-1], which will resolve all claims against Defendant Public Storage brought by the Florida class in this lawsuit.  As described in further detail below, the Settlement provides substantial relief to the Settlement Class, and its terms are well within the range of reasonableness, and is approved by the Court.  Similarly, the Court approves the Class' Motion for Attorneys' Fees awarding Class Counsel 33% of the $5 million Settlement Fund, approves reimbursement of Class Counsel's expenses in

the amount of $532,383.68, and grants an incentive award to Brian Morgan of $10,000.  Finally, the Court overrules the Objections of Abdulqader Ahmed [D.E. 373] and Arthur Putnam [D.E. 399].

## I.   STATEMENT OF FACTS

### A.   FACTUAL BACKGROUND

#### 1.   Procedural History

On April 30, 2014, then-lead Plaintiff Colin Bowe sued on behalf of himself and all others similarly situated who purchased insurance through the tenant insurance program ("TIP") offered at Public Storage.  [D.E. 1]. The Plaintiff sought monetary damages and declaratory and injunctive relief arising from Public Storage's offering of the TIP, alleging that Public Storage deceived its customers when it promised to pass through a self-storage insurance premium to an independent insurance company but instead kept a significant portion of the premium for itself.

Public Storage vigorously denied the Class' allegations and Public Storage consistently defended its conduct by, *inter alia*, arguing that it did not deceive its tenants in any way, that any alleged deception was immaterial to tenants, that tenants received the full benefit of their bargain (i.e., they received the insurance they paid for and all legitimate claims that were made were paid), and that it complied with all applicable laws. Public Storage also asserted that the insurance exemption applied to the Class' FDUTPA claim, thereby prohibiting the Class' claim under FDUTPA.   Furthermore, Public Storage advanced a variety of affirmative defenses.

The Court, on April 29, 2015, granted the Class' Motion to Certify the Class.  [D.E. 305]. Shortly thereafter, the Court approved a notice program.  [D.E. 320].  The Court on May 19, 2015, granted in part and denied in part Public Storage's Motion for Summary Judgment, permitting only the FDUTPA claim to go to the jury.  [D.E. 313].  In so doing, the Court also

decertified the nationwide RICO class, finding no evidence that the PSTIP insurance premiums were inflated based on the value of the PSTIP insurance.

After the Court's denial of summary judgment, the Parties prepared for trial. The Parties challenged each other's experts under *Daubert* and other standards, moved *in limine* to exclude other evidence, and submitted exhibit lists and deposition designations.  The Court issued a series of orders addressing those issues.  The Parties attended the Court's September 2 and 3, 2015, calendar calls and trial was scheduled to begin on September 8.  The Parties agreed to the material terms of a Settlement on September 5, 2015, and signed the Settlement Agreement on October 9, 2015.

On October 9, 2015, the Class filed its Motion for Preliminary Approval of the Settlement Agreement.  [D.E. 367].  The Court granted preliminary approval of the Settlement on October 21, 2015.  [D.E. 371].  Once the Court granted preliminary approval, the Settlement Administrator, with Court approval, noticed the Settlement Class in the manner described below. Pursuant to the Court's Order, all objections were required to be filed with the Court on or before January 11, 2016.  [D.E. 371].  On January 8, 2016, Objector Abdulqader Ahmed ("Objector") filed his objection to the Class' Settlement. The Objector's objection was based on the following four grounds: (1) the settlement amount was too low; (2) the notice program violated the absent Class members' Constitutional Due Process rights; (3) the Class' attorneys' fees should not be based on a percentage of the fund; and (4) the Settlement was the result of collusion between Class Counsel and Counsel for Public Storage.  [D.E. 373].  On January 28, 2016, Objector's Counsel withdrew their fourth objection to the Settlement. [D.E. 395].  Class Counsel filed its Response to the Objector's Objection [D.E. 398] and the Objector did not file a reply.     On January 27, 2016, Class Counsel took the deposition of the Objector.  [D.E. 398-5].

On January 15, 2016, the Class moved for final approval of the Settlement.  [D.E. 379].
The Class also moved that same day for Approval of its Attorneys' Fees, Expenses, and
Incentive Award for Brian Morgan.  [D.E. 380].  Public Storage adopted the Class' Motion for
Final Approval of the Settlement on January 20, 2016.  [D.E. 383].  Public Storage filed its
Response to the Class' Motion for Attorneys' Fees on February 1, 2016.  [D.E. 396].  The Class
filed its Response in Support of its Motion for Attorneys' Fees on February 11, 2016.  [D.E.
397].

On February 24, 2016, Arthur Putnam filed an untimely handwritten objection to the
Settlement with the Court. [D.E. 399]. Mr. Putnam was not a Class member as his filing makes
clear that he did not purchase self-storage insurance nor was his complaint with the actual
Settlement but rather Public Storage's practice of auctioning off customer goods for failure to
pay rent.  [*Id.*]  The Court held a Final Fairness Hearing on February 29, 2016.

**B.      SUMMARY OF THE SETTLEMENT TERMS**

The Settlement's terms are detailed in the Agreement attached as Exhibit A to the Class'
Motion for Preliminary Approval.  [D.E. 367-1].  The following is a summary of the material
terms of the Settlement.

**1.      The Settlement Class**

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rule of Civil
Procedure.  The Settlement Class is defined as:

> All persons who rented storage units from Public Storage within
> the state of Florida and who purchased self-storage insurance
> policies through Public Storage from May 1, 2010 through June
> 18, 2015.
>
> Excluded from this Class are Public Storage, its affiliates,
> subsidiaries, agents, board members, directors, officers, and/or
> employees.

## 2.    Monetary Relief for the Benefit of the Class

The Settlement creates a common fund of $5,000,000, ("Settlement Fund") paid for by Public Storage. The Settlement Fund will be used to pay the Class' costs and attorneys' fees. Class members were able to claim up to 50% of their alleged damages. In the event that there are any funds left after all attorneys' fees, costs, and claims have been paid, those funds will revert to Public Storage. If the claims should exceed the amount of the Settlement Fund minus fees and costs, Class members' payments will be allocated on a *pro-rata* basis.

As part of the claims process, Settlement Class members were asked to provide only basic information when submitting a claim and were be able to submit claims both online and through the mail. Specifically, Settlement Class members were only asked to provide their name, address, rental location, and dates of rental. The Claims Administrator will be able to compare the claims submitted by the Settlement Class members with Public Storage's records to ensure accuracy. In the event that Settlement Class members submit incorrect information, they will still receive a settlement payment if the Settlement Administrator can verify their entitlement to a payment through Public Storage's records. More than 11,000 Settlement Class members filed claims with the Claims Administrator to claim on the Settlement Fund.

Any uncashed or returned checks will remain in the Settlement Fund for six months from the date the first Settlement Fund Payments are mailed by the Settlement Administrator, during which time the Settlement Administrator will make reasonable efforts to effectuate delivery of the Settlement Class members' payments. Any funds remaining after that period will revert to Public Storage.

## 3.    Releases

In exchange for the benefits conferred by the Settlement, all Settlement Class members who did not opt out will have been deemed to provide Public Storage, its affiliated companies,

- 5 -

and their officers, employees, directors, and agents with a release of all claims that were brought or could have been brought by them in this litigation.  However, claims for property damage or other losses covered by the tenant insurance offered at Public Storage facilities are not included in the release and will be unaffected by the Settlement.  In return, Public Storage, its affiliated companies, and their officers, employees, directors, and agents, will likewise provide Plaintiff and the Settlement Class, and their attorneys and agents, with a release of all claims that were or could have been brought against any of them arising from the bringing or conduct of the litigation or the bringing of the claims set forth in the complaints filed by the Plaintiff.

     C.     **THE NOTICE PROGRAM**

The Class' notice program provided notice to the Class members in multiple formats and consisted of the following: (1) email notice to all Class members for whom Public Storage had email addresses; (2) notice sent by U.S. first class mail to those Class members for whom Public Storage did not have email addresses; (3) a case specific website (www.PublicStorageInsuranceLawsuit.com) where the notice and other court related filings were posted; (4) notice published in *The Miami Herald* and *The Tampa Tribune*; and (5) a toll-free telephone number where Class members could call to hear a pre-recorded message and leave a message that was returned by the Claims Administrator.  [D.E. 398-1 at ¶¶ 3-8].

     1.     **Email Notice**

Public Storage primarily communicates with its customers through email and had the email addresses of more than 90% of the Settlement Class members.  [D.E. 398-2 at ¶ 2].  To deliver email notice to those Settlement Class members, the Claims Administrator, A.B. Data, partnered with an experienced third-party vendor that specializes in mass email notifications in class action settlements. [D.E. 398-1 at ¶ 3]. To ensure a high degree of deliverability of the

email notice and to avoid spam filters, the third-party vendor used a number of industry-recognized best practices and complied with the Can-Spam Act.  [*Id.* at ¶ 5].

Specifically, the third-party vendor is pre-approved to send email notice from specific Internet Protocol ("IP") pools that are used solely for legal-related/Court-authorized emails to avoid spam filters.  [*Id.* at ¶ 4].  The email notice that was sent to the Class members contained text only with no attachments, to decrease the likelihood that the email would be captured by a spam filter.  [*Id.* at ¶ 5].  Similarly, and again using best practices, the email address that the notice was sent from was an actual, valid, and operational email address.  [*Id.*]  The subject line of the email notice was crafted to avoid spam-centric phrases and included the case caption as an accurate depiction of the subject of the email.  [*Id.*] Finally, the email notice contained an option for recipients to unsubscribe from future emails.  [*Id.*]  All of these best practices significantly diminished the likelihood that the email notice would be captured by a spam filter and increased the likelihood of deliverability.  [*Id.*]

Because the third-party vendor followed these industry-recognized best practices, only 11% of the email notices that were sent to Class members were returned to the third-party vendor as undeliverable.   [*Id.*] For those Class members, the Claims Administrator utilized Public Storage's records and a query of publicly available databases to obtain the mailing addresses for all of those individuals.  [D.E. 379-1 at ¶ 5].  On December 22, 2015, the Claims Administrator sent all of those individuals notice through first class United States mail.  [*Id.*].

### 2.    Mailed Notice

For those Class members for whom Public Storage did not have email addresses, the Claims Administrator sent those individuals notice through first class U.S. mail.  [D.E. 379-1 at ¶ 4].  On November 11, 2015, the Claims Administrator sent mailed notice to 83,795 Class

members. [*Id.*]  Of the 83,795 mailed notices, 20,436 were returned to the Claims Administrator as undeliverable as addressed.  [*Id.* at ¶ 5].  Thus, approximately 24% of the mailed notices were returned by the United States Postal Service as undeliverable as addressed.  [D.E. 398-1 at ¶ 6].  The Claims Administrator utilized a search query of publicly available databases and was able to obtain updated mailing addresses for 17,251 individuals or 85% of the Class members for whom notice was returned as undeliverable.  [D.E. 379 at ¶ 5].  On December 22, 2015, the Claims Administrator sent out a second mailed notice to those 17,251 Class members through first class U.S. Mail.  [D.E. 379-1 at ¶¶ 3-5].

### 3.  Publication Notice

Public Storage has a large customer base in the South Florida and Tampa markets.  The Claims Administrator therefore ran the publication notice in both *The Miami Herald* and *The Tampa Tribune* on Friday, November 20, 2015. [D.E. 379-1 at ¶ 6].  *The Tampa Tribune* has the second largest circulation of any newspaper in Florida with an average daily circulation of 198,543.[1]  *The Miami Herald* has the fifth largest circulation of any Florida newspaper with an average daily circulation of 141,188.[2]  *The Miami Herald* was selected because it primarily circulates throughout the southern part of Florida, where a majority of Public Storage's Florida locations are concentrated.  *See* [D.E 398-3 at 1-2].  The second largest concentration of Public Storage locations in Florida is in the Tampa region and through the central part of the state.  [*Id.*]  *The Tampa Tribune* circulates primarily there.  These newspapers provided additional notice to the greatest number of Class members.

### 4.  The Settlement Website and Toll-Free Hotline

---

[1] http://www.cision.com/us/2014/08/top-10-daily-newspapers-in-florida/ (last accessed Feb. 4, 2016).

[2] http://www.cision.com/us/2014/08/top-10-daily-newspapers-in-florida/ (last accessed Feb. 4, 2016).

The Claims Administrator also created a case specific website where Settlement Class Members could obtain information about the Settlement and file a claim form online. [D.E. 379-1 at ¶ 7]. In order to make sure that the website would be found by various search engines the website was named www.PublicStorageInsuranceLawsuit.com. For example, when searching for information about this lawsuit on Google, if the terms "Public Storage" and "Lawsuit" were searched the settlement website would appear on the first page of Google search results. [D.E. 398-4 at 1]. The Claims Administrator posted the notice, Settlement Agreement, Order Granting Preliminary Approval, and other case related documents on the website to provide Class members with ready access to information about the lawsuit. [D.E. 379-1 at ¶ 7]. The Settlement website also provided Class members with the ability to complete a claim form and submit it online, making it easier to submit a claim. [*Id.*]

The Claims Administrator also established a toll-free number for Class members to call if they required additional information. [D.E. 398-1 at ¶ 7]. The toll-free number had a pre-recorded message, which consisted of the information described in the notice. [*Id.*] If the Class members required additional information, they were able to leave a message at the end of the recording and the Claims Administrator would return their call. [*Id.*]

## III.   ANALYSIS

### A.   THE COURT GRANTS FINAL APPROVAL OF THE SETTLEMENT

#### 1.   The Legal Standard for Approval of Settlement

"A class action settlement [ ] should be approved so long as it is fair, adequate and reasonable and is not the product of collusion between the parties." *Access Now, Inc. v. Claire's Stores, Inc.*, 00-14017-CIV, 2002 WL 1162422, at *4 (S.D. Fla. May 7, 2002) (internal quotation and citations omitted). There are six factors for the Court to consider when assessing the fairness, reasonableness, and adequacy of a class action settlement:

(1) the existence of fraud or collusion behind the settlement;

(2) the complexity, expense, and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the probability of the plaintiffs' success on the merits;

(5) the range of possible recovery; and

(6) the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement. *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1345 (S.D. Fla. 2011) (citing *Leverso v. SouthTrust Bank of AL., Nat. Assoc.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)).

"In evaluating these considerations, the Court must not try the case on the merits." *Access Now*, *Inc.*, 2002 WL 1162422, at *4 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). "Rather, the Court must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" *Id.* (quoting *Cotton*, 559 F.2d at 1330). Also, "[i]n evaluating a settlement's fairness, 'it should not be forgotten that compromise is the essence of a settlement. The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might [be] gained.'" *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 468 (S.D. Fla. 2002) (quoting *Cotton*, 559 F.2d at 1330). "Above all, the court must be mindful that inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Id.* (internal quotation omitted). As set forth below, the Court finds that this Settlement meets these standards for final approval, and more than that, is an excellent result under the facts and circumstances here presented.

**B.    THE   SETTLEMENT   SATISFIES   THE   CRITERIA   FOR   FINAL
APPROVAL OF THE SETTLEMENT**

**1.    The Settlement is Free from Fraud and Collusion**

"Where the parties have negotiated at arm's length, the Court should find that the
settlement is not the product of collusion."  *Braynen v. Nationstar Mortg., LLC*, 14-CV-20726,
2015 WL 6872519, at *10 (S.D. Fla. Nov. 9, 2015) (internal quotation omitted); *see also Lipuma
v. Am. Express Co*., 406 F. Supp. 2d 1298, 318-19 (S.D. Fla. 2005) (approving class settlement
where the "benefits conferred upon the Class are substantial, and are the result of informed,
arms-length negotiations by experienced Class Counsel").  Moreover, "[t]he assistance of an
experienced mediator in the settlement process confirms that the settlement is non-collusive."
*Adams v. Inter-Con Sec. Sys., Inc.*, No. C-06-5428 MHP, 2007 WL 3225466, at *3 (N.D. Cal.
Oct. 30, 2007); *see also In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689(SAS), 2003 WL
22244676, at *4 (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the settlement was reached after
exhaustive arm's-length negotiations, with the assistance of a private mediator experienced in
complex litigation, is further proof that it is fair and reasonable.").

The Court finds that the Settlement here resulted from intense arms-length negotiations
on the eve of trial following eighteen months of contentious litigation.  There is no evidence that
fraud or collusion affected the settlement in any respect.  Throughout the litigation, the Parties
were in opposition on, among other things, the feasibility of each cause of action, the relevance
of specific documents and testimony, the admissibility of expert testimony, the application of the
filed-rate doctrine and insurance exemption to the FDUTPA claim, and the appropriate measure
of damages.

The Parties participated in two mediations conducted by separate mediators, both of
whom were former judges.  The mediation discussions continued after the Court's Calendar Call

on September 3, 2015.  The Court finds no evidence of fraud or collusion and further finds that the Settlement was negotiated at arms-length.

> **2.**     **The Complexity, Expense, and Likely Duration of the Litigation Support Final Approval of Settlement**

This factor weighs in favor of settlement approval where the litigation, including the appellate process, involves numerous class members and significant time and expense.  *See, e.g., Hall v. Bank of Am., N.A.*, No. 1:12-CV-22700-FAM, 2014 WL 7184039, at *4 (S.D. Fla. Dec. 17, 2014) (holding that this factor favored settlement approval where "[c]ontinuing to litigate the[ ] claims would have been time-consuming and expensive" and "even if plaintiffs were to prevail, class certification proceeding, a class trial and the appellate process could go on for years."); *see also In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1345 ("The claims and defenses are complex; litigating them has been difficult and time consuming").  The Court finds that this litigation was complex and difficult to litigate and that it was this complexity that caused the litigation to be expensive.

Ultimately, the fundamental issue in this case was whether Public Storage's customers suffered compensable damages due to Public Storage's allegedly deceptive representations regarding its actual economic interest in the premium revenue of the Perfect Solutions Insurance Program.  There was no issue that Public Storage's customers did not get what they paid for, i.e., tenant insurance.  There was no issue about Public Storage not paying claims, and there was no issue of pressure put on its customers to purchase insurance from the Perfect Solutions Insurance Program.   In fact, Public Storage's tenants were forewarned or told that coverage may be provided by, for example, their homeowner's insurance.  The sole issue was whether it was deceptive for Public Storage not to disclose that it benefited financially from its tenants paying premiums in exchange for insurance that was being provided by a third-party.

This case involved complex issues regarding the scope of FDUTPA's insurance exemption and the appropriate measure of damages when a defendant profits by retaining a portion of what Plaintiff's claim is a "pass-through charge." Furthermore, even after the Court ruled on Summary Judgment, the Parties filed numerous pleadings relating to the FDUTPA jury instructions, which involved the role of causation and materiality with respect to the Plaintiff's FDUTPA claim.

Additionally, the Class includes hundreds of thousands of individuals, and even if Plaintiff prevailed at trial, Public Storage would attempt to litigate multiple affirmative defenses. *See* [D.E. 330 at 4]. Public Storage also filed numerous papers about the applicability of the *Latman v. Costa Cruise Lines,* 758 So. 2d 699 (Fla. 3d DCA 2000) line of cases, and it was clear to the Court that there would have been substantial post-trial litigation and in all likelihood an appeal, and possibly a certification to the Florida Supreme Court, where Plaintiffs may have ended up with zero.

The Court recognizes that this case has been enormously expensive to prosecute, and these expenses would only compound if the litigation continued through the trial and an appeal. The Settlement here—which will provide relief for thousands of Class Members without the need for further litigation—is preferable to the additional expense and time that a trial and appeal would require. The traditional means for handling claims like those at issue here would tax the court system, require a massive expenditure of public and private resources, and, given the relatively small value of the claims of the individual Class members, would be impracticable. Thus, the Court finds that this factor favors final approval of the Settlement.

3.      **The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval of the Settlement**

When considering this factor, the Court will look to "the degree of case development that class counsel have accomplished prior to settlement to ensure that counsel had an adequate appreciation of the merits of the case before negotiating." *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d at 1348 (internal quotations omitted). "[S]ignificant discovery, merits briefing, and class certification motion practice" indicate that class counsel are well-informed of the strengths and weaknesses of the litigation. *Hall*, 2014 WL 7184039, at *4; *see also Gavaerts v. TD Bank, N.A.*, No. 1:14-CV-20744-RLR, 2015 WL 6751061, at *7 (S.D. Fla. Nov. 5, 2015) ("Discovery afforded Class Counsel insight into the strengths and weaknesses of the claims against [Defendant].").

Here, the stage of the proceedings and amount of discovery confirm that Class Counsel had adequate knowledge to agree to and recommend approval of the Settlement. The Court finds that Class Counsel were extremely well-positioned to evaluate the strengths and weaknesses of the Class' claims and prospects for success at trial and on appeal. Because the case settled two days prior to trial, Class Counsel had completed substantial briefing on the merits, prepared for trial, engaged in voluminous discovery, and reviewed thousands of anticipated trial exhibits. *See, e.g.,* [D.E. 337-4; D.E. 337-5]. Additionally, Plaintiff deposed dozens of potential trial witnesses. This factor strongly favors final approval of the Settlement.

4.      **The Probability of Success on the Merits Weighs in Favor of Final Approval of the Settlement**

Under this factor, the Court considers "the likelihood and extent of any recovery from the defendants absent . . . settlement." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1349 (internal quotation omitted). "[T]he Plaintiff's likelihood of success at trial is weighed

against the amount and form of relief contained in the settlement." *Saccoccio v. JP Morgan Chase Bank*, N.A., 297 F.R.D. 683, 692 (S.D. Fla. 2014).

The Court recognizes that there are substantial hurdles for Plaintiff in prosecuting this case through trial and an appeal. Plaintiff's success would have required a finding by the jury, *inter alia*, that Plaintiff and the Class suffered actual damages as a result of Public Storage's allegedly deceptive practices in retaining an undisclosed, substantial profit through the TIP (even though there were no claims or evidence shown that Public Storage's tenants did not receive the benefit of their bargain, i.e., the tenant insurance). Plaintiffs would also have to ultimately prove the applicability of the *Latman* line of cases to this case.

Public Storage was prepared to offer—and the Court was prepared to admit—expert testimony that, on average, consumers would have purchased the TIP even if Public Storage had disclosed that it was benefiting financially from the program. Based on this testimony, the jury may have found that a reasonable consumer would have purchased the TIP regardless of any knowledge of Public Storage's profits and, therefore, that Public Storage's alleged concealment of those profits caused no damages to consumers. Furthermore, even if Plaintiff prevailed at trial, there would have been extensive post-trial litigation, a likely appeal, and possibly even a certification to the Florida Supreme Court. The success of Plaintiff's FDUTPA claim on appellate review turned on, among other things, whether the insurance exemption to FDUTPA applied to Plaintiff's claim. *Lipuma*, 406 F. Supp. 2d at 1322 (finding that likelihood that appellate proceedings could delay class recovery "strongly favor[s]" approval of a settlement). Thus, in the end, Plaintiff could have been left with no recovery.

On the other hand, the Court finds that this Settlement guarantees relief for the Class without further delay. Each Class Member can recover up to 50% of the insurance premiums

that Public Storage received as undisclosed profits.  The prospect of recovering more for the

Class after an unpredictable jury trial does not outweigh those benefits.  *See, e.g., In re*

*Soderstrom*, 477 B.R. 249, 256 (Bankr. M.D. Fla. 2012) ("In this case, under these

circumstances, a bird in the hand is worth two in the bush.").  Accordingly, the Court finds that

this factor favors final approval.

### 5.   The Range of Possible Recovery Weighs in Favor of Final Approval of the Settlement

"In determining whether a settlement is fair in light of the potential range of recovery, the

Court is guided by the important maxim [ ] that the fact that a proposed settlement amounts to

only a fraction of the potential recovery does not mean the settlement is unfair or inadequate."  *In*

*re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1350 (internal quotations omitted)

(approving settlement that provided recovery of 9% to 45% of potential recovery that could have

been obtained through trial).  Indeed, "[a] settlement can be satisfying even if it amounts to a

hundredth  or  even  a  thousandth  of  a  single  percent  of  the  potential  recovery."

*Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) *aff'd sub nom. Behrens*

*v. Wometco Enters.*, 899 F.2d 21 (11th Cir. 1990); *see also Perez v. Asurion Corp.*, 501 F. Supp.

2d 1360, 1380-81 (S.D. Fla. 2007) ("The existence of strong defenses to the claims presented

makes the possibility of a low recovery quite reasonable.").  It is important that the Court weigh

the benefits Class members will receive from the settlement against the risks of moving forward

and recovering nothing.  *See id.* at 1381 ("These benefits to Defendant's approximately 40

million customers—when viewed against the backdrop of all of the uncertainties, risks, and

problems that have surfaced in this litigation . . .  and the reasonable possibility that Plaintiffs

would not have recovered anything if they had proceeded to trial—weigh heavily in favor of

approving this Settlement.").

The Court finds that the $5 million Settlement Fund for the FDUPTA claim in this case is an excellent result, given the complexity of the litigation and the significant risks and barriers that would have continued to loom in the absence of Settlement.  Plaintiff sought approximately $25,000,000 in damages at trial.  That range represented the approximate profit that Public Storage retained—without disclosure to consumers—from the TIP in Florida during the Class Period.  The Settlement of $5,000,000 obtains 20% of that amount, guarantees that each Class member who files a claim will receive a recovery of up to 50% of his or her individual damages, and eliminates the inherent risks and uncertainties of a jury trial and, most likely, an appeal and also a certification to the Florida Supreme Court.    The Court accordingly finds that this factor weighs in favor of final approval.

### 6.   The Opinions of Class Counsel and The Substance and Amount of Objector Opposition to The Settlement Weigh in Favor of Settlement

#### (a)   Class Counsel Have Evaluated the Strengths and Weaknesses of Their Claims and Support Approval of the Settlement

The endorsement of well-informed, experienced class action attorneys is strong support for the final approval of a settlement.  *Warren v. City of Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988).  The Court gives "great weight to the recommendations of counsel for the parties, given their considerable experience in [the] litigation."  *Id.*; *see also In re Domestic Air Transp.*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993) ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel."); *Mashburn v. Nat'l Healthcare, Inc.,* 684 F. Supp. 660, 669 (M.D. Ala. 1988) ("If plaintiffs' counsel did not believe that these factors all pointed substantially in favor of this settlement as presently structured, this Court is certain that they would not have signed their names to the settlement agreement.").  "The trial judge, absent fraud, collusion, or the like, should be hesitant

to substitute its own judgment for that of counsel." *In re Domestic Air Transp.*, 148 F.R.D. at 312-13 (internal quotation omitted).

The Court finds that counsel in this matter were especially experienced and conducted a high level of advocacy throughout the litigation. Class Counsel conducted a thorough investigation and analysis of the Class' claims, engaged in extensive discovery with Public Storage, and had the benefit of key rulings from the Court on what testimony and evidence would be admissible at trial. *See Francisco v. Numismatic Guaranty Corp. of Am.*, No. 06-61677-CIV, 2008 WL 649124, *11 (S.D. Fla. Jan. 31, 2008) (stating that "Class Counsel had sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation" where counsel conducted two 30(b)(6) depositions and obtained "thousands" of pages of documentary discovery). As a result of Class Counsel's extensive work on this case, they were well-positioned to evaluate the strengths and weaknesses of the Class' claims, as well as the appropriate basis upon which to settle them. The Court therefore finds that this factor weighs in favor of final approval.

> (b)  The Limited Opt-Outs and objections Raised By Class Members
> Support Approval of the Settlement

"In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor." *Lipuma*, 406 F. Supp. 2d at 1324. "Obviously, a low number of objections suggests that the settlement is reasonable, while a high number of objections would provide a basis for finding that the settlement was unreasonable." *Lee v. Ocwen Loan Servicing, LLC*, No. 14-CV-60649, 2015 WL 5449813, at *5 (S.D. Fla. Sept. 14, 2015) (internal quotation omitted); *Gavaerts*, 2015 WL 6751061, at *8 ("[T]he Court also finds it telling that of the 1,122 Settlement Class Members, none objected to, or opted out of, the Settlement."). Here, there were only 39 individuals that opted out and only one timely objection.

[D.E. 379-1 at 23].  In a class of hundreds of thousands, the low number of opt-outs and objections reflects the Class' overall satisfaction with the Settlement.

### C.   THE COURT GRANTS CLASS COUNSEL A FEE AWARD OF 33% OF THE SETTLEMENT FUND

#### 1.   The Legal Standard for Awarding Attorneys' Fees from a Common Fund

"Attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991).  "There is no hard fast rule mandating a certain percentage of a common fund which may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Id.*  Nevertheless, "[t]o avoid depleting the funds available for distribution to the class, an upper limit of 50% of the fund may be stated as a general rule, although even larger percentages have been awarded." *Waters v. Cook's Pest Control, Inc.*, 2:07-CV-00394-LSC, 2012 WL 2923542, at *15 (N.D. Ala. July 17, 2012).  "The district court has wide discretion to award attorneys' fees based on its own expertise and judgment because of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Id.*

The Eleventh Circuit, in *Camden I*, provided non-exclusive guidelines for courts to consider in determining a reasonable fee award in common fund cases.  The court held that the oft-applied factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), are appropriate for common fund cases, and it added other relevant guidelines.  Together, the factors for district courts within the Eleventh Circuit to consider are as follows:  (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7)

time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; (12) awards in similar cases; (13) the time required to reach a settlement; (14) whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel; (15) any non-monetary benefits conferred upon the class by the settlement; (16) the economics involved in prosecuting a class action; and (17) any additional factors unique to the particular case. *Camden I*, 946 F.2d at 772, 775.

> ### D.   A FEE AWARD OF 33% IS REASONABLE UNDER ELEVENTH CIRCUIT GUIDELINES

The Court finds that a fee award of $1,650,000, representing 33% of the $5,000,000 Settlement Fund, is reasonable based on the following specific *Camden I* guidelines: (1) the risk in bringing the action on a sole contingent basis, which precluded other employment; (2) the substantial time and labor devoted to the action; (3) the customary fee for similar services in the market; (4) the value of the results obtained by the settlement; (5) the experience, reputation, and ability of the attorneys; (6) the novelty and difficulty of the questions involved and undesirability of the case; (7) objections to the fee award by Class members; and (8) the fee is well within the range historically awarded in class actions in this Circuit and nationwide. Thus, a fee award of 33% of the Settlement Fund is reasonable.

> #### 1.   Class Counsel Assumed Considerable Risk to Bring This Action on a Contingent Basis and Lost Opportunities for Other Employment

Class Counsel took a significant risk in prosecuting this action entirely on a contingent fee basis. "Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award." *Ressler v. Jacobson*, 149 F.R.D. 651, 656 (M.D. Fla. 1992)). Indeed, "[a] contingency fee arrangement often justifies an increase in the award of

attorney's fees." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1364; *see also Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981), *cert. dismissed sub nom.*, *Ledbetter v. Jones*, 453 U.S. 950 (1981) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result").  This is particularly the case when the law firms prosecuting the case are of small size, as they are here, and thus the time devoted to the class action precludes other employment. *See In re Bayou Sorrel Class Action*, No. 6:04CV1101, 2006 WL 3230771, at *5 (W.D. La. Oct. 31, 2006) (awarding 36% fee based in part on reasoning that due to the small size of class counsel, it lost "the time and opportunity they would have had available to accept other employment.").

Without the "bonus" from a contingency fee arrangement, "very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks involved in recovering nothing." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1365 (quoting *Behrens*, 118 F.R.D. at 548).  Other district courts within this Circuit have found that this type of risk can support a fee award of over 30% of the settlement fund. *See Wolff v. Cash 4 Titles*, No. 03-22778-CIV, 2012 WL 5290155, at *1-2 (S.D. Fla. Sept. 26, 2012) report and recommendation adopted, No. 03-22778-CIV, 2012 WL 5289628 (S.D. Fla. Oct. 25, 2012) (awarding 33.3% of the settlement fund where there was no guarantee of Class Counsel receiving their hourly rates or reduced hourly rates for their efforts in the litigation and there was no hybrid contingent fee negotiated guaranteeing Counsel even a minimum amount for fees and costs); *Cook's Pest Control, Inc.*, 2012 WL 2923542, at *17 (finding that the risk factor supported a 35% fee award because Class Counsel "have spent more

time on this case than they will be compensated for at their customary rates[,] . . . [and] there has been a real possibility that Class Counsel would not recover anything for the class").

Here, the Court concludes that while the quality of lawyering was extraordinary, it was not entirely in proportion to the quality of the case. The Court believes that it was the aggregate of the claims and the pressure they collectively exerted on Public Storage and the prospect of extensive post-trial and appellate litigation that brought Public Storage to the table. Indeed, the Court finds that Class Counsel incurred substantial risk given the contingent nature of the fee, Class Counsel's wholly contingent outlay of out-of-pocket sums, and the high risk of failure and nonpayment.

Class Counsel received no compensation in this matter during the nearly two years of litigation. Even with a 33% fee award, Class Counsel will not be compensated fully for the time and labor spent on this case. The hours spent on this case by law firms of relatively small sizes detracted from work on other potential cases. Class Counsel put off other matters, outsourced work, and declined cases that they could otherwise have pursued but for the efforts toward this case. Class Counsel put forth significant work in this case despite the considerable contingency risk. The Court finds that this factor weighs heavily in favor of the 33% fee award.

### 2. Class Counsel Devoted Substantial Time and Labor to this Action

Despite the risks and costs of pursuing this action, Class Counsel expended considerable time and effort over the course of nearly two years in providing the best possible representation to the Class and prosecuting and settling the claims. The Court finds that a fee of 33% appropriately accounts for these efforts. Class Counsel prevented dismissal, obtained class certification, survived summary judgment (at least on the FDUTPA claim), excluded several of Public Storage's witnesses, and prepared thoroughly for an imminent trial. Class Counsel

expended 6,228.2 hours of work at a total billable cost of $3,030,042.   "Although the hours claimed or spent on a case should not be the sole basis for determining a fee, . . . they are a necessary ingredient to be considered."  *Cook's Pest Control, Inc.*, 2012 WL 2923542, at *16 (finding that this factor weighed in favor of 35% fee award "[b]ecause the requested amount of $875,000.00 falls well below the calculated fees [$1,076,140.00]"); *see also In re Bayou Sorrel Class Action*, 2006 WL 3230771, at *4 (considering the actual hours worked in the matter when awarding 36% fee award). Here, Class Counsel seeks a fee award that is substantially lower than their calculated fees.  The hours worked by Class Counsel are a reflection of the time and labor required to prosecute and settle Class Members' claims.

The Court also recognizes that Class Counsel undertook substantial efforts to respond to ethical misconduct by Public Storage's former counsel. The Court rejects Public Storage's argument that the Court should not consider the time and labor Class Counsel spent on all of Plaintiff's claims and that the work spent on Plaintiff's FDUTPA claims can somehow be separated from the work on Plaintiff's other claims.  First, Public Storage's reliance on *In re Sunbeam Securities Litigation*, 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001), for this argument is misplaced.  In *Sunbeam*, one of **multiple defendants** settled with the class on discrete claims.  *Id.* at 1334.  Here, there is only one defendant, and all of the claims made by Plaintiff are factually related.

Public Storage asserts that Plaintiff's counsel conducted discovery as to the RICO claim that was not necessary for the FDUTPA claim and that Plaintiff's counsel did nothing to allocate the work done as to the RICO claim only.  The Court finds that the work performed by Class Counsel for each of Plaintiff's causes of action were factually related, colorable, and difficult to resolve.  Public Storage allegedly profited through the TIP but Plaintiff claims it did not properly

disclose these profits to its tenants. The Amended Complaint, for example, incorporates the same factual allegations in support of each cause of action. *See* [D.E. 79 at 17-39]. When ruling on Public Storage's motion for summary judgment, the Court summarized the relevant factual background for all claims in a single section, without separating the facts on a claim-by-claim basis. *See* [D.E. 313 at 1-4]. The extensive discovery in this case focused on the singular overarching topic of Public Storage's administration of, and profits from, the TIP. The Court agrees with Plaintiff that the facts of these claims are intertwined. The entire case and all of the claims arose out of the same factual issue.

Finally, it is noteworthy that this case settled only two days before the start of trial. By the time the Parties agreed on a settlement, Class Counsel had already spent extensive time and labor on trial preparations and were ready and prepared to try the case. The time and labor that went into the settlement itself was also significant. The Parties had previously participated in two all-day mediations, which helped to ultimately direct the settlement terms.

Class Counsel put significant time and labor into this case, and the Class' recovery is a direct result of Class Counsel's efforts and expenditure of resources. Thus, the Court finds that this factor weighs heavily in favor of a 33% fee award.

### 3. The Fee of 33% is Lower Than the Customary Fee for Similar Services in the Market

The Court finds that a fee of 33% is reasonable when considering what the customary fee would be for similar services in the community. The Court considers the market rate when determining fee awards to class counsel. *See Wolff*, 2012 WL 5290155, at *4. "[C]lass counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." *Id.* (quoting *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992)); *see also Cook's Pest Control, Inc.*, 2012 WL 2923542, at

*16 (finding that the customary fee factor weighed in favor of a 35% fee award because class counsel "customarily enters into contingency fee agreements allowing for recovery of 33% in low risk cases with uncontested or moderately contested liability, and up to 49% in higher risk cases with difficult liability issues"); *Donovan v. Sheriff*, 3:11-CV-133-TLS, 2015 WL 7738035, at *5 (N.D. Ind. Dec. 1, 2015) ("[T]he Court finds that a 40% contingency would award Class Counsel the market price for its legal services.").

A fee of 33% is at the market rate of what the Class could have negotiated with counsel in this as a traditional contingency fee arrangement at the outset of the case. *See In re Pearlman*, 6:07-BK-00761-KSJ, 2014 WL 1100223, at *3 (Bankr. M.D. Fla. Mar. 20, 2014) ("[T]he Court finds the 35% contingency fee to be reasonable and in line with similar non-bankruptcy rates."); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1366 n.35 (noting that contingency fees of up to 40% are customary in the private marketplace); *Alvarez v. Best of Best Catering, Corp.*, 207-CV-764-FTM-29SPC, 2008 WL 4415402, at *2 (M.D. Fla. Sep. 25, 2008) ("Under the Florida Bar Rules of Professional Conduct, a contingency fee of forty percent (40%) is reasonable if an answer has been filed or if one of the parties has demanded appointment of an arbitrator.") (citing Fla. Bar R. 4-1.5(4)(B)(i)(b)(1))).   Thus, the Court finds that this factor weighs heavily in favor of the 33% fee award.

### 4.   Class Counsel Attained an Excellent Result for Class Members

The Court finds that the significant monetary relief Class Counsel obtained for Class Members favors an award of 33%.   The $5 million Settlement Fund for the FDUTPA claim in this case is an excellent result, given the complexity of the litigation and the significant risks and barriers that would have continued to loom in the absence of Settlement.   It is especially significant that Class Counsel achieved a cash common fund, which is "a substantial, tangible, and real benefit for the Class." *See Wolff*, 2012 WL 5290155, at *3 ("Unlike cases in which

- 25 -

attorneys for a class petitioned for a fee award after obtaining non-monetary relief for the class, such as in the form of 'coupons,' Class Counsel here created a wholly cash common fund.").

The $5,000,000 settlement fund is an unqualified success and is the result of quality lawyering by Class Counsel.  The fund represents about 20% of the maximum damages that could have been recovered on the Class' FDUTPA claims.  The fund will also allow each Class Member to recover up to 50% of his or her individual damages.  Because of Class Counsel's efforts, Class Members can immediately receive a portion of the TIP funds that, according to Plaintiff's allegations, Public Storage obtained through deception.  Moreover, in response to this litigation, Public Storage has now updated its insurance contracts to provide disclosures regarding its profit interest in the TIP program.

The Court rejects Public Storage's argument that Plaintiff was unsuccessful because he did not obtain $500,000,000 under RICO for a nationwide class.  Class Counsel did not represent a nationwide class for trial; rather, the certified Class was limited to residents of Florida. Accordingly, Class Counsel, on behalf of their actual clients, obtained a Settlement representing approximately 20% of the actual damages available at trial for the FDUTPA claim—this is an excellent result.

**5.**    **The Professional Skill and Standing of Respective Counsel Support The 33% Fee Award**

The Court finds that a 33% fee is reasonable given Class Counsel's professional skill and expertise, which have served the Class well in this litigation.  The Court considers the "experience, reputation, and ability of the attorneys" in determining a fee award.  *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1359; *see also Gevaerts v. TD Bank*, No. 1:14-CV-20744-RLR, 2015 WL 6751061, at *12 (S.D. Fla. Nov. 5, 2015) ("In the private marketplace, counsel of exceptional skill commands a significant premium. So too should it here.").

The Court finds that the lawyering in this case has been extraordinary.  Class Counsel are qualified and more than competent; they have extensive experience and expertise prosecuting complex class actions, including consumer actions similar to the instant case.  Despite the case's flaws (including whether Plaintiff's counsel could show that Public Storage's tenants suffered any harm, and whether the *Latman* case and its progeny applied to the facts of this case), an excellent settlement was reached due to the skill, sophistication, and creativity of Class Counsel. Public Storage's Counsel, moreover, was excellent and vigorously defended against Plaintiff's claims with fervor and adeptness, raised significant legal roadblocks to recovery, and required Class Counsel to maintain the highest quality of representation to reach the point of settlement. The Court finds that this factor weighs in favor of the 33% fee award.

### 6.  The Action Involved Novel and Difficult Issues and Was Viewed as Undesirable

The Court finds that this case presented novel and difficult issues, which contributed to the undesirability of the case, and which required Class Counsel's expertise to obtain the favorable result of the settlement.  This factor favors a higher fee award where there are "complex issues requiring experience and skill on the part of Class Counsel."  *In re Bayou Sorrel Class Action*, 2006 WL 3230771, at *4.  Difficult issues in a case can also often contribute to the undesirability of a case.  *Id.* at *6 (finding undesirability due in part to issues such as "problems of proof, problems of causation, and a host of other complex issues"); *see also Cook's Pest Control, Inc.*, 2012 WL 2923542, at *18 (finding undesirability due to complex discovery issues, along with "the expense and time involved in prosecuting such litigation on a contingent basis, with no guarantee or high likelihood of recovery").  "[C]ounsel should be rewarded for taking on a case from which other law firms shrunk."  *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1364.

This litigation presented complex legal issues regarding the breadth of FDUTPA when insurance is related to the relevant conduct, the calculations of damages under FDUTPA in pass-through cases under the *Latman* line of cases, and proof of causation and injury.  Specifically, Public Storage maintained that Plaintiff's FDUTPA claim falls under FDUTPA's exemption for "[a]ny person or activity regulated under laws administered by ... [t]he Office of Insurance Regulation of the Financial Services Commission; or ... regulated under the laws administered by the ... Department of Financial Services."  Fla. Stat. § 501.212.  Public Storage also asserted that *Latman* and its progeny do not apply to the facts of this case.   Furthermore, after all the investigation was undertaken by Plaintiff's counsel, it became apparent that there was no contention that could be made that class members did not get what they paid for: insurance for their stored belongings.  And since damage is usually necessary for a recovery in most cases, Public Storage made the strong argument that there were no recoverable damages but for the anomalous line of Florida cases characterized by *Latman*.  Indeed, in the end, it was questionable whether *Latman* and its progeny applied to the scenario presented by this case, and it was certainly not beyond the realm of possibility that another court might decide that those cases were inapplicable to the facts of this case and that the Plaintiff might end up with nothing.

Nevertheless, Plaintiff prevailed at the district court level in arguing that the potential damages consisted of the undisclosed profits, or "access fees," that Public Storage kept from the TIP.  *See Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1270 (S.D. Fla. 2015) ("[U]nder these circumstances . . . the full amount of the access fees would then be an appropriate measure of FDUTPA damages.").

These complex legal issues impacted the desirability of taking on this action.  No other law firm has taken the risk to bring this action and tackle these difficult issues.  Each stage of the

litigation was hotly contested and required substantial expertise to ensure that the Class' claims were effectively prosecuted.  Absent the diligence, care, and expertise of Class Counsel, Public Storage could have prevailed in full at multiple junctures in the litigation.  Indeed, a loss by Plaintiff on either the insurance exemption or damages issue would have summarily ended Plaintiff's case.  The Court therefore finds that this factor weighs in favor of a 33% fee award.

### 7.      There Are Limited Objections to the Fees Award

There was only one timely objection to the award of attorneys' fees by a Class member.  Furthermore, that objection does not address the amount of attorneys' fees but how and who pays for Class Counsel's attorneys' fees.  This factor weighs in favor of granting Class Counsel an attorneys' fees award of 33%.  *See Cook's Pest Control, Inc.,* 2012 WL 2923542, at *18 (holding that this factor weighed in favor of the requested 35% award where only one claimant objected to that request).

### 8.      The 33% Fee is Similar to Fees Awards in Other Class Actions

The Court finds that this factor supports a fee award of 33% because it is consistent with attorneys' fees awards in federal class actions in this Circuit.  *See, e.g.*, *In re Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (awarding 35.5%); *Cook's Pest Control, Inc.*, 2012 WL 2923542, at *18 (awarding 35%); *Wolff*, 2012 WL 5290155, at *1 (awarding 33.3%); *Morefield v. NoteWorld, LLC*, No. 1:10-CV-00117, 2012 WL 1355573, at *5 (S.D. Ga. Apr. 18, 2012) (awarding 33.33%); *In re: Terazosin Hydrochloride Antitrust Litig.*, 99-1317-MDL-Seitz, Docket Entry 1557 (S.D. Fla. Apr. 19, 2005) (awarding 33.33%); *Gutter v. E.I. Dupont De Nemours & Co*., 95-2152-Civ-Gold, Docket Entry 626 (S.D. Fla. May 30, 2003) (awarding 33.33%); *Tapken v. Brown*, Case No. 90-691-CIV-MARCUS, Docket Entry 362 (S.D. Fla. Feb. 28, 1995) (awarding 33%).

The 33% fee award is also well within the range of fee awards in class actions nationwide.  *See, e.g., Bickel v. Sheriff of Whitley County*, 1:08-CV-102-TLS, 2015 WL 1402018, at *6 (N.D. Ind. Mar. 26, 2015) (awarding 43.7%); *Chieftain Royalty Co. v. Laredo Petroleum, Inc.*, CIV-12-1319-D, 2015 WL 2254606, at *2 (W.D. Okla. May 13, 2015) (awarding 40%); *Donovan*, 2015 WL 7738035, at *5 (awarding 40%, which included $108,000 in fees plus costs, not to exceed $20,000); *Braud v. Transp. Serv. Co. of Illinois*, CIV.A. 05-1898, 2010 WL 3283398, at *13 (E.D. La. Aug. 17, 2010) (awarding 37%); *In re Bayou Sorrel Class Action*, 2006 WL 3230771, at *7 (awarding 36%); *In re U.S. Bancorp Litig.*, 291 F.3d 1035 (8th Cir. 2002) (affirming award of 36%); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1133–1141 (W.D. La. 1997) (awarding 36%).

## E.   CLASS COUNSEL ARE ENTITLED TO REIMBURSEMENT OF LITIGATION EXPENSES

"Upon submission of adequate documentation, plaintiffs' attorneys are entitled to reimbursement of those reasonable and necessary out-of-pocket expenses incurred in the course of activities that benefitted the class." *Int'l Precious Metals Corp.*, 190 F.3d at 1298 (internal quotation and citation omitted); *Gevaerts*, 2015 WL 6751061, at *14 (awarding costs and expenses for, *inter alia*, "fees for experts, photocopies, travel, online research, translation services, mediator fees, and document review and coding expenses").  Class Counsel have provided adequate documentation that they have incurred $532,383.68 in recoverable costs.  The Court finds that these costs were all necessary in the prosecution of this action.  Public Storage does not oppose reimbursement of these costs, nor does anyone else.  Accordingly, the Court finds that Class Counsel are entitled to reimbursement of the full amount of $532,383.68.

F.   **CLASS REPRESENTATIVE BRIAN MORGAN IS ENTITLED TO AN INCENTIVE AWARD**

"'[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'" *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218-19 (S.D. Fla. 2006) (quoting *Ingram v. Coca-Cola Co.,* 200 F.R.D. 685, 694 (N.D. Ga.2001)); *see also Godshall v. Franklin Mint Co.,* No. 01–CV–6539, 2004 WL 2745890, at *6 (E.D. Pa. Dec. 1, 2004) (granting special award of $20,000 to each named plaintiff for their work as class representatives); *In re Linerboard Antitrust Litig.,* No. MDL 1261, 2004 WL 1221350, at *18-19 (E.D. Pa. June 2, 2004) (awarding $25,000 for each of the five class representatives); *Dornberger v. Metro. Life Ins. Co.,* 203 F.R.D. 118, 124-125 (S.D.N.Y. 2001) (approving an award of $10,000 for lead plaintiff); *In re Residential Doors Antitrust Litig.,* MDL 1039, 1998 WL 151804, at *11 (E.D. Pa. Apr. 2, 1998) (awarding an incentive of $10,000 to each of the four Class representatives).

The Court approves an award of $10,000 to compensate Class Representative Brian Morgan for his significant efforts on behalf of the Class.  Specifically, Mr. Morgan prepared for and appeared at a deposition, remained in contact with Class Counsel regarding the progress of litigation, oversaw and guided Class Counsel's litigation efforts, participated in mediation, and prepared to testify at trial.  Additionally, he undertook substantial risk in acting as a named Plaintiff against a sophisticated defendant that could have pursued cost-shifting remedies had a settlement not been reached or Plaintiff not prevailed. *See Bellinghausen v. Tractor Supply Co*., 306 F.R.D. 245, 267-68 (N.D. Cal. 2015) (awarding incentive award of $10,000 where "Plaintiff filed this lawsuit despite knowledge that if he lost, the court might have ordered him to pay

Defendant's attorneys' fees and costs."). Thus, the Court grants an incentive award of $10,000 to Class Representative Brian Morgan.

### G.      THE COURT OVERRULES THE OBJECTORS' OBJECTIONS

Courts around the country routinely have to address objections filed by objectors to class action settlements. While the Court recognizes that in a small fraction of cases these objections are legitimate, the vast majority have nothing to do with the merits of the actual settlement but are motivated by attorneys attempting to extort a payout from class counsel. As this Court previously held:

> [M]ost if not all of the Objections are motivated by things other than a concern for the welfare of the Settlement Class. Instead, they have been brought by professional objectors and others whose sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto . . . . [P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing.

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1366 (internal quotation and citations omitted).

Here, Mr. Ahmed's Counsel's motivations are not in the best interest of the Class, but simply directed toward levying a tax on this settlement and to obtain a fee for themselves. Rather, it is really Objector's Counsel that is behind this objection. As discussed in detail below, Mr. Ahmed's Objection has no basis in fact or law. Frivolous objections like these hurt class actions. They slow down the approval process and delay the class members from receiving the relief to which they are otherwise entitled. Furthermore, they require attorneys that have spent thousands of hours and taken on the considerable financial risk of bringing a class action to pay attorneys that have neither shouldered any of the work or the financial risk. Such a result is

patently unfair and discourages excellent attorneys from bringing class actions.    Thus, these objections must be scrutinized carefully.

An objector's knowledge of the objection matters in crediting (or not) the objection and determining the objector's motives.    For example, in *Wilson v. EverBank,* No. 14-CIV-22264, 2016 WL 457011, at *1 (S.D. Fla. Feb. 3, 2016), the Court denied an objector's objection because the objector did not understand the basic terms of the settlement.    ("After carefully reviewing the submissions on that objection, including recent deposition testimony given by the objectors, the Court finds that the objection lacks merit and is based on fundamental misunderstandings of the terms of the Settlement and the law.").    Similarly, this Court in *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007), denied various objectors' objections because "it appears that most of the objectors have simply misread and/or misunderstood the Settlement documents and/or desired to 'have a better deal.'"

Both Mr. Ahmed's and Mr. Putnam's objections can be denied on these grounds alone. Mr. Ahmed's deposition revealed that he had no understanding of the lawsuit or the terms of the Settlement Agreement and could not even articulate the basis for his objection.    Mr. Ahmed was entirely unaware of the amount of the Settlement, believed it was unfair because the Settlement offer had not been made to him directly, and ultimately testified that the amount of the Settlement was not insufficient or inadequate in any way.    [D.E. 398-5 at 7-8, 11-12].    Similarly, Mr. Ahmed had no objections to how the Class was noticed about the Settlement Agreement. [*Id.* at 12].    Accordingly, Mr. Ahmed's objection fails on these grounds alone.

Mr. Putnam's objection also fails because he too has no understanding of the lawsuit or the settlement.    In addition to being untimely filed and not having standing to object because he is not a class member, which will be addressed below, Mr. Putnam's objection fails to articulate

any understanding of this lawsuit and the settlement.  First, Mr. Putnam's objection addresses Public Storage's practice of auctioning off the contents of its storage lockers to pay for past due rent after a certain period of time.  [D.E. 399 at 3-5].  This lawsuit has nothing to do with that practice but rather whether Public Storage deceived its tenants about its role in the TIP. Furthermore, Mr. Putnam complains about the settlement amount being reduced from $10 million to $5 million.  [*Id.* at 5-6]. Mr. Putnam is mistaken because the settlement amount was never $10 million and instead has always been $5 million.  [D.E. 367-1].

## 1.      Mr. Ahmed's Objection is Denied

The Court overrules the objection of Mr. Ahmed.  Mr. Ahmed ultimately objected to the Settlement on three grounds: (1) the settlement amount was not sufficient; (2) the notice program did not satisfy the absent Class members' Constitutional Due Process rights; and (3) Class Counsel's attorneys' fees should not be paid from the common fund.  Contrary to Mr. Ahmed's objection, the settlement amount is fair and reasonable, the notice program satisfied the Class' members Constitutional Due Process rights, and Class Counsel's attorney fees should be paid from the common fund. For the reasons discussed below, Mr. Ahmed's objection is overruled.

### (a)      The Settlement Amount is Fair, Adequate, and Reasonable

Mr. Ahmed objects to the settlement on the grounds that $5 million was an inadequate amount, claiming that "$38,600,000 is nearly certain to be awarded to the Class if the matter is simply prosecuted with competence."  [D.E. 373 at 8].  The remainder of his argument flows from this belief—namely—that because the settlement is less than $38,600,000, it is inadequate. Mr. Ahmed's counsel ignores the record of this litigation, set out in the motions for preliminary and final approval, and discounts to zero all of the substantial risks actually facing the Class at a trial of this matter.  As this Court has repeatedly noted, the Class faced a substantial risk of a zero recovery.

- 34 -

As the Court discusses at length above, this litigation presented considerable risks, and a trial of this matter is not "nearly certain" to result in a $38,600,000 verdict.  Under the *Bennett* criteria requiring analysis of the range of possible recovery and the point on the range at which a settlement is fair, "[n]ot surprisingly, the range of possible recovery 'spans from a finding of non-liability through varying levels of injunctive relief.'" *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1322 (S.D. Fla. 2005) (citation omitted).  "The existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable."  *Id.* at 1323 (citing *Bennett,* 737 F.2d at 986).

Collectively, Class Counsel has more than 50 years of trial experience, most of it in federal court, and has been certified as Class Counsel by courts around the country.  Class Counsel did not settle this case before a motion to dismiss or the motion for class certification was decided.  Instead, Class Counsel, through its skill and persuasiveness, were able to successfully push this case to the eve of trial, having succeeded in overcoming a motion to dismiss, litigating the disqualification of Public Storage's prior counsel, certifying a class, surviving a motion for summary judgment, and keeping at least some evidence after the Court's rulings on various motions *in limine*.  It was only on the very eve of trial, for which Class Counsel spent innumerable hours and tens of thousands of dollars preparing, that the parties settled.   And it was only through the skill of Class Counsel that a settlement was achieved. Accordingly, the Court denies this objection.

        (b)     <u>The Class' Notice Program Complied with Constitutional Due Process Requirements</u>

The Class' notice program was comprehensive and satisfied the absent Class members' due process rights.  However, Objector's Counsel disagrees and claims that email notice is "unprecedented" in class actions.  This however ignores the current state of the law.  In fact,

email notice in class actions is becoming the preferred method of notification not only because it is reliable but it is actually more likely to be received by the Class members.  Finally, Objector's Counsel makes a series of allegations that the email notice failed to take into account any best practices to avoid spam filters.  Those allegations, however, were directly contradicted by the Claims Administrator. [D.E. 398-1 at ¶¶ 3-6].

i.   The Best Practicable Notice Standard

"For a court to exercise jurisdiction over the claims of absent class members, there must be minimal procedural due process protection."  *Perez.,* 501 F. Supp. 2d at 1377.  "The notice provisions of Rule 23, which are meant to protect the due process rights of absent class members, set forth different notice requirements to different kinds of cases and even to different phases of the same case." *Juris v. Inamed Corp.,* 685 F.3d 1294, 1317 (11th Cir. 2012) (internal quotations omitted).   To satisfy due process requirements, the notice must be the "best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

However, the "best practicable" notice standard does not require that every class member actually receive notice.  5-23 Moore's Federal Practice - Civil § 23.102.  "The relevant question is not whether every absent class member actually receives notice, but whether the notice that the court orders is reasonably calculated to reach the absent members.  The fact that some class members may not actually receive timely notice does not render the notice inadequate as long as the class as a whole had adequate notice." *Id.*  Thus, as the Eleventh Circuit has held, "[c]ourts have consistently recognized that, even in Rule 23(b)(3) class actions, due process does not

require that class members actually receive notice." *Juris*, 685 F.3d at 1321; *see also Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (explaining that the class notice standard is "best practicable" as opposed to "actually received"); *In re Adelphia Commc'ns Corp. Secs. & Derivatives Litig.*, 271 F. App'x 41, 44 (2d Cir. 2008) (holding that the fact that some class members may not actually receive timely notice does not render the notice inadequate so long as the notice was reasonably calculated to reach all members) (quoting *Weigner v. New York*, 852 F.2d 646, 649 (2d Cir. 1988) ("It is clear that for due process to be satisfied, not every class member need receive actual notice, as long as class counsel 'acted reasonably in selecting means likely to inform persons affected.'"); *In re Agent Orange Prod. Liabl. Litig.,* 818 F.2d 145, 168-69 (2d Cir. 1987) (holding that with respect to a 23(b)(3) class, unidentified absent class members that could not be located through reasonable efforts did not need to be provided with individual notice in order to be bound); Newberg on Class Actions § 8:36 (5th ed.) ("[N]either Rule 23 nor the Constitution requires that a class member actually receive notice: notice suffices if it is reasonably calculated to reach the absent parties."); 7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1789.1 (3d ed. 2005) ("[A]s long as the notice scheme that is adopted meets [the constitutional standards], courts generally have ruled that an absent class member will be bound by any judgment that is entered, even though the absentee never actually received notice.").     "In reviewing the class notice to determine whether it satisfies the [] requirements [of due process], we look solely to the language of the notices and the manner of their distribution." *Adams v. S. Farm Beureau Life Ins. Co.,* 493 F.3d 1276, 1286 (11th Cir. 2007).

The Court finds that the Class' notice program was comprehensive and provided actual notice to nearly all of the Class members through a combination of email and U.S. mail and

constructive notice to all Class members through notice publication in *The Miami Herald* and *The Tampa Tribune*, a toll-free hotline, and a case-specific informational website. Courts have routinely held that notice programs that provide notice through a variety of media, including through email notice, satisfy the requirements of Federal Rule of Civil Procedure 23. *See Kelly v. Phiten USA Inc.*, 277 F.R.D. 564, 569-70 (S.D. Iowa 2011) (approving class notice where notice was sent through email relying on defendant's records of class members' email addresses and constructive notice was provided by publication in two newspapers and on defendant's Facebook page); *Browning v. Yahoo! Inc.*, No. C04-01463 HRL  2007 WL 4105971, at *4-7 (N.D. Cal. Nov. 16, 2007) (finding that notice program for settlement was "best practicable under the circumstances" under Rule 23(c)(2)(B) and satisfied due process  where email notice was provided  for Class members whose email addresses were known; mailed notice was provided for class members whose email addresses were unknown or where email notice was returned as undeliverable a website was established; and there was  a one-time publication in a newspaper).

ii.  Email Notice Satisfies Constitutional Due Process Requirements

The email notice provided to more than 90% of the Class members in this lawsuit was the best practicable notice and was reasonably calculated to apprise them of their rights.  Courts consistently approve notice programs where notice is provided primarily through email because email is an inexpensive and appropriate means of delivering notice to class members. *Stuven v. Texas De Brazil (Tampa) Corp.*, No. 8:12–CV–1283–T–24TGW, 2013 WL 610651, at *6 (M.D. Fla. Feb. 19, 2013) (declining to "impose a presumption that notice by mail is the preferred method of providing notice" and approving notice by email because "the better course is to determine what constitutes fair and proper notice based on the facts of each case."); *Kelly*, 277

F.R.D. at 569-70 (approving settlement class notice where notice was primarily provided by email); *see also Guy v. Casal Inst. of Nev., LLC*, 2014 WL 1899006, at *7 (D. Nev. May 12, 2014) (permitting notice in an opt-in class to be sent by email and/or U.S. Mail).  For example, the court in *Kelly* only required that direct notice be sent to the class through the class' email addresses and by Facebook notification. 277 F.R.D. at 569-70.

Furthermore, email notification is particularly appropriate where a majority of the defendant's contact and communications with class members occur electronically.  For example, in *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012), the primary delivery of notice was through email because contact with the class members was primarily through electronic means. Direct email notice in *Lane* was supplemented with constructive notice provided through notice publication in *USA Today*, the creation of an informational website, and the establishment of an informational toll-free number.  Similarly, in *In re Sony Corp. SXRD Rear Projection Telev. Mktg, Sales Practices & Prods. Liab. Litig.*, 2010 WL 1993817, at *5 (S.D.N.Y. May 19, 2010), the court approved of a notice program where notice of a settlement to a class of 350,000 individuals could be sent by either mail or email.  *See also Kelly*, 277 F.R.D. at 569 (approving email notice "sent based upon [defendant]'s customer email data"); *Cranney v. Carriage Servs., Inc.*, 2008 WL 608639, at *5 (D. Nev. Feb. 29, 2008) (permitting defendant to provide direct notice of opt-in class through email while requiring constructive notice through publication).

The Court finds that email notice to the Class members is particularly appropriate in this case because Public Storage has the email addresses for more than 90% of them and Public Storage's primary method of communication with the Class was through email.  [D.E. 398-2, at ¶¶ 2, 5].  Public Storage collected Class members' email addresses at the time they signed their leases, communicated with them through email, and had a portal where Class members could

update their email addresses.  [*Id.* at ¶¶ 3-5].  This creates a strong presumption that the email addresses were valid and operational.  That assumption was correct because only 11% of the emails were returned to the third-party email vendor as undeliverable.  [D.E. 398-1 at ¶ 6].  In other words, 89% of the emails were successfully delivered to the Class members through email. [*Id.*]  Furthermore, the third-party vendor that sent the email notice complied with the Can-Spam Act and used recognized industry-standard best practices to ensure that the email was not captured by a spam filter.  Importantly, email notice was significantly more effective than mailed notice and had a higher delivery rate; only 11% of emails were returned as undeliverable in comparison with the 24% of mailed notices that were returned as undeliverable as addressed. [*Id.*]  For those individuals whose emails were bounced back, the Claims Administrator provided them with notice through U.S. first class mail.  [*Id.* at ¶¶ 3-5].   Accordingly, email notice to the Class was the best practicable notice and complied with the Class' Constitutional Due Process rights.  *See Lane*, 696 F.3d at 818; *In re Sony Corp.*, 2010 WL 1993817, at *5; *Kelly*, 277 F.R.D. at 569; *Phelps*, 2011 WL 3298414, at *6.

Furthermore, as Mr. Ahmed testified, email notice worked as intended.  Mr. Ahmed received notice by email, printed it out, and took it to his attorney.  [D.E. 398-5, at 15-19, 22-25]. Mr. Ahmed claimed that the email was caught in his spam filter but acknowledged that based on his pre-existing relationship with Public Storage, he opened the notice because he believed it to be important.  [*Id*. at 22].  While he did not read the notice himself, he printed it out and took it to his attorney.  [*Id*. at 16-19].  Thus, the notice program worked as it was supposed to—Mr. Ahmed received notice and took steps to protect his legal rights.  *See* [*Id*. at 15-19, 22-25]. Because of the effectiveness of the notice program, the Objector acknowledged that he did not

have any complaints with the way that Public Storage customers were notified about the Proposed Settlement of the lawsuit.  [*Id.* at 12].

          iii.    <u>Mr. Ahmed's Counsel's Objections About Email Notice Are Entirely Without Merit</u>

Even though Mr. Ahmed did not have any complaints about the notice program, his counsel raises a series of objections about the email notice.  [D.E. 398-5 at 12].  Objector's Counsel's primary argument is that notice by email was not the best notice practicable and therefore violated the Class members' Due Process rights.  [D.E. 373 at 8-12].  As Objector's Counsel claims, "Notice administered *primarily* through e-mail is completely improper and, for that matter, unprecedented."   [D.E. 373 at 10] (emphasis in original).   This, however, is inaccurate.   As noted above, email notice in class actions is used regularly and has been approved in many federal courts throughout the United States.  *See Lane*, 696 F.3d at 818; *In re Sony Corp.*, 2010 WL 1993817, at *5; *Kelly*, 277 F.R.D. at 569; *Phelps*, 2011 WL 3298414, at *6; *Stuven*, 2013 WL 610651, at *6; *Guy*, 2014 WL 1899006, at *7.

Objector's Counsel also relies on the 2010 Federal Judicial Center's Checklist ("FJC Checklist"):

> If available, parties should use postal mailing addresses, which are generally more effective than e-mail in reaching class members: mail-forwarding services reach movers, and the influx of "SPAM" e-mail messages can cause valid e-mails to go unread.  If e-mail will be used – e.g., to active e-mail addresses the defendant currently uses to communicate with class members – be careful to require sophisticated design of the subject line, the sender, and the body of the message, to overcome SPAM filters and ensure readership.

[D.E. 373 at 11] (emphasis not included).  Based on the FJC Checklist, Objector's Counsel argues that the email notice failed to comply with the FJC Checklist because it "did not have a 'sophisticated design of the subject line, the sender, and the body of the message, to overcome SPAM filters and ensure readership.'"  [D.E. 373 at 11].  That, however, is also inaccurate.

First, Objector Counsel's reliance on the FJC Checklist is misplaced.  The FJC Checklist is outdated because it is more than five years old, based on flawed assumptions, and does not recognize the current trend among federal courts in approving email notice.   The FJC Checklist's preference for U.S. mail is based on the outdated belief that mail delivery is "generally more effective than email in reaching class members."  As the data here demonstrates, that assumption is no longer correct.  As the Claims Administrator noted, only 11% of the email notices sent to Class members were returned as undeliverable whereas 24% of the mailed notices were returned as undeliverable.  [D.E. 398-1 at ¶ 6]. This is not entirely unsurprising because the Class is comprised of individuals storing goods, reflecting a more transient population in general. Moreover, individuals typically use an email address for longer periods of time than a mailing address, and take them with them as they move from place to place.

Furthermore, Objector's Counsel claims that "[t]he parties failed to undertake any measures whatsoever to ensure that the e-mail notice was able to overcome SPAM filters—and as a result—as in Mr. Ahmed's situation, the notice was labeled SPAM and diverted from the inbox, or the notice dispatched went undelivered altogether."  [D.E. 373 at 11 n.23]. Objector's Counsel cites the FJC Checklist in support that the email notice failed to employ any best practices to avoid spam filters.   The Objector's Counsel's claims are unsupported and contradicted by the Claims Administrator's affidavit.  [D.E. 398-1].  The Class used a third-party vendor hired by the Claims Administrator to send out the email notice that complied with the Can-Spam Act and used industry recognized best practices to ensure that the emails were not caught in a spam filter.  [D.E. 398-1 at ¶¶ 3-5].  The email notice addressed all of the issues raised by the FJC Checklist and more: (1) the email notice was sent from specific IP pools that are used solely for legal related/Court-authorized emails; (2) the email notice contained text only

with no attachments; (3) the from email address was an actual, valid and operational email address; (4) the subject line of the email notice avoided certain spam-centric phrases and included the case caption as an accurate depiction of the subject email; and (5) the email notice contained an option for recipients to unsubscribe from future emails. [*Id.* at ¶¶ 4-5]. Thus, the email notice exceeded the FJC's checklist.

In addition, the Objector claims that if the email notice was caught in his spam filter it must have occurred to other Class members. However, as the Objector testified, he was unaware of any other Class member having the email notice caught in its spam filter. [D.E. 398-5, at 25]. The court in *Browning* addressed similar objections to email notice and held:

> The Court acknowledges evidence indicating that some number of class members may have deleted the email notice out of concern that it was an identity theft scam. However, no objector has presented evidence of how widespread this concern was throughout the class. There are tradeoffs involved in any form of notice, especially with a settlement class of this size. For approval, the notice need not have been perfect. Rather, it needed to be the 'best notice practicable under the circumstances' and directed 'in a reasonable manner to all members who would be bound.' The email notice program adopted in this case met these requirements.

2007 WL 4105971, at *8 (internal citations omitted). Here, Objector's Counsel has offered no evidence that any other Class member other than the Objector received email notice in their spam filter. Having failed to carry its burden and offer any supporting evidence, the Court rejects this argument.

Objector's Counsel argues that *Lane* actually supports its argument that email notice is inappropriate in this case even though the class in *Lane* was noticed primarily through email and posts on the defendant's Facebook page. [D.E. 373 at 10 n. 17]. Objector's Counsel claims that *Lane* is distinguishable from this case because: "(1) the defendant was Facebook; (2) Facebook is an internet based enterprise; and (3) the Facebook notification was administered to the entire

class, not just a portion of thereof." [*Id.*]  These distinctions are without merit.  While it is true that the defendant here is not Facebook, nor is it an internet based company, those facts have no bearing on whether email notice is appropriate.  As the case law makes clear, the propriety of email notice turns on the totality of the notice program and whether the defendant has valid email addresses for the class members and communicates with them through email.  *See In re Sony Corp. SXRD Rear Projection Telev. Mktg, Sales Practices & Prods. Liab. Litig.*, 2010 WL 1993817, at *5; *Kelly*, 277 F.R.D. at 569; *Stuven*, 2013 WL 610651, at *6.  Here, Public Storage has the Class' email addresses and communicates with them through email.  Furthermore, Objector's Counsel's point that the entire class in *Lane* was noticed primarily through email does not support its argument at all, but actually undermines it.  The court in *Lane* found it appropriate to rely exclusively on email notice as the primary manner to inform the class about the settlement, whereas here notice by first class U.S. mail was provided to those Class members for whom there was no email address or the email notice was returned as undeliverable.  Thus, the Due Process rights of the absent Class members were better protected here than they were in *Lane.*  Accordingly, the Court overrules this objection.

(c)    <u>Class Counsel's Attorneys' Fees Appropriately Are A Percentage of the Common Fund</u>

Mr. Ahmed's final objection to the settlement is that the attorney fees should not be based on a percentage of the common fund but on the Class' loadstar.  However, payment of attorneys' fees in that manner is contrary to the law of this Circuit.  Specifically, Mr. Ahmed argues that FDUTPA's fee shifting provision abrogates federal common fund case law, and that Class Counsel's fees should be calculated based on its lodestar, and not as a percentage of the common fund.  The Objector advances the plainly incorrect notion that Florida law trumps federal law.

- 44 -

It is true that Florida courts follow the lodestar approach in common fund class action cases. The federal courts in this circuit, however, do not, and have not at least since the Eleventh Circuit declared in *Camden I* that "[a]ttorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774; *see also Poertner v. Gillette Co.*, 618 F. App'x 624, 628 (11th Cir. 2015) (quoting *Camden I* in affirming district court's award of percentage of the common fund attorneys' fees in FDUTPA class action); *Francisco v. Numismatic Guaranty Corp. of Am.*, No. 06-61677-CIV, 2008 WL 649124, *14 (S.D. Fla. Jan. 31, 2008) (awarding percentage of the common fund attorneys' fees in case involving FDUTPA and unjust enrichment claims). This follows Supreme Court precedent. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.").

The Objector cites a few cases that he claims support his position. They do not. The Second Circuit in *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1327 (2d Cir. 1990), considered the question of whether, because the plaintiff might be able to recover its attorneys' fees under the fee shifting provision of RICO, it should *also* receive fees from a fund set up to cover attorneys' fees as part of a settlement. The court held that the plaintiff could recover its attorneys' fees from the fund even if it might also recover some of them under RICO. That is, this case stands for exactly the opposite of what Objector claims it does. Indeed, the Second Circuit notes that, "[i]n our view, fee-shifting statutes are generally *not* intended to circumscribe the operation of the equitable fund doctrine." *Id.* (emphasis added). *Horowitch v. Diamond Aircraft Indus., Inc.*, 645 F.3d 1254 (11th Cir. 2011), was not a class action, and thus the court never considered the relationship between the fee-shifting provision of FDUTPA and

its holding in *Camden I*.   It did, however, preview how that would turn out, writing that, "a statute allowing for the recovery of attorney's fees, like the FDUTPA fee-shifting provision at issue in this case, generally applies in federal court *so long as it does not conflict with a valid federal statute or rule*." *Id.* at 1259 (emphasis added).   Objector's reading of FDUTPA puts it in direct conflict with *Camden I*.   Accordingly, it does not aid the Objector and this objection is overruled.

### 2.   The Court Overrules The Objection Of Arthur Putman

The Court also overrules the objection of Mr. Putnam.   Pursuant to the Settlement Agreement, all objections were required to be filed with the Court on or before January 11, 2016. [D.E. 367-1 at ¶ 28].   Mr. Putnam filed his objection with the Court on February 24, 2016.   [D.E. 399].   Accordingly, Mr. Putnam's objection was not timely filed and is therefore denied. Mr. Putnam also filed with his objection an invoice from Public Storage which reflected that he did not purchase self-storage insurance while renting from Public Storage.   [*Id.* at 3].   Accordingly, Mr. Putnam does not have standing to object to the Settlement because he is not a Class member and his objection is denied on these grounds too. Finally, Mr. Putnam's objection to the Settlement addresses Public Storage's practice of auctioning off goods left behind in storage units for non-payment of rent.   [*Id.* at 4-6]. This lawsuit did not involve those practices and his objection is denied as it is wholly unrelated to the Settlement in this lawsuit.

## IV.   CONCLUSION

In light of the foregoing, it is ORDERED AND ADJUDGED that the Court hereby:

(1)   GRANTS final approval of the Settlement;

(2)   APPROVES Class' Counsel's attorneys' fee request of 33% of the Settlement Fund or $1,650,000;

(3)   APPROVES an incentive award for Plaintiff Brian Morgan of $10,000;

(4)  APPROVES payment of Class Counsel's costs in the amount of $532,383.68;

(5)  DENIES the Objection of Mr. Ahmed; and

(6)  DENIES the Objection of Mr. Putnam.

DONE and ORDERED in chambers at Miami, Florida this ___9___ day of March, 2016.


_____

URSULA UNGARO
UNITED STATES DISTRICT JUDGE


Copies furnished to:
Counsel of record
United States Magistrate Judge Alicia M. Otazo-Reyes